# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| BUNNATINE H. GREENHOUSE | ) | |
| 11300 Stones Throw drive | ) | |
| Reston, VA 20194 | ) | |
|  | ) | |
|  Plaintiff, | ) | |
|  | ) | **JURY TRIAL DEMANDED** |
|  v. | ) | |
|  | ) | |
| FRANCIS J. HARVEY, SECRETARY | ) | |
| UNITED STATES ARMY | ) | **C.A. No. _____** |
| 101 Army Pentagon | ) | |
| Washington, DC 20310-0101 | ) | |
|  | ) | |
|  and | ) | |
|  | ) | |
| CARL A. STROCK, COMMANDER | ) | |
| U.S. ARMY CORPS OF ENGINEERS | ) | |
| 441 G Street, N.W. | ) | |
| Washington, DC 20314-1000 | ) | |
|  | ) | |
|  and | ) | |
|  | ) | |
| ROBERT GATES, | ) | |
| SECRETARY OF DEFENSE | ) | |
| 10th & Constitution Ave., N.W. | ) | |
| Washington, D.C. 20302-1000 | ) | |
|  | ) | |
|  and | ) | |
|  | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF DEFENSE | ) | |
| 9th Street and Pennsylvania Ave., N.W. | ) | |
| Washington, D.C.  20530 | ) | |
|  | ) | |
|  and | ) | |
|  | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF THE ARMY | ) | |
| Army Pentagon | ) | |
| Washington, D.C.  20310-0103 | ) | |
|  | ) | |
|  and | ) | |

|                                                    |     |
|----------------------------------------------------|-----|
| UNITED STATES ARMY CORPS                           | )   |
| OF ENGINEERS                                       | )   |
| 441 G Street, N.W.                                 | )   |
| Washington, DC 20314-1000                          | )   |
|                                                    | )   |
| and                                                | )   |
|                                                    | )   |
| UNITED STATES OF AMERICA,                          | )   |
|                                                    | )   |
| Defendants.                                        | )   |

## COMPLAINT

This complaint concerns a "mixed case" of discrimination and reprisal claims based on sex, race and age under Title VII of the Civil Rights Act of 1964 ("Title VII"), *as amended*, 42 U.S.C. §§ 2000e *et seq*., and the Whistleblower Protection Act ("WPA"), 5 U.S.C. §§ 1211-1215. 1218-1219. 1221-1222, and 5 U.S.C. §§ 7702-7703, and a claim under the Privacy Act of 1974, 5 U.S.C. § 552a, for damages.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e (including §§ 2000e-5(f)(3), 2000e-5(g), 2000e-16(c)), 29 C.F.R. §§ 1614.302(a)(1) and (d)(1)(I), 1614.407(b) and (d), pursuant to 5 U.S.C. §§ 701-706, 7701, 7702, 7703, 7720, pursuant to 29 U.S.C. § 633a, pursuant to the United States Code of Judicial Procedure, 28 U.S.C. §§ 1331 and 1343, and pursuant to the Privacy Act of 1974, as amended, 5 U.S.C. §§ 552a(g)(1)(D) and (5).

2.      Jurisdiction is proper because Plaintiff has exhausted all available administrative remedies.

3.      Venue is proper in this District pursuant to the United States Code of Judicial

Procedure, 28 U.S.C. § 1391, and pursuant to 42 U.S.C. §§ 2000e-5(f)(3) because the unlawful employment practices and other action alleged in the complaint occurred in the District of Columbia.

4.      This Court has jurisdiction over the Plaintiff's whistleblower claims pursuant to Section 7720 of title 5 of the United States Code, which governs the prosecution of "mixed case" claims, and Section 7703 of title 5 of the United States Code.

5.      Plaintiff initially elected to proceed with her "mixed case" claims before the Agency's Equal Opportunity Employment Office ("EEO Office").   All of retaliation and discrimination claims underlying her whistleblower claims consist of the exact same acts and omissions comprising Plaintiff's sex, race, and age discrimination and reprisals claims.

6.      Pursuant to 29 C.F.R. § 1614.302(a)(1), Title VII claims that directly relate to the claim brought under the WPA constitute a "mixed case" complaint.  Pursuant to 29 C.F.R. §1614.302(d)(1)(I) the district court has jurisdiction to hear Plaintiff's "mixed case" complaint.

7.      Plaintiff exhausted her administrative remedies regarding the complaint she originally filed with the Department of the Army ("DA") Equal Employment Opportunity Office ("EEOO") on October 14, 2003 that along with additional claims set forth in the first amendment to her original claim.  On May 10, 2004 the original claim and the amended additional claims were initially docketed by the Department of the Army as DA No. ARHQOSA03AUG0109.   The discriminatory conduct accepted for investigation by the DA EEOO was designated in paragraphs lettered "a" to "z" which are incorporated here by reference.

8.      On August 25, 2004 Plaintiff filed a 2nd Amendment to Plaintiff's discrimination

complaint, Docket No. ARHQOSA03AUG0109.   The basis for the original complaint and all amendments through August 25, 2004 were identified as sex (female), race (African American) and age (7/22/44).  However, a subsequent amendment, filed on October 14, 2004, expanded that basis to include discrimination and retaliation in violation of federal law, including the Federal WPA.

9.        On October 14, 2004 the Third Amendment to Docket No. ARHQOSA03AUG0109 was filed.  The Third Amendment set identified discriminatory and retaliatory action consisting of Plaintiff's planned removal from the Senior Executive Service ("SES") and her removal as the United States Army Corps of Engineer's ("USACE") Principle Assistant Responsible for Contracting ("PARC").  This Amendment constituted a "mixed case" claim as the basis for the adverse action was identified as sex (female), race (African American) and age (7/22/44) and whistleblower activity in violation of federal law, including the Federal WPA.

10.        On September 2, 2005 a Fourth Amendment to Docket No. ARHQOSA03AUG0109 was filed setting forth a "mixed case" retaliation and discrimination claim based on her race (African American), gender (female), age (DOB 7/22/44), and reprisal (prior protected EEO activity) as well as the discrimination based on protected whistleblower disclosures, including violations of federal law, including the Federal WPA, the First Amendment to the United States Constitution and the Lloyd-LaFollette Act.  The amendment identified Plaintiff's removal from the SES and from the USACE PARC position, her demotion to a GS-15 position as a Program Manager in the Engineering and Construction Division (E & C), Directorate of Civil Works.  The complaint further alleged a claim that the Secretary of the Army's refusal to docket a conflict of interest complaint violated AR 690-

600, 8-12(d)(2) and that the refusal to docket the complaint constituted adverse action.

11.     On September 26, 2005 a Fifth Amendment to Docket No. ARHQOSA03AUG0109 was filed alleging that the Department of the Army delay in processing Plaintiff's complaint constituted discrimination based on Plaintiff's protected whistleblower activity under federal law, including the Federal WPA, the First Amendment to the United States Constitution and the Lloyd-LaFollette Act, and on the basis of sex, race and age.

12.     On February 23, 2006 a Sixth Amendment to Docket No. ARHQOSA03AUG0109 was filed alleging that Plaintiff's treatment following her removal from the SES was discriminatory.  This "mixed case" claim alleged that 1) the failure to issue an appropriate position description, 2) the failure to issue performance standards, 3) the failure to assign work assignments, 4) the exclusion and isolation of Plaintiff from management meetings, and 5) the failure to return Plaintiff to her career field constituted unlawful discrimination.

13.     On March 1, 2006 a Seventh Amendment to Docket No. ARHQOSA03AUG0109 was filed.  In this amendment Plaintiff set forth a "mixed case" claim (based on violations of federal law, including the federal WPA, the First Amendment, and the Lloyd-LaFollette Act, and on the basis of sex (female), race (African American) and age (61 DOB 07/22/44) and retaliation for having engaged in prior EEO activity under Title VII.).  In this complaint Plaintiff alleged that the selection and placement of Ms. Sandra R. Riley to head the USACE as its Director of Contracting was discriminatory.

14.     On May 11, 2006 an Eighth Amendment to Docket No. ARHQOSA03AUG0109 was filed. In this amendment Plaintiff set forth a "mixed case" claim (based on violations of

federal law, including the Federal WPA, the First Amendment to the United States

Constitution and the Lloyd-LaFollette Act, and on the basis of sex (female), race (African

American), age (61, DOB 07/22/44), and retaliation for having engaged in prior EEO activity

under Title VII.  This amendment set forth the following claims: 1) that the Hon. Reginald

Brown, Assistant Secretary of the Army (Manpower and Reserve Affairs) did not approve

Plaintiff's removal from the SES or as the USACE PARC thereby rendering Plaintiff's

removal illegal; 2) the submission of false and misleading "analysis" under the signature of

General Strock to the Secretary of the Army was improperly used to justify Plaintiff's

removal from the SES and as the USACE PARC; 3) the refusal to act upon or accept

Plaintiff's request for reassignment in response to an announcement issued on behalf of

Assistant Secretary Claude Bolton that was subsequently filled with a less qualified applicant

was discriminatory.

## **PARTIES**

15.      Plaintiff, Ms. Bunnatine Greenhouse, is a citizen of the United States and a

resident of the state of Virginia. At all relevant times to this action Plaintiff was and is

employed by the United States Army Corps of Engineers ("USACE"), stationed at USACE

Headquarters, which is located at 441 G Street, N.W., Washington, D.C., 20314-1000.

16.      Defendant Francis J. Harvey is the Secretary of the United States Army who is

being sued in his official capacity and in his capacity under 42 U.S.C. § 2000e-16(c).

17.      Defendant Claude Bolton is an Assistant Secretary of the United States Army who

is being sued in his official capacity and in his capacity under 42 U.S.C. § 2000e-16(c).

18.      Defendant Carl A. Strock is the commanding general of the United States Army

Corps ("USACE") , as well as the USACE Chief of Engineers and Head of Contracting

Activity ("HCA"), who is being sued in his official capacity and in his capacity under 42 U.S.C. § 2000e-16(c).

19.     Defendant Robert Gates is the Secretary of Defense who is being sued in his official capacity and in his capacity under 42 U.S.C. § 2000e-16(c).

20.     Defendant United States Department of Defense is an Agency of the United States Government and is an executive agency within the meaning of 42 U.S.C. § 2000e-16(a).

21.     The United States Department of the Army is an Agency of the United States Government and is an executive agency within the meaning of 42 U.S.C. § 2000e-16(a).

22.     The United State Army Corps of Engineers ("USACE") is headquartered in Washington, D.C. The USACE is an executive agency within the meaning of 42 U.S.C. § 2000e-16(a).

23.     Defendant United States of America is a proper party in this action, and Defendant's address is c/o U.S. Attorney General, 10th St. and Constitution Ave., N.W., Washington, D.C.  20530.

## FACTS

24.     In the United States Army Corps of Engineers ("USACE" or "Corps") a hostile work environment for female and minority employees exists.

25.     Federal and military accusation regulations govern contracting activity undertaken by the Corps.

26.     Pursuant to acquisition regulations, the Office of Secretary of Defense ("OSD") must designate a Head of Contracting Activity ("HCA") for the USACE.

27.     The OSD designated the Commanding General ("CG") of the USACE to function as the Corp's HCA.

28.    Pursuant to acquisition regulations, the HCA must designate a single Principle Assistant Responsible for Contracting ("PARC") who must head the Corp's contracting organizational element.  In this regard Army Federal Acquisition Regulation Supplement ("AFARS") specifically specifies that the PARC must be "the senior staff official of the contracting function".

29.    Pursuant to acquisition regulations, the USACE PARC must directly report to the USACE HCA.

30.    A vacancy in the USACE's PARC position occurred in 1997.

31.    The CG of the USACE at that time was Lieutenant General ("LTG") Joe Ballard. LTG Ballard oversaw a  two level competitive selection process, the first level composed of a panel of Military General Officers and members of the Senior Executive Service (SES) and the second Level composed of the CG  (LTG Ballard) and the Director, Human Resources (SES).  With respect to the first level, Plaintiff emerged as one of three candidates.  During the second level Plaintiff was determined to be qualified person based on her education, training, experience and leadership skills, and she was selected for that position.

32.    Plaintiff was sworn into office as the USACE's PARC on June 9, 1997.

33.    Plaintiff was the first black and the first female head of contracting (PARC) within the USACE.

34.    Plaintiff designation as the head of contracting element and Senior Procurement Executive for the Agency placed her into the Senior Executive Service ("SES").  Plaintiff became the Corp's first black female senior executive.

35.    Plaintiff's SES level placed her as the civilian equivalent to a Brigadier General.

36.    Pursuant to the Competition in Contracting Act of 1984, the USACE must

establish a "competition advocate." The competition advocate is responsible for ensuring that all impediments to competition are removed from the contracting process and ensuring fair and open competition occurs with respect to government contracting activity, as a statutory preference; and challenging requirements that hampered effective competition.

37.     Plaintiff was designated as the competition advocate for all contracting activity, over $10 Million reviewed and approved at the USACE Headquarters. While serving as PARC, Plaintiff was the sole competition advocate at USACE Headquarters.

38.     The USACE's command structure is dominated by white males. With the exception of the HCA, the remainder of the command structure is outside the lineage of contracting authority.

39.     As a black female in a position of significant authority, Plaintiff encountered hostility and discrimination based on her race and sex. The hostility Plaintiff encountered based on her race and sex was known to many within the USACE, including the USACE's CG who initially hired Plaintiff, LTG Joe Ballard.

40.     The hostility aimed at Plaintiff was witnessed by others within the USACE, including other USACE employees Christy Watts, and Sheila Bloom.

41.     Once installed as the USACE PARC, Plaintiff received specific instruction from CG Ballard to take aggressive action to terminate the casual and clubby contracting practices that were routinely occurring within the USACE.

42.     In an effort to curb the casual and clubby contracting practice Plaintiff required Commanders in the field to strictly follow Federal Acquisition Regulations.

43.     As PARC and Procurement Executive for the USACE, Plaintiff held a position of power which permitted her to require commanders to follow Plaintiff's direction of strict

adherence to contracting requirements, to abide by Federal Contracting Law, and to end preferential treatment of favored contractors.

44.      As PARC, Plaintiff held a position of power which permitted her to require commanders to follow Plaintiff's direction of strict adherence to contracting requirements.

45.      The Commanders, prior to the late 1980's enactment of the Defense Acquisition Workforce Improvement Act (DAWIA), were the Contracting Officers in the USACE, with final authority to obligate the Government in Contracting; but with the enactment of DAWIA, Commanders no longer had contracting authority.  As a stopgap to override the tenets of the Law (DAWIA), the Corps established for its Commanders DAWIA Acquisition Letters, where commanders assumed informal acquisition authority, with the Contracting Officers serving merely as "administrative clerks" in the contracting process and not independent decision makers or business advisors in the business of contracting.  As a result of the removal of the improprieties in the contracting process and the revolution in Contracting entrenched by the new PARC and Procurement Executive, the USACE commanders were upset that a black woman altered their established ways of conducting contracting business.

46.      Commanders reacted negatively to the fact that a black woman had the power to compel them to strictly adhere to contracting requirements.

47.      Eventually, LTG Flowers upon obtaining Command of the USACE, enacted a policy that no SES could tell a Commander "No" about any action that they wanted to do, regardless of the judgment of the executive.  This was accomplished in part by permitting Commanders, by using a "Just Do It Card" issued by the CG, to affect the conduct of contracting because the signed "Just Do It Card" by LTG Flowers allowed individuals outside the contracting lineage of authority to interfere in the contracting process without having to

10

seek the advice from individuals that were statutorily and regulatorily responsible and accountable for contracting actions.

48.     As a result of Plaintiff's sex and race she encountered continuous and recurrent hostility in the work place.

49.     As a member of the SES, Plaintiff was to receive a Senior System Civilian Evaluation Report that was to be prepared by a "rater" and a "senior rater." Whoever held the position of Deputy Commanding General ("DCG") within the USACE functioned as Plaintiff's "rater" and whoever held the position of Commanding General ("CG") within the Corps functioned as Plaintiff's "senior rater."

50.     Between 1997 and 2000, Plaintiff excelled in the performance of her professional duties. CG Ballard considered her performance to be outstanding and advised Plaintiff throughout his tenure that her performance as PARC was outstanding and that she was among the most professional members of the SES under his command.

51.     CG Ballard observed and stated in Plaintiff's February 2000 performance review that that Plaintiff was committed to having the best contracting organization in DoD; that she was a "leader in her field"; that she was "Customer focused" and a "problem solver"; and that she had "unlimited potential."

52.     In 2000 LTG Ballard retired and was replaced by LTG Robert Flowers as CG of the USACE and as its HCA.

53.     LTG Flowers functioned as the USACE's CG and HCA between October 23, 2002 and July 1, 2004.

54.     Under CG Flowers' leadership, USACE General Counsel Robert Anderson, DCG Hans van Winkle and his replacement, DCG Robert Griffin, exhibited hostility and otherwise

11

discriminated against Plaintiff based on her sex and race.

55.     Under CG Flowers' leadership, USACE General Counsel Anderson, DCG Hans van Winkle and his replacement, DCG Robert Griffin, exhibited hostility and otherwise discriminated against Plaintiff based on Plaintiff engaging in protected whistleblower activity.

56.     Commanders assumed that Plaintiff would leave the USACE when CG Ballard, a black male, retired.

57.     Elements within the USACE command desired to return to an atmosphere where the white male command structure was in control of contracting as before Plaintiff was installed as PARC.

58.     With the retirement of CG Ballard, elements within the USACE command structure were emboldened to increased hostilities towards Plaintiff's policy of strict adherence to contracting requirements.

59.     One example of the resentment to the strict adherence to contracting requirements was Plaintiff's insistence that Commanders downsize the scope of a contract thereby interfering with the ability of the commander to ensure the award of a contract to the contractor of their choice.  The downsizing of these contracts worked to increase competition thereby allowing minority and women-owned and other small contracting firms to effectively compete and obtain contracts the commanders wanted to award to larger contracting entities.

60.     The hostility and discriminatory treatment of Plaintiff was exhibited by her exclusion from meetings, instituting an Acquisition Advisory Board, wherein the Deputy Chief of the PARC Office for the PARC was placed on that Board with final decisions on Contracting Strategy and issues were made by the DCG serving on the Board when the DCG was outside the lineage of Contracting Authority.

12

61.     Hostility was further exhibited by recurrent derogatory comments.

62.     For example, USACE General Counsel, Robert Anderson, routinely belittled Plaintiff during staff meetings held with Plaintiff's peers and by routinely diverting Contracting Actions that were clearly not within his purview and responsibility to be done by his staff in order to circumvent the authority of the Procurement Executive of the Command. Instead, the General Counsel's authority within the procurement and contracting process was limited to a determination of legal sufficiency of the documents and was not as opposed as a substitute for the decision-making procurement strategy and the authorities that were vested in the PARC and Procurement Executive of the Agency.

63.     Another example of the hostile treatment aimed at Plaintiff included others taking credit during meetings for work accomplished by Plaintiff.

64.     Eventually, interference by commanders in the field became so overt that they were willing to issue instructions to contracting officers under their control that they could not contact Plaintiff for guidance on contract action contrary to the wishes of the district command.

65.     Another example of interference by commanders concerned attempts to obtain contracting warrants.  For example, in one memo to a district commander states:  "we actually had a pretty good workable solution until our [contracting officer] got involved" and that the command was "bothered by the command issues here.  Commanders command, and the staff officers make recommendations to Commanders.  We have a couple of staff officers [Plaintiff and the district chief of contracting, Christy Watts] making decisions for the commanders." In a separate memo the district command voiced its opinion that Plaintiff "should not have this much control and (power?)" over contracting related matters.

66.      DCG Van Winkle discriminated against Plaintiff by intentionally keeping Plaintiff out of the "1700 huddle meetings" DCG Van Winkle held each day with his key staff regarding Contracting and other decisions in the launching of the Iraq War.  In so doing, DCG Van Winkle discriminated against Plaintiff on more than one occasion by calling Plaintiff into an assembled 1700 huddle meeting and then would summarily dismiss Plaintiff from these meetings in front of his key staff, after the Plaintiff answered a specific question.

67.      On March 6, 2002, Plaintiff engaged in protected activity by hand-delivering to USACE CG Flowers a letter dated March 5, 2002 wherein Plaintiff voiced concern over improper interference with the exercise of her official duties as the PARC, including interference with the proper review and execution of contracting documents.

68.      LTG Flowers failed to provide Plaintiff with a response to her March 5, 2002 letter after having promised to do so.

69.      On April 1, 2002 LTG Flowers issued a memorandum to Plaintiff stating that he was "truly impressed" by plaintiff's "skills in communicating our message" and with Plaintiff's "commitment" and "outstanding support."

70.      In late 2002 Earnestine (Tina) Ballard, who as a GS-15 held the temporary detail (Acting, Deputy Assistant Secretary of the Army, Procurement and Policy), was promoted to the high-level SES position (Civilian Protocol of a LTG), as Deputy Assistant Secretary of the Army (Procurement and Policy) on November 12, 2002.

71.      Ms. Ballard was not the most qualified individual for the position.  Prior to Ms. Ballard's tenure in the temporary Acting position, the Plaintiff had been invited by Mr. Bolton for an "office call" and prior to discussions with Mr. Bolton, his Executive Officer having explained to Plaintiff that the visit was related to the potential to offer Plaintiff a directed

14

reassignment to the Deputy Assistant Secretary of the Army (Procurement and Policy)

position (DASA (P&P).

72.     When the Corps became aware of the intent of Mr. Bolton to reassign the Plaintiff

to head HQDA Procurement, a campaign to derail that action commenced.  As a result, even

though the Plaintiff had worked as a GS-15 in the office of the Deputy Assistant Secretary of

the Army (Procurement) prior to her appointment as the USACE PARC, and although

Plaintiff had applied for the position and was determined the best qualified for the position by

the Personnelist, the Plaintiff was excluded from the selection panel.

73.     Ms. Ballard lacked broad-based contracting experience when she was selected as

Deputy Assistant Secretary of the Army (Procurement and Policy) and received waivers for

some of the requirements of the Defense Acquisition Workforce Improvement Act (DAWIA)

to be appointed to the position.

74.     Soon after obtaining this position Deputy Assistant Secretary Ballard was

confronted with contracting responsibilities related to the commencement of the Iraq War.

75.     The USACE was designated as the HQDA's executive agent for the award of a

five year no-compete $7 billion contract to Halliburton subsidiary Kellogg Brown & Root

("KBR") known as "Restore Iraqi Oil" ("RIO").

76.     Many meetings were held between HQDA, OSD and USACE personnel on the

strategy for the RIO contract, without including the PARC and Procurement Executive

responsible for Contracting for the USACE.  Prior to any knowledge of or involvement by

Plaintiff, representatives from the OSD, HQDA and USACE made the decision that the RIO

contract would be a sole-source, no-compete contract to KBR, and a draft Justification and

Approval ("J&A") for the non-competitive acquisition was already in place before the PARC

was made aware of the contractual requirement for the USACE.

77.     The initial intent of the RIO Contract extended the scope of work beyond the restoration of the Iraqi Oil fields, to specifically include the production, marketing and distribution of products once the oil fields were returned to operation.

78.     Essentially, under the contract OSD and DA sought to award KBR in a no-compete environment would have provided KBR with a five year monopoly on the restoration, pumping and distribution of Iraqi oil, which in Plaintiff's eyes represented waste, fraud and abuse.

79.     Deputy Assistant Secretary Ballard was responsible and committed within the DA to ensure the successful conclusion of the RIO contract evolved as initially envisioned by OSD and the DA, ignoring the caution that the Plaintiff had placed above her signature on the J&A that went forward to HQDA for final review by Deputy Assistant Secretary Ballard and final approval and signature by Mr. Bolton.

80.     Deputy Assistant Secretary Ballard knew that Plaintiff was far more qualified and knowledgeable of contracting matters and that she would carefully scrutinize the RIO Contract for deficiencies.

81.     The USACE was designated as the executive agency for the execution of contracts related to the restoration of Iraqi oil.  Plaintiff, as the Corp's principle individual responsible for contracting, should have been involved at the point in time when initial planning for the USACE's involvement with contracts related to the invasion of Iraq commenced.

82.     Federal acquisition regulations require that before a no-compete contract can be awarded under certain circumstances, the federal government must prepare a J&A document

setting forth the specific factual and legal basis justifying the exception to competition and a non-competitive contract award.

83.    Where the no-compete contract exceeds $10 million, the J&A must be submitted to the USACE's PARC for review and recommendation for approval and under the Plaintiff's authority as the agency's Competition Advocate.  Because the RIO Contract was valued at $7 billion, Plaintiff's review and recommendation for approval as the PARC and as the competition advocate for the USACE meant that Plaintiff could not be completely shut out of the process.

84.    Plaintiff's first opportunity to understand the workings and wording of the RIO contract requirements occurred when she eventually was asked to attend a video teleconference ("VTC") at the USACE Operations Center (UOC), where the attendees included along with the USACE Military Program Managers, Resource Management, General Counsel, etc., a HQDA representative and the OSD representative, to list a few of the central stakeholders.

85.    During the course of the VTC, Plaintiff learned for the first time of three contracting actions involving the Iraq War: 1) a no-bid, no-compete ($2M) contract to KBR for the preparation of a Contingency Plan for restoration of the Iraqi oil fields following an invasion; 2) a contract concerning the pre-positioning of equipment necessary to restore the Iraqi oil fields following an invasion; and 3) a huge, $ 7 Billion follow-on contract designated as Restore Iraqi Oil or "RIO Contract".

86.    During the VTC Plaintiff learned for the first time that all three contracting actions (one already awarded to KBR by the HQDA, as an out-of-scope modification of an existing Army Contract) were to be awarded exclusively on a no-bid, no-compete basis to

17

KBR.

87.    During the VTC Plaintiff learned that the completed Contingency Plan contract had been awarded to KBR under a previously awarded contract known as LOGCAP.  Plaintiff immediately voiced concern over the fact that such an award to KBR under the preexisting LOGCAP contract was illegal because the scope of the LOGCAP contract did not extend to work related to the invasion of Iraq.   The Plaintiff discussed the enormous monetary risks to the Government for such actions and that such actions, destroy the integrity of the Procurement and Contracting Process and creates economic unfairness to unsuccessful contractors during the original competition.

88.    Subsequently, the United States Government Accounting Office ("GAO") concluded that the preparation of the contingency plan under the LOGCAP contract was illegal.

89.    Before Plaintiff was brought into the process the OSD and DA and the USACE had already determined that the pre-positioning work and the RIO Contract itself would also be awarded to KBR on a no-bid, no-compete basis.

90.    Plaintiff learned that a key justification for the selection of KBR for the RIO Contract was the fact that KBR had previously prepared the contingency plan.  Plaintiff raised a concern that because a non-competitive award had already been illegally made to KBR for the development of the Contingency Plan, it would be improper and a conflict of interest to award the follow-on RIO Contract work exclusively to KBR on a no-compete basis or to KBR at all.  Plaintiff voiced concern over the fact that the procurement policy in the past was that the contracting entity used to develop an economic analysis, such as the contingency plan, was automatically excluded from follow-on procurement activity directly related to the

18

economic analysis or Contingency Plan, prepared by that contractor, and a Clause would be placed in the contract for the Contingency Plan or Economic Analysis, acknowledging the follow-prohibition for work evolving out of the Contingency Plan or Economic Analysis.

91.     During the VTC Plaintiff further learned that the Army was anticipating awarding the pre-positioning scope of work to proceed under the LOGCAP Contract.

92.      Plaintiff raised a concern that the award of the pre-positioning contract under LOGCAP was improper because the USACE had already been designated as the executive agent for the restoration of the Iraqi oil fields whereas the LOGCAP contract was under the auspices of Army Material Command ("AMC").  Furthermore, the Plaintiff explained that the pre-positioning requirement was a new procurement and the only legal way for it to be effected would be as a new procurement and under compelling emergency conditions, would be through a Letter Contract, and if there was a valid justification for a sole source, the Justification and Approval (J&A) would be submitted after the fact of the Letter Contract, but the Letter Contract must be definitized within 180 days.

93.     Plaintiff voiced concern that the Pre-Positioning of Equipment contract could not lawfully be awarded to KBR under LOGCAP because the pre-positioning tasks fell outside of scope of work covered by the LOGCAP Contract and that permitting KBR to go forward with the pre-positioning scope of work under LOGCAP would be illegal and destroy the integrity of the original LOGCAP procurement process.

94.     Plaintiff staunchly stated that contracting regulations required that the USACE prepare a separate letter-contract and a separate J&A before the pre-positioning work could be contracted to KBR.

95.     Plaintiff was led to believe that her concerns would be addressed with respect to

the pre-positioning work such that a separate letter-contract and J&A would be prepared by the USACE.  However, upon questioning USACE personnel at a later time as to why a J&A for the pre-positioning work had not come to her for approval, she was informed that the pre-positioning work was ultimately awarded as a modification under the LOGCAP contract illegally.

96.        At the commencement of the VTC a draft J&A had already been prepared for awarding the RIO Contract to KBR on a sole source, no-compete basis.

97.        Plaintiff was shocked by the fact that all concerned intended to award, as set forth in the draft J&A for the RIO Contract, a no-bid, sole source contract to KBR for a fixed term of five years that would cover not only the restoration of the Iraqi oil fields, but explicitly extend to the to the subsequent marketing and distribution of oil product.  Under the proposed contract presented to Plaintiff KBR would have the monopoly on the rebuilding of the Iraqi oil infrastructure as well as the operation of the Iraqi oil fields and the delivery and marketing of oil products.

98.        Plaintiff explained to the group, including the Contracting, Legal and Project Management Team at the Southwestern Division of the Corps, who was responsible for soliciting and awarding the Contract that it would take congressional legislation for the Corps to be able to perform marketing and distribution functions for oil; that a statement of non-availability would be needed from Defense Fuel or other Defense agencies who had mission responsibility for the product oil and all of the processes for its utilization.

99.        Plaintiff was shocked at the intended scope, duration, and exclusion of other potential contractors contemplated by the RIO contract that were presented to Plaintiff for the first time during the VTC.

100.       Plaintiff raised a concern over the scope and duration of the RIO Contract.

101.       Plaintiff asserted that the scope of work then contemplated under RIO effort exceeded the core capabilities of the U.S. Army Corps of Engineers.  Plaintiff repeatedly explained that the Corps did not have the legal authority to engage in the marketing or distribution of oil rendering the proposed scope of the contract improper.  Plaintiff profoundly explained that the marketing and distribution of oil were the responsibility of the Defense Fuel Agency and that it would take an Act of Congress to provide the Corps with the authority necessary to contract for the production and distribution of oil.

102.       In response to Plaintiff's vigorous objection to extending the scope of the RIO Contract to production and distribution, the J&A presented to Plaintiff initially was changed. Reference to marketing and distribution of product was specifically deleted from the J&A and Plaintiff's approval was thereby conditioned on the explicit understanding that the no-compete RIO Contract that was about to be awarded to KBR did not extend to marketing and distribution.

103.       Plaintiff further raised concerns during the course of the VTC that all of the justifications presented in the J&A to the RIO Contract were questionable, deficient and could not be validated because they did not rely on any unique attributes that KBR alone possessed. Instead the attributes were government-imposed or government-created.  For example, a key justification for awarding the RIO contract was knowledge of the Contingency Plan. However, that requirement was purely government-created because KBR had been hand-selected and pre-selected without the benefit of any other potential bidders knowing about the requirement.  Because no other contractor was permitted to participate in the drafting of the contingency plan, and because no other contractor knew of the existence of the contingency

plan because it had been improperly prepared under the LOGCAP Contract, the inclusion of that requirement guaranteed that KBR alone would be awarded the follow-on RIO Contract. Plaintiff complained that this course of action demonstrated the appearance of preferential treatment prohibited under Federal Contracting law.

104.    Plaintiff's stated concerns related to the RIO Contract that were identified during the VTC upset OSD and DA officials who had already agreed on the terms they felt appropriate for the award of the contract to KBR.

105.    Plaintiff attended a planning session held at the Pentagon on February 26, 2003 to discuss pre-positioning by KBR related to the Iraq invasion and cost and other issues related to the implementation of the RIO Contract.  This meeting was co-chaired by MG Strock (who at the time was USACE Director of Military Programs, and would subsequently be named CG of the Corps commencing July 1, 2004).

106.    KBR representatives were invited to attend and did attend the February 26 meeting.

107.    During the February 26 meeting and after KBR has completed their planning update on their pre-positioning activities, discussions turned to matters (budgetary projections, etc.) outside the scope of information KBR should be privy to until after the RIO Contract was awarded and finalized, which presented  KBR with potential advantage during the definitization process and a potential advantage in any follow-on competition related to the RIO effort.

108.    Plaintiff was so disturbed by KBR's continued participation after discussions turned to matters outside the scope of information KBR was privy to hear that she left her seat and whispered in MG Strock's ear that the KBR representatives had to be removed from the

22

meeting.

109.     MG Strock was forced to dismiss the KBR representatives from the meeting.

110.     Based on Plaintiff's observations she concluded that the line between government officials and KBR had become so blurred that it gave rise to an appearance of a conflict of interest in violation of FAR §3.101-1.     Plaintiff was disturbed by the fact that no one else in the room seemed to care as that conduct further fueled Plaintiff's impression that the contracting process was compromised.

111.     Following KBR's exclusion from the meeting, Plaintiff observed that the five (5) year base contract term still remained and she strenuously voiced objection to the granting of a five (5) year contract term based on the "compelling emergency" justification.  Plaintiff raised her concern with representative of the OSD, DA and USACE.

112.     Plaintiff explained that there was no basis to conclude that the emergency conditions would exist a year or even six months after the invasion and that if emergency conditions persisted the duration of the contract that would require continuation of the services of KBR, as the incumbent, the contract could be extended by the stroke of a pen from Washington and would be totally transparent to the prosecution of the war.  Plaintiff explained that the contract was being characterized as a "bridge to competition" and that the inclusion of anything more than a one year term would call that characterization into question and would otherwise represent a deficiency in business acumen, would not be in the best interest of the government, would not ensure best value for the government; and would not be fair to other potential bidders.

113.     Plaintiff left the meeting insisting that the RIO Contract duration be limited to a single year.

114.    The final version of the RIO J&A was presented to Ms. Greenhouse for signature on February 27, 2003.  The final version provided for a two year base period with three one year extensions.

115.    Plaintiff was shocked that the duration of the RIO Contract had not been changed to a single year.  Plaintiff specifically inquired as to who made the decision to keep the five year term (modified to two base years with three one year options) in the contract and was told that this decision was made by MG Strock that the duration of the contract with options had to be five years.

116.    Plaintiff could not sign off on the contract as presented.  However, the prosecution of the war prevented Plaintiff from further questioning the contract as the duration had already been insisted upon by representatives from the OSD and the DA. Instead, Plaintiff took the only remaining option available to her.  She penned a comment directly onto the original copy of the J&A indicating her objection to the duration of the contract.  Below her signature Plaintiff hand-wrote:  "I caution that extending this sole source effort beyond a one year period could convey an invalid perception that there is not strong intent for a limited competition."

117.    The penning of this comment placed scrutiny on the action being forced upon Plaintiff and was a contributing factor to forcing the USACE, the HQDA and OSD to abandon the intent to not revisit the contract for the entire five year duration.

118.    Plaintiff's protected activity interfered with the intended scope of the RIO contract to include marketing and distribution of oil, as well as the intended fixed five (5) year term duration.  The waste, fraud and abuse posed by the five year duration and excessive scope of the contract would not have been partially corrected but for Plaintiff's actions.

24

119.     Elements within the DA and the USACE were upset by Plaintiff's objections to the scope and duration of the non-compete contract awarded to KBR.

120.     Plaintiff was discriminated against by her exclusion from meetings leading to the initial decision on the scope of work and selection process for the award of the RIO Contract.

121.     Deputy Assistant Secretary Ballard and representatives from the USACE and DA, including General Robert Griffin, conspired to keep Plaintiff in the dark as to contracting matters related to RIO.

122.     Deputy Assistant Secretary Ballard was so upset with Plaintiff's protected activities related to the award of the RIO Contract that she thereafter refused to communicate with Plaintiff and circumvented Plaintiff's authority by exclusively communicating with USACE General Robert Griffin on contracting matters she knew were not part of General Griffin's responsibilities and for which he did not have the statutory authority or required expertise to undertake.

123.     Deputy Assistant Secretary Ballard together with General Griffin intentionally usurped the responsibilities of the USACE PARC.

124.     The USACE did not timely disclose the existence of the RIO contract to Congress or the public.  However, consistent with Plaintiff's forced change to the scope of the RIO Contract, the initial public disclosures indicated that the RIO contract would be limited to putting out oil fires and repairing the broken oil well infrastructure.

125.     On April 10, 2003 the USACE received congressional correspondence from Rep. Henry Waxman concerning the RIO Contract.

126.     Plaintiff, as the chief procurement officer of the USACE, should have had the lead responsibility for drafting and reviewing congressional correspondence related to the

25

RIO Contract, specifically the April 10, 2003 letter from Rep. Waxman.

127.      Without Plaintiff's knowledge or consent, the responsibility for responding to congressional correspondence related to the RIO Contract was placed with the USACE's Directorate of Military Programs which was at that time under the direction of MG Strock.

128.      On May 2, 2003 CG Flowers responded to the congressional correspondence received from Rep. Waxman.  Although the scope of the RIO contract was specifically altered by Plaintiff to exclude the production and distribution of product, the response submitted by CG Flowers falsely asserted that the intended scope of the RIO contract included production and distribution of product.  This assertion contradicted the explicit basis for the approval of the J&A for the RIO Contract by Plaintiff in her capacity as the USACE PARC and Competition Advocate.

129.      The USACE intentionally misled Congressman Waxman as to the true intended legal scope of the Rio Contract as approved by the Plaintiff as the PARC and Competition Advocate.

130.      Plaintiff was intentionally excluded from responding to correspondence from Congressman Waxman as a result of her prior protected activity so that the USACE could submit false and misleading information in response to Congressman Waxman's inquiry as to the true scope of the RIO Contract.

131.      To the extent the scope of the RIO Contract was eventually extended to include production and distribution of product that action was improper and illegal as a result of the intentional failure to seek the approval of Plaintiff as the USACE PARC and Competition Advocate.

132.      On 02 April 2003 LTG Flowers issued a memorandum for Assistant Secretary of

the Army (Acquisition, Logistics and Technology), Claude M. Bolton, Jr., setting forth false

assertions concerning Plaintiff's character and performance and otherwise seeking to remove

Plaintiff from her position as USACE PARC and from the SES.  LTG Flowers based the

proposed removal on a level 5 performance review rating.

133.    The drastic change in rating covering Plaintiff's 10/2001 to 9/2002 rating period

did not reflect Plaintiff's actual performance.  Instead, this downgraded performance review

was retaliatory and discriminatory.

134.    On March 7, 2003 the USACE DCG Van Winkle further retaliated against

Plaintiff by taking personnel action against Plaintiff based on a deficient DA Inspector

General ("IG") report.  DCG Van Winkle took this action in violation of Army regulation

("AR") 21-1, which prohibited DCG Van Winkle from relying on the deficient DA IG Report

as the sole basis for initiating disciplinary action against Plaintiff.

135.    DCG Van Winkle further discriminated against Plaintiff by initiating more than

one EIG "sensing sessions" aimed at discrediting Plaintiff.

136.    On 18 April 2003 Plaintiff engaged in protected activity by delivering to Hon.

Reginald J. Brown, Assistant Secretary of the Army (Manpower and Reserve Affairs), a letter

setting forth concerns Plaintiff had alleging improper conduct on the part of the USACE

Command in the evaluation of Plaintiff's performance.

137.    On 30 May 2003 Assistant Secretary Bolton issued a memorandum to Assistant

Secretary Brown recommending that he deny LTG Flower's request to remove Plaintiff from

the SES and as USACE PARC based on failing performance.

138.    June 6, 2006 was DCG Van Winkle's last official day in office.  On that day DCG

Van Winkle violated Army Regulations by utilizing an Army OIG report as the sole basis for

issuing Plaintiff a proposed thirty day suspension.  DCG Van Winkle knew or should have

known that the conclusions of the Army OIG were inaccurate and could not support the

charge.  DCG Van Winkle violated Army Regulations and issued the charge with the intent to

harass and further exacerbate the hostile environment Plaintiff was forced to endure.

139.    MG Van Winkle left the USACE and his replacement as USACE DCG was MG

Robert Griffin.

140.    On June 23, 2003 MG Robert Griffin became Plaintiff's rater.

141.    On 11 July 2003 Assistant Secretary Brown issued a memorandum to the DCG

Griffin denying LTG Flower's request to issue a Level 5 rating to Plaintiff and further

directing that Plaintiff's unsuccessful Level 5 rating be changed.

142.    The rating was subsequently altered by DCG Griffin to a level 4.

143.    On 24 October 2003, Plaintiff issued a memo to LTG Flowers advising that his

planned USACE 2012 reorganization would result in "Mission Failure (Noncompliance with

Congressional Lineage of Acquisition of Procurement and contracting Authority)".

144.    On December 8, 2003 DCG violated Army Regulations by intentionally releasing

to Plaintiff's subordinates a memorandum identifying the content of a confidential EIG report.

This action on the part of DCG Griffin was part of the totality of actions creating a hostile

work environment for Plaintiff.

145.    Plaintiff's annual performance review was downgraded, in part, as a result of

submitting Plaintiff's stated concerns regarding the USACE 2012 reorganization.

146.    On December 11, 2003 the Defense Contract Audit Agency ("DCAA") issued a

draft report concluding that KBR had overcharged for the purchase of fuel under the RIO

Contract by $61 million.  This finding was widely reported by the national press and proved

embarrassing to KBR.

147.    On December 19, 2003 the Commander of the USACE, LTG Flowers, took the unusual step of issuing a waiver to the RIO Contract requirement that KBR provide "cost and pricing data" to demonstrate the reasonableness of the cost of purchasing fuel under the contract. The waiver document asserted that the USACE determined that the price charged for the fuel was "fair and reasonable."

148.    As a result of this waiver KBR would receive payment for the $61 million the DCAA concluded had been overcharged by KBR under the RIO Contract.

149.    The waiver ended the firestorm of adverse national press coverage concerning the $61 million overcharging claim contained in the DCAA Audit report.

150.    The method undertaken to grant the waiver violated established cost and accounting standards and USACE procedure and was improper and illegal.

151.    Plaintiff, as the USACE PARC, was the individual authorized to review and evaluate the justification and concur on the waiver documents before the waiver could be presented to the HCA for final approval.

152.    Based on Plaintiff's prior objections to KBR contracts and her policy that waivers include a sufficient basis to justify the action taken, elements within the USACE concluded that Plaintiff would raise and document her objections to the granting of the waiver to KBR.

153.    Command elements within the USACE conspired to keep the waiver request from the USACE PARC for fear that the waiver would be rejected.

154.    Elements within the USACE Command clandestinely orchestrated to circumvent the statutory authority of the PARC by using LTC Albert Castaldo, Plaintiff's deputy office chief, as the conduit to bring the waive request to the HCA.

29

155.     Elements within the USACE Command, the Office of General Counsel and LTC Castaldo intentionally failed to notify Plaintiff that the waiver request was being processed.

156.     The preparation, transmittal and approval of the KBR waiver request was rushed to completion in a single day.  The KBR waiver request was prepared in Dallas, Texas, on December 19, 2003.  On that date the USACE's Southwest Division ("SWD") prepared and caused to be delivered the KBR waiver request to USACE headquarters located in Washington D.C.  Later that same day, in Washington, D.C., the KBR Waiver request was signed by LTC Castaldo, USACE attorney Michael Adams, and LTG Flowers.

157.     Elements within the USACE responsible for the handling of the KBR Waiver intentionally sought to ensure that Plaintiff would never learn of its existence.

158.     On December 19, 2003 Plaintiff conducted her official duties from home due to illness.  During the entire course of the work day, Plaintiff was in constant contact by phone with her administrative assistant who was faxing to Plaintiff for her review and signature.

159.     On December 19, 2003 Plaintiff was willing and able to review the KBR waiver request and would have done but for the fact that the existence of the KBR waiver request was intentionally kept from her by elements within the USACE, including LTG Flower, USACE Office of General Counsel and LTC Castaldo.

160.     Knowledge of the KBR waiver request was intentionally kept from individuals within the Office of the PARC who would have alerted Plaintiff to the fact that the request had been made.

161.     Well established procedures within the Office of the PARC were put in place so as to assure that Plaintiff would timely be notified of any action needing her immediate review.

30

162.     Pursuant to the Office of the PARC procedures, Plaintiff was to be timely notified of the KBR waiver request upon its arrival and processing by office of the PARC.

163.     Upon receipt of the waiver request by the PARC office a control number was to be assigned.  The control number is specifically assigned by Plaintiff's administrative assistant, who remained in daily contact with Plaintiff and was under instruction to immediately notify Plaintiff of any significant action no matter the time of day or time the action was received.

164.     A conspiracy by elements within the USACE was hatched to ensure that the KBR waiver request did not reach Plaintiff.

165.     The KBR Waiver request was not processed in accordance with PARC office procedures in order to ensure that Plaintiff was never told of the existence of the request.

166.     The KBR waiver request was intentionally not assigned a control number in order to assure that it would not be brought to Plaintiff's attention.

167.     The conspiracy to exclude Plaintiff's from reviewing the KBR waiver request is evidenced by the fact that when the waiver request was prepared in the SWD on December 19, 2003 it was drafted so as to specifically eliminate Plaintiff's name from the document and replace Plaintiff's signature line with that of LTC Castaldo.

168.     The intentional insertion of LTC Castaldo's name into the KBR waiver request demonstrate a predetermined decision that Plaintiff would not be permitted to review or approve the waiver.

169.     At the time LTC Castaldo's name was placed into the KBR Waiver request documentation it was well known to all of the conspirators that LTC Castaldo was not authorized to exercise the authority of the PARC nor authorized to sign the waiver request on

31

behalf of the PARC.

170.     Knowing that the PARC had neither reviewed nor approved the KBR Waiver request, the document was immediately presented to the HCA for signature.

171.     LTC Flowers, as HCA, signed the KBR waiver knowing that the document was never presented to the USACE PARC for review.

172.     The knowing exclusion of the PARC violated controlling Army regulations specifying that the PARC was to be the senior executive to review the waiver request before it would be submitted to the HCA for final approval.

173.     Providing a waiver is a discretionary act undertaken by the government with no specific time constraint imposed on the completion of the requested action.

174.     Plaintiff did not learn of the existence of the waiver until she happened to read about the waiver in national press reports.

175.     Plaintiff, in fact, would not have signed off on the waiver because the documentation relied upon to justify the waiver did not provide her with a sufficient basis to allow her to conclude that the fuel charges were fair and reasonable.

176.     Elements within the USACE Command, the USACE Office of General Counsel and LTC Castaldo knowingly and intentionally kept Plaintiff in the dark about the need to conduct an independent review of the second RIO Contract.

177.     Prior to LTG Strock appearing before Congress the USACE sought to prepare him for questioning regarding the KBR Waiver under the RIO Contract.  At that time Plaintiff alerted LTG Strock and other high level USACE employees that the USACE's response to the KBR Waiver request was, in fact, improper and was not justified in accordance with federal regulations.

178.    On January 14, 2004, the USACE DCG Griffin, who is not within the lineage of authority over contracting, improperly exerted control over the contracting responsibilities of the PARC in order to conduct an "independent review" of the second RIO Contract.

179.    MG Griffin went behind the back of the PARC and utilized LTC Castaldo to prepare an "Independent Review" of the contract selection process that resulted in selecting KBR as the major contractor.

180.    The independent review of the second RIO contract was orchestrated without any input from the PARC with the intent to keep the PARC in the dark about issues related to KBR.

181.    Plaintiff engaged in protected activity by delivering a letter dated February 12, 2004 to the Hon. Reginald J. Brown, Assistant Secretary of the Army (Manpower and Reserve Affairs) wherein Plaintiff outlined a continuing pattern of improper attempts to derail Plaintiff's career and remove her from contracting responsibilities.  Therein Plaintiff specifically raised, *inter alia*, that Department of the Army Inspector General ("DAIG") investigations were being improperly used by the USACE Command.

182.    In the February 12, 2004 letter Plaintiff specifically requested that she be considered for reassignment out of the Corps and requested to be advised whether regulations permitted a directed reassignment.

183.    Plaintiff did not receive any reply to her February 12, 2004 letter.

184.    DCG Griffin intended from the outset to present Plaintiff with a failing performance review in order to remove her from the SES and as USACE PARC.

185.    DCG Griffin failed to comply with Army Regulations related to the performance appraisal process and did so with the intent to improperly provide Plaintiff with a failing

33

performance appraisal and thereby remove Plaintiff from the SES and as the USACE PARC. For example, DCG Griffin designated arbitrary and capricious metrics to assess Plaintiff's timely completion of contracting actions.  DCG Griffin prepared this metrics without any input from Plaintiff in violation of Army Regulations and without knowing the procedure in place to track contracting actions to ensure timely completion of tasks by the Office of the PARC and without any consideration as to whether the metric was valid.

186.     DCG Griffin accomplished his goal of issuing a failing performance review to Plaintiff.

187.     CG Flowers discriminated and retaliated against Plaintiff by issuing Plaintiff a final rating of level five (5) for the period of 10/2002 to 9/2003.

188.     On March 2, 2004 Plaintiff engaged in protected activity by issuing a letter to Assistant Secretary Bolton stating, *inter alia*, that the command structure of the USACE was intentionally undermining the procurement process.  In support of this stated concern Plaintiff advised Assistant Secretary Bolton that MG Griffin, who was not in the contracting chain of command, was exercising responsibilities and functions that should have been performed pursuant to regulation by the PARC and that highly competent contracting officers were being removed from the USACE because they had the courage to expose contract abuse.

189.     Although aware that Plaintiff had raised concerns, Secretary Bolton took no action to investigate Plaintiff's concerns and no individual on his behalf attempted to call or meet with Plaintiff in order to discuss her concerns.

190.     On March 16, 2004 CG Flowers issued a memo to Assistant Secretary Brown seeking to remove Plaintiff for unacceptable performance based on the failed performance rating for the period 10/2002 to 9/2003.

191.    On July 14, 2004 Assistant Secretary Bolton recommended that the final failed rating of Plaintiff be disapproved. Assistant Secretary Bolton determined that Plaintiff could still be removed from the SES and as USACE PARC because the issuance of two level 4 ratings within a three year period would require Plaintiff's removal from the SES pursuant to Office of Personnel Management regulations. Assistant Secretary Bolton concluded that: "Accordingly, based on my belief that the evidence is insufficient to support an Unsuccessful (Level 5) rating, I recommended that you disapprove LTG Flowers' intent to assign Ms. Greenhouse an Unsuccessful rating. Assuming that LTG Flowers will replace the Unsuccessful rating with a Fair rating, I recommend that LTG Flowers proceed with Ms. Greenhouse's proposed removal from the SES because of the two less than fully successful ratings within the past three years."

192.    Assistant Secretary Brown did not approve of the recommendation that a level 4 rating be issued to Plaintiff and he did not approve her removal from the SES and never communicated approval of LTG Flower's decision to remove Plaintiff from the SES or as USACE PARC.

193.    Commencing July 1, 2004 LTG Carl Strock became the HCA and CG of the USACE.

194.    Upon taking command, LTG Strock stated he would take action to remove Plaintiff from the SES and as USACE PARC. LTG Strock made his intentions known to others at the time he took command.

195.    On October 1, 2004 Plaintiff engaged in protected activity by presenting during an in-briefing held with CG Strock a written request that the HCA halt the interference by others into PARC functions.

35

196.     Approval for the removal of Plaintiff from the SES and as the USACE PARC was not forthcoming from Assistant Secretary Brown.  Nonetheless, CG Strock issued a memorandum dated October 5, 2004, subject: Notice of Removal from the Senior Executive Service.

197.     Plaintiff had previously been advised by a member of Assistant Secretary Brown's staff that procedurally, she would not be removed from the SES until after she was afforded the opportunity to present her case before the Office of the Assistant Secretary.  No such opportunity was afforded Plaintiff.

198.     Plaintiff was previously further advised that Assistant Brown would be the final deciding official within the Department of the Army with authority to remove Plaintiff from the SES.

199.     Plaintiff's request via her February 12, 2004 letter that she be considered for reassignment was pending with Assistant Secretary Brown at time he was to decide what action to take with respect to CG Strock's request to remove Plaintiff.

200.     Army Regulations specified that when performance is allegedly at issue a member of the SES may be considered for reassignment as opposed to removal.

201.     Upon information and belief, Assistant Secretary Brown would not have taken action removing Plaintiff until such time as he considered Plaintiff's February 12, 2004 letter and the request for reassignment contained therein.

202.     The USACE cannot lawfully relax or modify regulations that provide the safeguard of Plaintiff's rights against unlimited agency discretion in the decision to remove Plaintiff from the SES.

203.     Army Regulation 690-900, Chapter 920, § S 5-7(f)(2)(b) provides that

36

permission to initiate the process of removal of a career SES member must be obtained from the appropriate functional officer within the Office of Secretary of the Army, who in this case was Assistant Secretary Brown.

204.    Assistant Secretary Brown's approval for action concerning the removal of a member of the SES was to be carried out upon his issuance of a formal memorandum authorizing the removal of Plaintiff from the SES.

205.    Assistant Secretary Brown did not approve or authorize the removal of Plaintiff from the SES.

206.    CG Strock knew that Assistant Secretary Brown's review and approval of Plaintiff's removal was required and he knew or should have known that Assistant Secretary Brown never issued a determination that Plaintiff could be removed from the SES.

207.    Assistant Secretary Bolton acknowledged that it was up to Assistant Secretary Brown to make the final determination whether Plaintiff could be removed from the SES and the fact that he allegedly "noted" his receipt of Assistant Secretary Bolton's memorandum did not and does not constitute his approval.

208.    In response to the October 5, 2004 notice of removal, Plaintiff, through counsel, submitted a written Request for Investigation to the Hon. Les Brownlee, then Acting Secretary of the Army. Therein Plaintiff set forth serious including, *inter alia*, allegations of contract abuse related to contracts awarded to KBR; an allegation that the USACE Command intentionally interfered with the PARC's required review of the KBR Waiver request; and allegations that DCG Griffin was improperly controlling contracting matters that should have been under the direction and control of the PARC. A copy of this letter is incorporated by reference.

209.     The DA issued a letter on October 22, 2004 signed by Robert M. Fano, stating that the Acting Secretary of the Army directed that the Commander, USACE, suspend any adverse personnel action until a sufficient record was available to address the concerns set forth in the Request for Investigation.

210.     At the request of the Acting Secretary of the Army, Plaintiff's Request for Investigation was forwarded to the Department of Defense Inspector General ("DOD IG") for review and action, as appropriate.

211.     The DOD IG never contacted or sought to interview Plaintiff.

212.     On June 3, 2005 a memo under LTG Strock's signature was issued seeking approval to remove Plaintiff from the SES.  Therein LTG Strock falsely asserts that the memo from Assistant Secretary Bolton dated July 14, 2004 authorized LTG Strock to remove Plaintiff.  To the contrary, the authorization to remove Plaintiff from the SES rested with Assistant Secretary Brown and that authorization was never forthcoming.

213.     LTG Strock further sought to satisfy the additional conditions imposed by the Acting Secretary of the Army through the conditions set in the October 22, 2004 letter from Mr. Fano.  LTG Strock did so by submitting to the Secretary of the Army a document identified as an "analysis" LTG Strock claimed to have been prepared by his staff.

214.     The purpose of submitting the "analysis" was to mislead the Secretary of the Army as to the adequacy of an investigation into Plaintiff's concerns conducted by the USACE and thereby obtain the removal of Plaintiff.

215.     The "analysis" contains self-serving, false and misleading statements.

216.     The submission of the "analysis" to the Acting Secretary of the Army was improper given that LTG Strock did not: a) authorize the preparation of the "analysis"; b) had

38

no idea who prepared it; c) did not know when it was prepared; d) did not know whether the document had been verified; and e) had never even bothered to read the "analysis."

217.    On June 27, 2005 Plaintiff voluntarily appeared before a congressional committee.  Before the Senate Democratic Policy Committee, Plaintiff reported that the worst contract abuse she witnessed during her professional career concerned contracting efforts related to the award of the RIO Contract to KBR.

218.    Three days before Plaintiff voluntarily appeared before this congressional committee, it was conveyed to Plaintiff by the acting General Counsel of the U.S. Army Corps of Engineers that it would not be in Plaintiff's best interest to voluntarily appear. Plaintiff left that meeting knowing that adverse action would befall her if she appeared before the Senate Democratic Policy Committee.

219.    In fact, the day Plaintiff appeared, the Army Inspector General ("IG") released to the Secretary of the Army, Dr. Francis Harvey, CG Strock's requesting that Plaintiff be removed from the SES and from her position as USACE PARC.

220.    Three weeks after appearing before the Senate committee Secretary Harvey authorized Plaintiff's removal as PARC and from the Senior Executive Service based on false and misleading information presented to him under the signature of CG Strock.

## COUNT I

### (Failure to Obtain Required Approval to Remove Plaintiff from the SES)

221.    Plaintiff incorporates by referencing paragraphs 1 through 220, inclusive, and all allegations contained therein.

222.    On April 2, 2003 LTG Flowers issued a memorandum for Assistant Secretary of

the Army (Acquisition, Logistics and Technology), Claude M. Bolton, Jr., seeking to remove

Plaintiff from her position as USACE PARC and from the SES. LTG Flowers based the

proposed removal on having issued Plaintiff a level 5 unsatisfactory performance review

rating.

223.    On 30 May 2003 Defendant Bolton issued a memorandum to Assistant Secretary

Brown recommending that he deny LTG Flower's request to remove Plaintiff from the SES

and as USACE PARC.

224.    On 11 July 2003 Assistant Secretary Brown issued a memorandum to the DCG

Griffin denying LTG Flower's request to issue a Level 5 rating to Plaintiff and further

directing that Plaintiff's unsuccessful Level 5 rating be changed.

225.    The rating was subsequently altered by DCG Griffin to a level 4.

226.    USACE CG Flowers again sought to remove Plaintiff by issuing her an

unsatisfactory level 5 performance rating for the period 10/2002 to 9/2003.

227.    On March 16, 2004 Flowers again issued a memo to Assistant Secretary Brown

seeking to remove Plaintiff for unacceptable performance based on the failed performance

rating (Level 5).

228.    On July 14, 2004 Defendant Bolton issued a recommendation to Assistant

Secretary Brown stating that based on Defendant Bolton's "belief that the evidence is

insufficient to support an Unsuccessful (Level 5) rating" that he recommended that LTG

Flowers' intent to assign Ms. Greenhouse an Unsuccessful rating be disapproved and,

assuming that LTG Flowers replaced the Unsuccessful Level 5 rating with a Fair Level 4

rating, that LTG Flowers proceed with Plaintiff's proposed removal from the SES as a result

of being issued "two less than fully successful ratings within the past three years."

40

229.    Assistant Secretary Brown did not approve the issuance of the first level 4 rating and he did not approve of the recommendation that a second level 4 rating be issued to Plaintiff.

230.    Assistant Secretary Brown did not approve Plaintiff's removal from the SES.

231.    Defendants must comply with established pre-removal procedures before Plaintiff could lawfully be removed from the SES.

232.    In or about July 2004, Defendant Strock became CG of the USACE replacing LTG Flowers.  Defendant Strock acted on Defendant Bolton's recommendation and altered the performance review prepared by his predecessor to a level 4 and issued it to Plaintiff on October 6, 2006.

233.    At the same time Defendant Strock prepared a memorandum dated October 5, 2004 with the subject heading: Notice of Removal from the Senior Executive Service.  This memorandum was presented to Plaintiff on October 6, 2004 for the purpose of advising Plaintiff that she was being removed from the SES.

234.    The USACE cannot lawfully relax or modify regulations that provide the safeguard of Plaintiff's rights against being removed from the SES.

235.    Army Regulation 690-900, Chapter 920, § S 5-7(f)(2)(b) provides that permission to initiate the process of removal of a career SES  member must be obtained from the *appropriate* functional officer within the Office of Secretary of the Army, who in this case was Assistant Secretary Brown.

236.    Defendants failed to comply with existing valid regulations.

237.    Pursuant to controlling regulations, Assistant Secretary Brown was required to approve Plaintiff's removal.

41

238.        Assistant Secretary Brown's approval for action concerning the removal of a member of the SES was to be carried out upon his issuance of a formal memorandum authorizing the removal of Plaintiff from the SES. No such memorandum was issued.

239.        Assistant Secretary Brown never took official action authorizing the removal of Plaintiff from the SES.

240.        Defendants knew that Assistant Secretary Brown's review and approval of Plaintiff's removal was required.

241.        Defendant Strock knew or should have known that Assistant Secretary Brown never issued a determination that Plaintiff could be removed from the SES.

242.        Defendant Strock knew or should have known that he could not remove Plaintiff until such time as Assistant Secretary Brown issued a memorandum authorizing Plaintiff's removal.

243.        Defendant Bolton acknowledged that where Assistant Secretary Brown may have noted receipt of his memorandum, noted did not and was not intended to indicate that Assistant Secretary Brown approved Plaintiff's removal from the SES.

244.        Plaintiff was advised that procedurally, she would not be removed from the SES until after she was afforded the opportunity to present her case before the Office of the Assistant Secretary. No such opportunity was afforded Plaintiff. Plaintiff was further advised that Assistant Secretary Brown would be the final deciding official within the Department of the Army with authority to remove Plaintiff from the SES.

245.        Plaintiff's request via her February 12, 2004 letter that she be considered for reassignment was pending with Assistant Secretary Brown at time he was to decide what action to take with respect to CG Strock's request to remove Plaintiff.

42

246.    Upon information and belief, Plaintiff would not have been removed by Assistant Secretary Brown until such time as he responded to Plaintiff's request for reassignment.

247.    Plaintiff was substantially prejudiced by the failure of the USACE to comply with DA procedures that were specifically enacted to protect Plaintiff from unfettered agency discretion.

248.    The unlawful removal of Plaintiff from the SES as a result of the failure to obtain the required approval of Acting Secretary Brown violated the CSRA (WPA) and Title VII.

249.    The unlawful removal of Plaintiff from the SES caused by the failure to obtain the approval of Assistant Secretary Brown constitutes reprisal based on Plaintiff's prior EEO and Whistleblowing activity and otherwise constitutes unlawful conduct under Title VII and the CSRA (the WPA).

250.    The unlawful removal of Plaintiff from the SES caused by the failure to obtain the approval of Assistant Secretary Brown violated Plaintiff's right to due process under the United States Constitution as that right is afforded protection to federal employees pursuant to the WPA and under Title VII.

251.    The violation of Plaintiff's Constitutionally protected due process rights entitles Plaintiff to injunctive relief, including the issuance of an order requiring Plaintiff's immediate reinstatement to the SES and as the USACE PARC.

## COUNT II

### (Title VII Claims)

252.    Plaintiff incorporates by referencing paragraphs 1 through 251, inclusive, and all allegations contained therein.

253.    Plaintiff was subjected to discrimination, a hostile work environment and

43

retaliation based on the totality of actions alleged in the paragraphs set forth above and as otherwise set forth in the complaints Plaintiff filed with the DA's EEOO that became the subject of DA Docket No. ARHQOSA03AUG0109. Said complaints are incorporated herein by reference.

254.    Plaintiff was subjected to discrimination, a hostile work environment and retaliation on the basis of her race and sex and as a result of having engaged in protected EEO activity.

255.    As a direct and proximate result of Defendants' actions Plaintiff has suffered damages, including but not limited to, actual pecuniary and non-pecuniary damages, and compensatory damages, in the form of direct and indirect injury to Plaintiff's career and reputation, and she has suffered embarrassment, humiliation, anxiety, physical upset, physical problems, emotional upset, mental anguish, physical pain and suffering in an amount subject to proof. Plaintiff has also suffered damages in the form of back pay and benefits, lost pay and benefits, and accrued interest. All of Plaintiff's damages are ongoing and continuing.

## COUNT III

### (WPA Claims)

256.    Plaintiff incorporates by referencing paragraphs 1 through 255, inclusive, and all allegations contained therein.

257.    Plaintiff was discriminated on the basis of engaging in protected whistleblower activity under the WPA.

258.    Plaintiff was subjected to discrimination, a hostile work environment and retaliation in violation of the WPA based on the totality of actions alleged herein and as otherwise alleged in the mixed case complaints Plaintiff filed with the DA's EEOO that

became the subject of DA Docket No. ARHQOSA03AUG0109. Said complaints are incorporated herein by reference.

259.    Plaintiff engaged in protected activity under the WPA by delivering to USACE CG Flowers a letter dated March 5, 2002 raising concerns over improper interference with the exercise of her official duties as the PARC, including interference with the proper review and execution of contracting documents.

260.    Plaintiff engaged in protected activity under the WPA as a result of raising concerns related to waste, fraud and abuse related to interference of the official duties of the USACE PARC and with respect to improper contracting activity related the award and implementation of the RIO Contract and a waiver requested by KBR related to the RIO Contract.

261.    Plaintiff further engaged in protected activity under the WPA for identifying and raising concerns and engaging in the activities set forth and identified in the October 21, 2003 Request for Investigation submitted to the Acting Secretary of the Army.

262.    On 18 April 2003 Plaintiff engaged in protected activity by delivering to Hon. Reginald J. Brown on April 18, 2003 a letter setting forth concerns related to the improper conduct on the part of the USACE Command in the evaluation of Plaintiff's performance.

263.    On 24 October 2003, Plaintiff engaged in protected whistleblower activity by issuing a memo to LTG Flowers raising a concern that the planned USACE 2012 reorganization would result in "Mission Failure (Noncompliance with Congressional Lineage of Acquisition of Procurement and contracting Authority).

264.    Plaintiff engaged in protected activity under the WPA by alerting LTG Strock and others of improprieties associated with the granting of the KBR Waiver as LTG Strock was

preparing to appear before Congress.

265.    Plaintiff engaged in protected activity under the WPA as a result of raising

concerns regarding the implementation of the Rio Contract during the VTC held in or about

February 2003.

266.    Plaintiff engaged in protected activity when she raised concerns during the course

of the meeting held at the Pentagon on February 26, 2003, and when she subsequently

documented her objection to the duration of the RIO Contract on the final J&A.

267.    Plaintiff engaged in protected activity by working with the Federal Bureau of

Investigation related to concerns and allegations pertaining to the award of the RIO Contract.

268.    Plaintiff engaged in protected activity by delivering a letter dated February 12,

2004 to Assistant Secretary Brown outlining a continuing patter of improper attempts to derail

Plaintiff's career and remove her from contracting responsibilities.

269.    On March 2, 2004 Plaintiff engaged in protected activity by issuing a letter to

Assistant Secretary Bolton stating, *inter alia*, that the command structure of the USACE was

intentionally undermining the procurement process.

270.    On October 1, 2004 Plaintiff engaged in protected activity by advising CG Strock

during an in-briefing that improper interference of the functions of the PARC were occurring.

271.    Plaintiff was subjected to discrimination, a hostile work environment and

retaliation on the basis of her race, sex, age, protected EEO activity and as a result of

engaging in activity protected under federal law, including the WPA.

272.    As a direct and proximate result of Defendants' actions Plaintiff has suffered

damages, including but not limited to, actual pecuniary and non-pecuniary damages, and

compensatory damages, in the form of direct and indirect injury to Plaintiff's career and

46

reputation, and she has suffered embarrassment, humiliation, anxiety, physical upset, physical problems, emotional upset, mental anguish, physical pain and suffering in an amount subject to proof. Plaintiff has also suffered damages in the form of back pay and benefits, lost pay and benefits, and accrued interest. All of Plaintiff's damages are ongoing and continuing.

## COUNT IV

### (Privacy Act Claims)

273.     Plaintiff incorporates by referencing paragraphs 1 through 272, inclusive, and all allegations contained therein.

274.     On June 3, 2005 a memo under LTG Strock's signature was issued seeking approval to remove Plaintiff from the SES. Therein LTG Strock falsely asserts that the memo from Assistant Secretary Bolton dated July 14, 2004 authorized LTG Strock to remove Plaintiff.

275.     At the time this statement was issued LTG Strock knew or should have known that the authorization to remove Plaintiff from the SES rested with Assistant Secretary Brown and that authorization was never forthcoming.

276.     Accompanying the June 3, 2005 memorandum was a document referred to as the "analysis" which Defendant Strock alleged was prepared by his staff. The "analysis" was specifically engineered and used as a basis to seek approval for the removal of Plaintiff from the SES and as USACE PARC.

277.     The purpose of Defendant Strock's and Defendant USACE's submission of the "analysis" was to mislead the Secretary of the Army as to the status of the investigation into Plaintiff's concerns and as to the validity of Plaintiff's assertions set forth in the October 21, 2003 letter issued to the Acting Secretary of the Army through Plaintiff's counsel.

47

278.     The "analysis" contains self-serving, false and misleading statements.

279.     The submission of the "analysis" to the Secretary of the Army occurred even though LTG Strock did not: a) authorize the preparation of the "analysis"; b) had no idea who prepared it; c) did not know when it was prepared; d) did not know whether the document had been verified; and e) without LTG Strock having read the "analysis."

280.     The "analysis" constitutes a confidential personnel record pertaining to Plaintiff within one or more Privacy Act systems of records and was used by LTG Strock, USACE and DA as a justification to remove Plaintiff from the SES and as USACE PARC.

281.     All of the aforementioned confidential personnel records pertaining to Plaintiff are maintained in Privacy Act systems of records and are protected from unauthorized disclosure under the Privacy Act, as amended, 5 U.S.C. § 552a.

282.     Defendants USACE and DA willfully and intentionally failed to maintain accurate, timely and complete records in violation of 5 U.S.C. § 552a(e)(5).

283.     Plaintiff suffered adverse action proximately caused by the failure to maintain accurate records, including Plaintiff's removal from the SES and as the USACE PARC.

284.     Defendant Strock, USACE and DA violated 5 U.S.C. § 552a(e)(2) by willfully and intentionally failing to the greatest extent practicable to collect directly from Plaintiff information that would have refuted the allegations set forth in Plaintiff's Request for Investigation.

285.     Defendants DOD, DA and USACE failed to conduct any meaningful investigation of Plaintiff's claims, as set forth in Plaintiff's October 21, 2003 Request for Investigation and as required pursuant to the letter issued on behalf of the Acting Secretary of the Army on October 22, 2003.

48

286.        Plaintiff's removal from the SES and as USACE PARC was the proximate result of the failure to obtain from Plaintiff, to the greatest extent practicable, information related to Plaintiff's Request for Investigation.

287.        At no time prior to her removal was Plaintiff ever contacted by Defendants to obtain or provide information related to the issues set forth in Plaintiff's October 21, 2003 Request for Investigation.

288.        Plaintiff's removal from the SES and as PARC constitutes adverse action related to Plaintiff's rights, benefits and privileges under Federal Programs.

289.        The failure of the USACE to seek information from Plaintiff during the course of the preparation of the "analysis" proximately caused adverse determinations interfering with Plaintiff's rights and benefits under federal programs. As a direct and proximate result of Defendants' actions Plaintiff has suffered adverse effects, including but not limited to, actual pecuniary and non-pecuniary damages, actual out of pocket costs and compensatory damages, in the form of direct and indirect injury to Plaintiff's career and reputation, and she has suffered embarrassment, humiliation, anxiety, physical upset, physical problems, emotional upset, mental anguish, physical pain and suffering in an amount subject to proof. Plaintiff has also suffered adverse effects in the form of back pay and benefits, lost pay and benefits, and accrued interest. All of Plaintiff's damages are ongoing and continuing.

290.        All of Defendants' alleged violations of the Privacy Act were committed knowingly and willfully, and Plaintiff suffered adverse effects as a direct result of Defendants' unlawful conduct.

291.        As a direct and proximate result of Defendants' actions Plaintiff has suffered damages, including but not limited to, actual pecuniary and non-pecuniary damages, and

compensatory damages, in the form of direct and indirect injury to Plaintiff's career and reputation, and she has suffered embarrassment, humiliation, anxiety, physical upset, physical problems, emotional upset, mental anguish, physical pain and suffering in an amount subject to proof. Plaintiff has also suffered damages in the form of back pay and benefits, lost pay and benefits, and accrued interest. All of Plaintiff's damages are ongoing and continuing.

## COUNT V

### (Refusal to Transfer or Reassign)

292.    Plaintiff incorporates by referencing paragraphs 1 through 291, inclusive, and all allegations contained therein.

293.    Plaintiff filed an application in response to a request for reassignment announcement issued on behalf of Defendant Bolton.

294.    Plaintiff was made aware of the reassignment opportunity by Ms. Linda Barker on March 17, 2006, and was notified that Defendant Bolton was interested in soliciting interested SES members with acquisition qualifications and resource management background and/or experience. Because of her qualifications in accordance with the initial notification and description of the reassignment opportunity, Plaintiff timely provided to Ms. Linda Barker the appropriate package of information, including Plaintiff's résumé; the receipt of which was acknowledged by Defendant Bolton's office.

295.    Plaintiff did not hear about the position for which she applied for almost a month, and on April 27, 2005, she expressed concern to Ms. Barker over this issue. In response, Ms. Barker notified Ms. Greenhouse that her application had been previously forwarded to Mr. Bolton's Executive Officer. Furthermore, she notified Ms. Greenhouse that only one SES (Ms. Greenhouse) had applied for the reassignment opportunity, and because of the low

50

number of applicants, Defendant Bolton opened the reassignment opportunity to a competitive process.

296.      On April 19, 2006, Defendant Bolton testified during the DA's EEOO investigation that the competitive process which he had instructed to open had allowed for GS-15 employees to apply for the reassignment position.

297.      Although Plaintiff had applied for the position and was more qualified than the individual eventually selected, the position was filled without Plaintiff ever being considered.

298.      The Director of the USACE Human Resources, Dr. Susan Duncan, acknowledged that she specifically raised a concern that Ms. Greenhouse was being subjected to a double standard as an opportunity to transfer to a different position within the Army had been offered to another member of the SES.

299.      The individual ultimately selected for the position was Thomas E. Mullins.

300.      Mr. Mullins' application for the position demonstrates that he was less qualified for the position than Plaintiff.

301.      The failure to consider Ms. Greenhouse for this reassignment opportunity and the failure to consider her application as part of any subsequent competitive application process which was expanded to include lower-grade GS-15 employees constitutes per se discriminatory and retaliatory conduct as a result of Plaintiff's protected whistleblower disclosures and as a result of her prior EEO activity.

302.      Plaintiff was further discriminated against when during the same time frame where Plaintiff's performance was criticized by the USACE Command, an internal investigation on another SES member was conducted wherein the conclusion was reached that

51

a poor work climate, bad morale, favoritism, and other difficulties indicated that a very bad working climate existed.

303.    Plaintiff was subjected to disparate treatment as the other SES member was reassigned to another position whereas Defendants sought to terminate Plaintiff even though reassignment opportunities existed.

304.    The failure to consider Plaintiff for the position opened under Defendant Bolton violated Title VII, and the CSRA, including the WPA.

305.    The failure of Defendants to respond to Plaintiff's own request for reassignment set forth in her February 12, 2004 letter to Assistant Secretary Brown constitutes discriminatory action in violation of Title VII, and the CSRA, including the WPA.

306.    As a direct and proximate result of Defendants' actions Plaintiff has suffered damages, including but not limited to, actual pecuniary and non-pecuniary damages, and compensatory damages, in the form of direct and indirect injury to Plaintiff's career and reputation, and she has suffered embarrassment, humiliation, anxiety, physical upset, physical problems, emotional upset, mental anguish, physical pain and suffering in an amount subject to proof.  Plaintiff has also suffered damages in the form of back pay and benefits, lost pay and benefits, and accrued interest.  All of Plaintiff's damages are ongoing and continuing

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief from this Court, as follows:

(a) Grant Plaintiff such preliminary and permanent injunctive relief, including but not limited to an order of reinstatement, as may be appropriate;

(b) Grant Plaintiff declaratory relief as may be appropriate;

(c) Award Plaintiff injunctive and declaratory relief, monetary damages, including but not limited to back pay and benefits, subject to proof and in an amount to be determined at trial, for violation of Plaintiff's rights under Title VII, and including but not limited to actual, compensatory damages for, *inter alia*, harm to reputation, physical pain and embarrassment and humiliation, as well as for damage to Plaintiff's career;

(d) Award Plaintiff damages, subject to proof and in an amount to be determined at trial, for violating Plaintiff's rights under the Privacy Act, including but not limited to actual damages and compensatory damages for, *inter alia*, harm to reputation and embarrassment and humiliation, as well as for damage to Plaintiff's career;

(e) Award Plaintiff damages in an amount not less than $1,000 for each and every violation of the Privacy Act;

(f) Award Plaintiff her costs and reasonable attorney fees;

(g) Grant such other and further relief as the Court may deem just and proper; and

(h) Award Plaintiff pre-judgment and post-judgment interest.

Respectfully Submitted,


_____/s/_____
Michael D. Kohn
DC Bar No. 425617


_____/s/_____
David K. Colapinto
DC Bar No. 416390


_____/s/_____
Stephen M. Kohn
DC Bar No. 411513
KOHN, KOHN, COLAPINTO, LLP
3233 P Street, NW
Washington, DC 20007
(Phone) 202-342-6980
(Fax) 202-342-6984

Dated: January 26, 2007

54

*H 07-182 EGS*

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| BUNNATINE H. GREENHOUSE | FRANCIS J. HARVEY, SECRETARY UNITED STATES ARMY et. al. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
~~AND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF~~

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Michael D. Kohn, David K. Colapinto
Kohn, Kohn & Colapinto, LLP
3233 P Street NW Washington, DC 20007
Telephone: 202-342-0097

CASE NUMBER   1:07CV00182

JUDGE: Emmet G. Sullivan

DECK TYPE: Employment Discrimination

DATE STAMP: 01/26/2007

*JURY ACTION*

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ◉ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CIT
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) ~~FOR DIVERSE~~...

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ◉ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| **G. Habeas Corpus/ 2255** | **H. Employment Discrimination** | **I. FOIA/PRIVACY ACT** | **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| **K. Labor/ERISA (non-employment)** | **L. Other Civil Rights (non-employment)** | **M. Contract** | **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Complaint concerns a "mixed case" of discrimination and reprisal claims under Title VII of the Civil Rights Act of 1964 and additional statutory authority

42 USC 2000

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐ **DEMAND $** ______ Check YES only if demanded in complaint **JURY DEMAND:** YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

**DATE** January 26, 2007 **SIGNATURE OF ATTORNEY OF RECORD** [signature]

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.** CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.** CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.** CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.** RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.