# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BUNNATINE H. GREEENHOUSE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0182 (EGS) |
| | ) | |
| | ) | |
| PETE GEREN, | ) | |
| Secretary of the Army, et. al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Bunnatine H. Greenhouse, through counsel, hereby responds to Defendant's Motion for Partial Summary Judgment on the Pleadings or, in the Alternative, for Partial Summary Judgment.

## <u>INTRODUCTION</u>

Defendant's argue that the district court lacks jurisdiction over Ms. Greenhouse's whistleblower claims should be dismissed. However, this argument must fail because Defendants do not consider Ms. Greenhouse's statutory right to pursue her whistleblowers claim as part of the "mixed case" complaint. In this regard, Ms. Greenhouse timely brought before the district court the mixed case claims she fully exhausted before the Agency's Equal Employment Opportunity ("EEO") office.

Defendants' argument that Plaintiff's Privacy Act claims should be dismissed is also misplaced because Defendants misconstrue her claim as seeking damages flowing

from her "demotion from the SES" when her Privacy Act claims rather permit damages

flowing from the Agency's failure to collect information directly from Plaintiff, and for

the Agency's failure to maintain accurate records about plaintiff, which resulted in her

demotion from the SES.  Case law within this Circuit establishes that such claims are

separate and distinct from any claim Ms. Greenhouse may have under the Civil Service

Reform Act ("CSRA").

### STATEMENT OF FACTS

Plaintiff's Counter Statement of Facts is separately filed contemporaneously with

this Memorandum.

### ARGUMENT

I.     **PLAINTIFF'S WHISTLEBLOWER PROTECTION ACT CLAIM WAS PROPERLY BROUGHT BEFORE THE DISTRICT COURT AFTER HAVING EXHAUSTED ADMINISTRATIVE HER "MIXED CASE COMPLAINT" ADMINISTRATIVE REMEDIES BEFORE THE AGENCY'S EEO OFFICE.**

Defendants claim that the Ms. Greenhouse's whistleblower claim must be

dismissed for lack of jurisdiction.  This argument, however, is flawed because

Defendants fail to recognize that by incorporating the Whistleblower Protection Act

("WPA") into the Civil Service Reform Act ("CSRA") Congress provided Ms.

Greenhouse a remedy that entitled her to raise her whistleblower claims before the

Agency's EEO office as part of a "mixed case complaint" and to file an appeal of her

entire mixed case with the appropriate United States district court.

The Civil Service Reform Act of 1978, Pub.L. No. 95-454, 92 Stat. 1111 (Oct. 13,

1978) (CSRA) "comprehensively overhauled the civil service system" *Lindahl v. Office*

*of Pers. Mgmt.,* 470 U.S. 768, 773-74, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985), by

replacing a patchwork of rules and regulations with a comprehensive statutory framework for the processing of claims.  From its inception, the CSRA included whistleblower protections against whistleblower retaliation.  However, whistleblower protections were significantly expanded in 1989 with the passage of the Whistleblower Protection Act. Indeed, whistleblower protection remains integral to the full protections congress offers federal employees under the CSRA and there is no meaningful basis to consider such protections separate from or inferior to other protections offered under the CSRA.

Within the CSRA, "5 U.S.C. § 7702 contains the statutory provisions directly addressing the procedural path a mixed case – an adverse personnel action subject to appeal to the MSPB coupled with a claim that the action was motivated by discrimination." *Butler v. West,* 164 F.3d 634, 638 (D.C. Cir. 1999).  While "the prosecution of mixed cases are extremely complicated, [] they can be reduced to a decision tree." *Id.*  The *Butler* Court outlines the decision tree pertaining to the filing of a mixed case and sets forth when administrative remedies may be exhausted and when a district court can accept jurisdiction over a mixed case.  Under the *Butler* decision tree, under no circumstance, may a mixed case be brought directly to district court in the first instance. *Accord, Stella v. Mineta,* 284 F.3d 135, 142 (D.C.Cir.2002)("[u]nder no circumstances does the WPA grant the district court jurisdiction to entertain a whistleblower cause of action brought directly before it in the first instance").

> An employee who intends to pursue a mixed case has several paths available to her.  At the outset, the aggrieved party  can  choose between filing a 'mixed case complaint' with her agency's EEO office and filing a 'mixed case appeal' directly with the MSPB.  *See* 29 C.F.R. § 1614.302(b).  By statute, the relevant agency EEO office and the MSPB can and must address both the discrimination claim and the appealable personnel action.  *See*  5U.S.C. § 7702(a).  Should she elect the agency

EEO route, within thirty days of a final decision she can file an appeal
with the MSPB or a civil discrimination action in federal district court.

*Butler,* 164 F.3d at 638.  Thus, "[e]mployees pursuing relief though an EEO mixed case

complaint may file a civil discrimination action in federal district court within 30 days

of a final decision by the agency or after 120 days have passed without a decision, but

only if no appeal to the MSPB is pursued at that time." *Mcadams v. Reno*, 64 F.3d 1137,

1141 (8th Cir. 1995).  The uncontested facts here are that Ms. Greenhouse filed a mixed

case complaint with the Agency's EEO office, which was timely appealed to the district

court within 30 days of a final agency decision.  *See* Plaintiff's Exhibits ("P. Exs.") G,

L-K.

District court jurisdiction over a "mixed case complaint" initiated before an

agency's EEO office rests on three factors.  First, pursuant to 5 U.S.C. § 7702(a)(1)(A),

the employee or applicant for employment must demonstrate that he or she was

"affected by an action which the employee or applicant may appeal to the Merit Systems

Protection Board".  Second, pursuant to 5 U.S.C. § 7702(a)(1)(B), the complaint must

"allege[] that a basis for the action was discrimination prohibited by specific statutes,

including but not limited to discrimination based on race and sex.  Third, the employee

or applicant for employee must comply with the exhaustion requirements set forth in 5

U.S.C. §§ 7702.

All three factors are satisfied in the instant matter.  There is no dispute that Ms.

Greenhouse can satisfy the second and third factors as she timely filed discrimination

claims with the agency's EEO office and she timely appealed the final decision of the

agency's EEO office.  P. Exs. G, L-K.  The final factor, that Ms. Greenhouse's claim

before the agency's EEO office involves a prohibited personnel action, is established

because her whistleblower claims are ultimately appealable to the MSPB. In this regard,

the United States "government acknowledge[d] . . . that a whistleblower claim coupled

with a discrimination claim can be characterized as a 'mixed case' complaint."

*Schneider v. Dalton*, 1999 WL 1079628 (9th Cir. 1999) (unpublished). This same result

was reached in *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265-66 (4th Cir. 2001), where

the court observed that district court jurisdiction under 5 U.S.C. § 7702 extends to "a

claim of discrimination . . . coupled with a Whistleblower Protection Act claim." In

*Robinson v. Rubin*, 77 F.Supp.2d 784, 793 (S.D. Tex. 1999), the district court concluded

that "a 'mixed case' involving both a whistleblower and discrimination claims [may be

brought] before the employing agency's EEO department [under] 5 U.S.C. § 7702." In

*Wells v. Shalala*, 228 F.3d 1137 (10th Cir. 2000), the court specifically considered the

agency's argument that district court lacked jurisdiction over a mixed case complaint

that included a whistleblower claim filed with the agency's EEO office . The *Wells*

court "reject Defendants' jurisdictional contention" observing that the employee was not

required to raise his whistleblower claims separately through the OSC/MSPB process:

> [T]he employee has the option in a 'mixed case' complaint of filing a
> civil action in the district court rather than appealing to the MSPB. This
> construction of the CSRA makes eminent sense, for as we recognized in
> *Christo v. Merit Sys. Protection Bd.,* 667 F.2d 882, 883 (10th Cir.1981):
> '[T]he various statutory provisions of the Act and its legislative history
> indicate a clear Congressional preference for combining various aspects of
> a single agency determination under one review proceeding, both in the
> administrative and judicial channels.' *See also Wall v. United States,* 871
> F.2d 1540, 1545-46 (10th Cir.1989) (Seymour, J., dissenting) (To obtain
> judicial review in a 'mixed case,' an employee may file suit in federal
> district court after final agency action, 'whether the final agency action
> consists of resolution of a mixed case by the Board, or rejection of the
> claim by claimant's agency.'). To force Plaintiff to bifurcate his case and
> return to the administrative process for further consideration of his [WPA]
> retaliation claim would frustrate principles of judicial economy and serve

no useful purpose.'   *See Woodman v. Runyon,* 132 F.3d 1330, 1342 (10th Cir.1997).

*Wells v. Shalala*, 228 F.3d 1137, 1142-43 (10th Cir. 2000)(footnotes and citations

omitted);  *accord, Quinn v. West*, 140 F.Supp2d 724, 734 (W.D. Tex 2001)(jurisdiction

before district court proper because "forc[ing] Plaintiff to bifurcate his case and return to

the administrative process for further consideration of his WPA claim would frustrate

principles of judicial economy and serve no useful purpose").

      The Agency misconstrues *Stella v. Mineta,* 284 F.3d 135, 142 (D.C.Cir.2002),

claiming that this case stands for the proposition that unless a complainant has the right to

appeal directly to the MSPB, the complainant must first complaint to the OSC.   To the

contrary, *Stella* implies that a district court may take jurisdiction over a whistleblower

claim as part of a mixed case.   In this regard *Stella* begins by observing that the plaintiff

initially "filed a District Court action "asserting violations of Title VII and the WPA."

*Id.,* at 140.   However, because "FAA employees were not subject to the usual Title 5

procedures, because in 1995, Congress had directed the FAA to develop its own

personnel management system.   Under that system, FAA whistleblower claims could not

be brought through the usual route, and the MSPB lacked jurisdiction over FAA

employees' claims."  *Id.,* at 141.   Thus, while *Stella* observed that the avenues for

jurisdiction under Title 5 do not "grant the District Court jurisdiction to entertain a

whistleblower cause of action brought directly before it in the first instance,"  *id.,* at 142,

the Court goes on to note that the Title 5 avenue of district court jurisdiction would

ordinarily be available but for the fact that the plaintiff's status as a FAA employee

divested her of that option.  *Id.,* at 142 ("Unfortunately for Ms. Stella, the Title 5 avenue

was not open to FAA whistleblowers between 1996 and 2000 because . . . Congress

directed the FAA to establish its own personnel management system . . . [and] the applicable grievance procedure . . . was not subject to review in any forum"). Thus, *Stella* is consistent with all of the other federal courts that extend district court jurisdiction to a whistleblower claim brought as part of a mixed case.

The Agency also seeks to dismiss Ms. Greenhouse's whistleblower claims by asserting that "Congress specifically denied to members of the SES the right to appeal a removal for performance to the MSPB, in the same piece of legislation in which it granted those rights to non-Senior Executive Service employees." Agency Brief at p. 11. However, this distinction is irrelevant because Congress, when enacting the WPA, explicitly extend MSPB appeal jurisdiction of whistleblower claims to members of the "the Senior Executive Service." *See* 5 U.S.C. §2302(a)(2)(B). Thus, as Ms. Greenhouse is statutorily afforded the right to file an Individual Right of Action ("IRA") appeal with the MSPB, *see* 5 U.S.C. § 1221, the fact that she is a member of the SES does not affect her right to combine her discrimination and whistleblower claims and prosecute them pursuant to the "mixed case" procedures set forth in 5 U.S.C. § 7702.

Defendants argue Ms. Greenhouse must proceed with her WPA claims before the OSC/MSPB in order to exhaust administrative. *See* Defendants' Brief at 10 ("Plaintiff failed to take the first required step . . . of bringing a WPA complaint to the Office of Special Counsel. Further plaintiff failed to seek redress with the Merit Systems Protections Board via an IRA appeal"). This proposition, however, would only serve to "frustrate the principles of judicial economy and serve no useful purpose." To force Plaintiff to bifurcate his case and return to the administrative process for further consideration of his [WPA] retaliation claim would frustrate principles of judicial

economy and serve no useful purpose.' *See Woodman v. Runyon,* 132 F.3d 1330, 1342 (10th Cir.1997)." *Wells v. Shalala*, 228 F.3d 1137, 1142-43 (10ᵗʰ Cir. 2000).[1]

In conclusion, there is no basis to dismiss Ms. Greenhouse's whistleblower claim because district court jurisdiction extends to whistleblower claims brought before the court as part of a "mixed case" complaint.

## II.    PLAINTIFF'S PRIVACY ACT CLAIMS SHOULD NOT BE DISMISSED.

### A.  Plaintiff's Valid Privacy Act Claims Are Not Barred by the CSRA.

Defendants mischaracterize plaintiff's Privacy Act claims for violations of subsections (e)(2) and (e)(5) of the Privacy Act.  Contrary to defendants' assertions plaintiff does not seek review of her "demotion from the SES" under the Privacy Act. *See* Def. Mot., p. 14.  Rather, plaintiff alleges that the Agency is liable for violations of the Privacy Act for the failure to collect information directly from plaintiff when the information may result in adverse determinations about an individual's rights, benefits and privileges, and for the failure to maintain accurate records to assure fairness to plaintiff, *see* 5 U.S.C. §§ 552a(e)(2) and (e)(5), and that her Privacy Act claims are separate and distinct from any other claim Ms. Greenhouse may have.

Curiously, defendants ignore the true nature of plaintiff's Privacy Act claims to argue that she is challenging the propriety of the Agency's personnel action against her, and that challenges of federal agency personnel actions is authorized only under the Civil

---

[1] This is particularly true given that "[a] determination by the Special Counsel under [the WPA] shall not be cited or referred to in any proceeding under this paragraph or any other administrative or judicial proceeding for any purpose, without the consent of the person submitting the allegation of a prohibited personnel practice."  5 U.S.C. 1214(b)(2)(E).  There is no reason to force Ms. Greenhouse to exhaust an administrative remedy when it is solely up to her discretion whether to rely on the record that could have been made before the OSC.

Service Reform Act ("CSRA"). That, however, is not what plaintiff has alleged.

Count IV of Plaintiff's Complaint is an action for damages under the Privacy Act alleging that the Agency failed to collect information from plaintiff in violation of subsection (e)(2) of the Privacy Act (*see* Complaint, ¶¶ 208-220, 284-289), and that the Agency failed to maintain accurate records about plaintiff which resulted in the Agency taking adverse action (*see* Complaint, ¶¶ 274-283).

Our Court of Appeals has held that federal employees may allege violations of the Privacy Act and recover damages for an adverse personnel action caused by an inaccurate or incomplete record, or for other violations of the Privacy Act. *See Hubbard v. EPA,* 800 F.2d 1, 4-5 (D.C. Cir. 1986), aff'd. in part*, Spagnola v. Mathis,* 859 F.2d 223 (D.C. Cir. 1998) (*en banc*). Privacy Act claims by federal employees for damages arising from inaccurate records or other violations by federal agencies are distinguished from a complaint alleging a wrongful personnel decision. *See Kleiman v. Dept. of Energy,* 956 F.2d 335, 338-39 and at n. 5 (D.C. Cir. 1992), citing *Hubbard,* 809 F.2d at 5 (second emphasis added) ("nothing we say today should be taken to cast doubt on *Hubbard's* statement that 'the Privacy Act permits a federal job applicant to recover for damages for an adverse personnel action *actually caused* by an *inaccurate* or incomplete record.'"). Notably, the D.C. Circuit has declined to rule that the CSRA bars a Privacy Act damages claim altogether. *Kleiman,* 956 F.2d at 337-39 and n. 5 (holding only that the Privacy Act does not provide relief where the plaintiff fails to contest that a record accurately reflected his assigned job title, and where the plaintiff directly challenged his position classification which is reviewable under the CSRA).

Where, as here, the plaintiff is a federal employee and alleges that a federal

agency has taken adverse personnel action as a result of inaccurate records or the failure to collect information from the plaintiff, or where there is another Privacy Act violation, there is jurisdiction over the plaintiff's cause of action for damages under the Privacy Act. *See, e.g., Hubbard, supra.; Waters v. Thornburgh,* 888 F.2d 870, 873-875 (D.C. Cir. 1989), overruled in part on other grounds, *Doe v. Chao,* 540 U.S. 614, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004); *Dickson v. Office of Personnel Management,* 828 F.2d 32, 36-37 (D.C. Cir. 1987); *Blazy v. Tenet,* 979 F.Supp. 10, 19-20 (D.D.C. 1997); *Thompson v. Department of State*, 400 F.Supp.2d 1, 8 (D.D.C. 2005).

As demonstrated in more detail herein, plaintiff does not seek review of her demotion from the SES under the Privacy Act, but rather she seeks damages for the Agency's failure to collect information directly from her, and for the Agency's failure to maintain accurate records about plaintiff, which caused the demotion from the SES. Under these circumstances, it would be improper to dismiss Plaintiff's Privacy Act claims for damages in which she alleges violations of Privacy Act subsections (e)(2) and (e)(5).

**B. Plaintiff's Claim for Failure to Collect Information Directly from the Subject of Investigation Under Privacy Act Subsection (e)(2).**

The Privacy Act provides that "[e]ach agency that maintains a system of records shall ... collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." 5 U.S.C.A. § 552a(e)(2). "[T]he specific nature of each case shapes the practical considerations at stake that determine whether an agency has fulfilled its obligations under the Privacy Act to

elicit information directly from the subject of the investigation to the greatest extent practicable." *Cardamone v. Cohen*, 241 F.3d 520, 528 (6th Cir. 2001).

Courts have held that Privacy Act subsection 552a(e)(2) does not prevent agencies from interviewing third parties when investigating subjective allegations of misconduct. Nevertheless, courts have found violations of the Privacy Act when an agency speaks to a third party even though the individual under investigation possesses objective proof that would eliminate the need for any further questioning. *See, e.g., Waters v. Thornburgh,* 888 F.2d 870, 873 (D.C.Cir.1989) partially overruled on other grounds, *Doe v. Chao,* 540 U.S. 614, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004) (holding that Department of Justice violated the Privacy Act by asking state bar association to confirm that a DOJ employee took the exam when it could have asked the employee for his admission ticket).

Plaintiff alleges that defendant violated subsection (e)(2) by relying on information provided by Lt. Col. Strock and his staff before interviewing plaintiff, even though after receiving a request for investigation from plaintiff the Army had agreed to refer the matter to the Department of Defense ("DOD") Inspector General ("IG") for investigation and to compile a "sufficient record" on plaintiff's allegations of "improprieties and retaliation" before any "adverse personnel action" is taken against plaintiff. Complaint, ¶¶ 208-210 and 284-289; P. Ex. D at pp. 8-18 [copy of Letter from Kohn, Subj.: Request for Investigation (10/21/2004)]; P. Ex. D at p. 19 [Letter from Labor and Employment Law Division, Re: Request for Investigation (10/22/2004)].

The information provided by LTG Strock and his staff resulted in "an adverse determination" about plaintiff's "rights, benefits, and privileges," when plaintiff was

removed from the SES following the recommendation of LTG Strock before any DOD IG investigation took place, before information was obtained directly from plaintiff, or before the DOD compiled any record regarding plaintiff's allegations of improprieties and retaliation, "thereby triggering the agency's (e)(2) obligation."  *See Thompson v. Department of State*, 400 F.Supp.2d 1, 8 (D.D.C. 2005).  The information provided by Lt. Col. Strock and his staff in fact led to the removal of plaintiff from the SES. *See* Def.'s Mot., Ex. A.[2] Thus, the issue is whether the agency collected information "to the greatest extent practicable" directly from plaintiff.  *Thompson,* 400 F.Sup.2d at 8, citing 5 U.S.C. § 552a(e)(2).

Privacy Act subsection (e)(2) was designed to " 'discourage the collection of personal information from third party sources and therefore to encourage the accuracy of Federal data gathering.'" *Waters,* 888 F.2d at 874 (quoting Analysis of House and Senate Compromise Amendments to the Federal Privacy Act, 120 Cong. Rec. 40,405, 40,407 (1974) [hereinafter "Staff Analysis" ]). "It reflects congressional judgment that the best way to ensure accuracy in general is to require the agency to obtain information 'directly from the individual whenever practicable.'" *Id.* (quoting Office of Management and Budget Privacy Act Guidelines, 40 Fed.Reg. 28,949, 28,961 (July 9, 1975) (hereinafter "OMB Guidelines")). "It supports 'the principle that an individual should to the greatest extent possible be in control of information about [her] which is given to the government

---

[2] Contrary to defendants' assertion, plaintiff does not challenge Lt. Col. Strock's recommendation as an adverse action reviewable by the Privacy Act.  Rather, plaintiff alleges that the information provided by Lt. Col. Strock, which resulted in her removal from the SES, contained inaccurate information and that the Agency failed to collect information directly from plaintiff, as required and as the defendants had agreed to do by referring the matter to the DOD IG.  Plaintiff alleges that the failure to collect information from her, and the failure to maintain accurate records gives rise to a claim for damages under the Privacy Act.

... a principle designed to insure fairness in information collection which should be instituted wherever possible.'" *Waters*, 888 F.2d at 875 (quoting Staff Analysis, 120 Cong. Rec. at 40,407).

In this case, the defendants agreed on October 22, 2004 to conduct an investigation of plaintiff's allegations of improprieties and retaliation before taking any adverse action against her. Complaint, ¶¶ 208-210 and 284-289; P. Ex. D at 8-18 [copy of Letter from Kohn, Subj.: Request for Investigation (10/21/2004)]; P. Ex. D at p. 19 [Letter from Labor and Employment Law Division, Re: Request for Investigation (10/22/2004)]. However, despite agreeing to refer the matter to the DOD IG and suspend taking any adverse personnel action against plaintiff until a sufficient record was created by the IG, the defendants removed plaintiff from the SES based on information provided by LTG Strock before plaintiff was ever contacted by the DOD IG and before there was any investigation by the IG. Complaint, ¶¶ 208-220; P. Ex. D.

Defendants' motion to dismiss Plaintiff's claims under Privacy Act subsection (e)(2) must be denied. Based on the circumstances of this case, failure by defendants to conduct the investigation by DOD IG that defendants referred to DOD IG to undertake, and taking adverse personnel action against plaintiff based on the information provided by LTG Strock and his staff before DOD IG even spoke to plaintiff and before DOD IG conducted any investigation, and plaintiff's allegations that these failures were willful and resulted in adverse action (Compl., ¶¶ 208-220 and 284-291), gives rise to a claim under Privacy Act subsection (e)(2).

### C. Plaintiff's Claim for Failure to Maintain Accurate Records Under Privacy Act Section (e)(5).

Privacy Act Subsection (g)(1)(C) concerns the accuracy of records and provides a cause of action against a federal agency that maintains a system of records when it "fails to maintain any record ... with such accuracy ... and completeness as is necessary to assure fairness ... and consequently a determination is made which is adverse to the individual." 5 U.S.C. § 552a(g)(1)(C). This subsection provides a damages remedy for violations of Privacy Act subsection (e)(5), which requires an agency to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." *See Doe v. United States,* 821 F.2d 694, 697 n. 8 (D.C.Cir.1987) (en banc) (noting that the standard in subsection (e)(5) is reiterated in (g)(1)(C)); *Deters v. United States Parole Comm'n,* 85 F.3d 655, 660-61 & n. 5 (D.C.Cir.1996); *Blazy v. Tenet,* 979 F.Supp. 10, 19 (D.D.C. 1997).

In order to state a claim under the Privacy Act for an agency's failure to maintain accurate records to assure fairness to an individual, a plaintiff must establish "inaccurate records, agency intent, proximate causation, and an 'adverse determination.'" *Toolasprashad v. Bureau of Prisons,* 286 F.3d 576, 583 (D.C.Cir.2002). *Also see, Blazy, supra.*

As the courts have observed, typically in Privacy Act cases "it is feasible, necessary, and proper for the agency, and in turn, the district court to determine whether each filed item of information is accurate." *Blazy,* 979 F.Supp. at 20, quoting *Sellers v. Bureau of Prisons,* 959 F.2d 307, 311 (D.C. Cir. 1992). Where the facts are "'clearly provable,' the district court must conduct a *de novo* review of the evidence to determine

14

the accuracy of the records." *Id.*

Significantly, in this case, the defendants have not even argued that the facts at issue are accurate or verified. Nor have the defendants asserted that plaintiff's Complaint fails to state a claim under Privacy Act subsections (e)(5) and (e)(2). Instead, defendants misconstrue the nature of plaintiff's Privacy Act claims to argue that plaintiff is directly challenging her removal from the SES, whereas plaintiff has only pleaded a claim for damages resulting from defendants' failure to maintain accurate records under Privacy Act subsection (e)(5) and defendants' failure to collect information directly from plaintiff under Privacy Act subsection (e)(2).

In this case, plaintiff has alleged several failures by defendants to maintain accurate records which resulted in adverse action. These facts state a claim for relief under Privacy Act subsection (e)(5).

First, plaintiff alleges that the June 3, 2005 memorandum issued by Lt. Col. Strock falsely asserts that the memorandum from Assistant Secretary Bolton dated July 14, 2004 authorized Strock to remove plaintiff from the SES. *See* Complaint, ¶¶ 188-212 and 274-275. Defendants do not assert in their motion to dismiss or for summary judgment that the Strock memorandum dated June 3, 2005 was accurate.

Second, plaintiff alleges that Lt. Col. Strock provided a document referred to as an "analysis" which was attached to his memorandum of June 3, 2005 and that this "analysis" contained false and misleading information that was intended to mislead the Secretary of the Army as to the status of the investigation into plaintiff's concerns about improprieties and retaliation. P. Ex. D at pp. 3-4 ("Enclosed is an analysis prepared by my staff which clearly demonstrates that Ms. Greenhouse's removal from the SES is

based on her performance and not in retaliation for any disclosures of alleged improprieties she may have made."), and pp. 20-28 ("Analysis"); Complaint, ¶¶ 276-283.

Notably, defendants did not even provide the Court with a copy of the "analysis" as part of Defendants' Exhibit A to Defendants' motion. Nor did the defendants assert in their motion that the "analysis" was accurate. As plaintiff alleged in her Complaint, LTG Strock has testified in the fact-finding conference investigation into plaintiff's EEO complaint, held on April 18, 2006, that he submitted the "analysis" to the Secretary of the Army to support the request for removal of plaintiff from the SES even though LTG Strock did not authorize the preparation of the "analysis," had no idea who prepared it, did not know when it was prepared, did not know whether the document had been verified, and without having read the "analysis." Complaint, ¶¶ 279-280. *Also see* P. Ex. F [Testimony of Lt. Col. Strock before the EEO fact-finding investigation conference] at Tr. 2111, 2167-2170.

Defendants' motion to dismiss Plaintiff's claims under Privacy Act subsection (e)(5) must be denied. Based on the circumstances of this case, failure by defendants to maintain accurate information about plaintiff, taking adverse personnel action against plaintiff based on the inaccurate information provided by Lt. Col. Strock and his staff before DOD IG even spoke to plaintiff and before DOD IG conducted any investigation, and plaintiff's allegations that these failures were willful and resulted in adverse action (Compl., ¶¶ 208-220 and 274-291), gives rise to a claim under Privacy Act subsection (e)(5).

<u>CONCLUSION</u>

For the foregoing reasons, Defendants motion for partial summary judgment on the pleadings, or in the alterative, for partial summary judgment should be denied with respect to Plaintiff's WPA claims and her Privacy Act claims.

Respectfully Submitted,

_____/s/_____
Michael D. Kohn
DC Bar No. 425617

_____/s/_____
David K. Colapinto
DC Bar No. 416390
KOHN, KOHN, COLAPINTO, LLP
3233 P Street, NW
Washington, DC 20007
(Phone) 202-342-6980
(Fax) 202-342-6984

Dated: December 4, 2007

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                              |   |                                    |
|------------------------------|---|------------------------------------|
| BUNNATINE H. GREEENHOUSE     | ) |                                    |
|                              | ) |                                    |
| Plaintiff,                   | ) |                                    |
|                              | ) |                                    |
| v.                           | ) | Civil Action No. 07-0182 (EGS)     |
|                              | ) |                                    |
|                              | ) |                                    |
| PETE GEREN,                  | ) |                                    |
| Secretary of the Army, et. al., | ) |                                 |
|                              | ) |                                    |
| Defendants.                  | ) |                                    |

## PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS

1.      Ms. Greenhouse has been a member of the United States Army's Senior Executive Service ("SES") since 1997, at which time she was named as the United States Corps of Engineers ("USCE") Principal Assistant responsible for Contracting ("PARC"). Complaint, ¶32.

2.      Army Regulation ("AR") 690-900, Chapter 920, Subchapter 5 addresses performance-based removals of a member of the Army's SES.  Defendants' Statement of Material Facts Not in Dispute ("DSMF") at Fn. 1.

3.      The basis for Ms. Greenhouse's removal from the SES is that she initially received two successive proposed Level 5 fails ratings from the Commander of the USACE. A performance rating of a member of the USACE's SES used to justify the removal of a member of the USACE's SES must be approved by the Assistant Secretary of the Army (Manpower Reserve Affairs)("ASA(MRA)"), Logistics & Technology), who, during the relevant time period, was Hon. Reginald J. Brown. Complaint, ¶¶ 137, 141, 190, 192.

4.      The USACE was prohibited from removing Ms. Greenhouse from the SES until such time as ASA Brown approved that Ms. Greenhouse's performance warranted her removal from the SES.  Complaint, ¶198.

5.      The first proposed adverse performance appraisal to be issued to Ms. Greenhouse covered the period of October 1, 2001 through September 30, 2002.  By way of a memorandum dated April 2, 2003, the Commander of the USACE, LTG Robert B, Flowers, issued a request that Ms. Greenhouse's level 5 rating be approved and that Ms. accordingly be removed from the SES.  LTG Flowers issued his memorandum to the Assistant Secretary of the Army (Acquisition, Logistics & Technology) ("ASA(ALT)"), the Hon. Claude Bolton, who was responsible for providing ASA Brown with a recommendation as to what action ASA Brown may wish to follow. Plaintiffs Exhibit ("Ex.") A; Complaint, ¶137.

6.      ASA Bolton reviewed the proposed Level 5 rating and on May 30, 2003, recommendation to ASA Brown, by way of memorandum, "that the evidence is insufficient to support the proposed action" and that ASA Brown "disapprove LTGs' request to proceed with Ms. Greenhouse's proposed removal from the Senior Executive Service based on unsatisfactory performance."  Ex. B; Complaint ¶137.

7.      On July 11, 2003, ASA Brown completed his review of Ms. Greenhouse's proposed level 5 performance appraisal and forward a memorandum to LTG Flowers directing that Ms. Greenhouse not be removed from the SES and that the Commander of the USACE change Ms. Greenhouse's Level 5 rating.  Ex. C; Complaint ¶141.

8.     On March 16, 2004 the Command of the USACE, LTG Flowers, transmitted a subsequent request to ASAs Bolton and Brown seeking approval for the issuance of another Level 5 final performance rating of Ms. Greenhouse covering the rating period of June 11, 2003 through December 31, 2003.  Complaint, ¶227.

9.     On July 14, 2004, ASA Bolton issued a memorandum to ASA Brown stating that "based on [ASA Bolton's] belief that the evidence is insufficient to support an Unsuccessful (Level 5) rating, I recommend that you disapprove LTG Flowers' intent to assign Ms. Greenhouse an Unsuccessful rating.  Assuming that LTG Flowers will replace the Unsuccessful rating with a Fair rating, I recommend that LTG Flowers proceed with Ms. Greenhouse's proposed removal from the SES because of the two less than fully successful ratings within the past three years."  Ex. D, pp.5-7; Complaint, ¶191.

10.     Without having obtained a memorandum of approval from ASA Brown, the USACE obtained access to copy of ASA Bolton's memorandum to ASA Brown. Relying on ASA Bolton's memorandum of recommendation to ASA Brown, the USACE decided to issue Ms. Greenhouse a Level 4 rating and proceeded with the removal of Ms. Greenhouse from the SES and as the Agency's PARC. Complaint, ¶232.

11.     On October 5, 2004, the Commander of the USACE, LTG Strock, issued a memorandum to Ms. Greenhouse notifying her that she was being removed from the SES.  Ex. E. No memorandum from ASA Brown is included in the documents relied upon for the removal of Ms. Greenhouse from the SES. *Id.*

12.     ASA Brown did not approve Ms. Greenhouse's removal from the SES and never communicated approval for the removal of Ms. Greenhouse to the Commander of

the USACE. Complaint, ¶192.[1]

13.    Ms. Greenhouse concluded that her removal from the SES and as the Agency's PARC constituted a violation of the WPA as well as Title VII. On October 14, 2004 Ms. Greenhouse filed to amendment to a pending EEO complaint to include a claim that her removal from the SES and as the USACE's PARC constituted a "mixed case" based on "sex, race and age discrimination as well as retaliation and discrimination based on whistleblower activity in violation of the federal law including the Federal Whistleblower Protect Act." Ex. G.

14.    On October 21, 2004 Ms. Greenhouse, through her counsel, submitted a Request for Investigation to the then Acting Secretary of the Army, the Hon. Less Brownlee setting forth much of the basis of her whistleblower claims.   Ex. D, pp.8-18. Therein Ms. Greenhouse's counsel alleged that the Command of the USACE sought to remove Ms. Greenhouse as a result of the allegations detailed in the October 21, 2004. The allegations concerns, *inter alia,* allegations that the USACE engaged in unlawful and improper contracting activity with respect to contracts to be awarded and that were ultimately awarded to Halliburton subsidiary Kellogg Brown and Root ("KBR"). *Id.*

15.    The allegations were of such significance that, the Acting Secretary of the Army, through counsel, responded to the Request for Investigation the following day stating:   "The Army has referred this matter to the Department of Defense Inspector

---

[1] The document utilized by the USACE to remove Ms. Greenhouse from the SES contains near the top of the page a penned comment that appears to read "Noted RJB". Ex. D, pp.5.  Whether the penned comments can be authenticated is in question as Mr. Brown is now deceased.  Even if an assumption were made that the penned comment is in ASA Brown's handwriting, the meaning of the word "noted" cannot constitute a formal determination that ASA Brown approved Ms. Greenhouse's removal.  Bolton observed that the word "noted" does not equate to approval.  Ex. I [Testimony of Claude Bolton] Tr. 2397-98.

General for their review and action, as appropriate.  Additionally, the Acting Secretary of the Army has directed that the Commander, USACE, suspend any adverse personnel action so that Ms. Greenhouse remains in her current position until a sufficient record is available to address the specific matters you raised."  Ex. D, p.19.

16.     Ms. Greenhouse has yet to be contacted or interviewed by the DOD IG. Complaint, ¶211.  Ex. H, ¶2.

17.     On June 3, 2005 USACE Commander Strock issued a memorandum to the Secretary of the Army, with attachments, requesting the removal of Ms. Greenhouse from the SES.  Ex. D.  This memorandum asserts that it was sent "thru the Inspector General". Defendants' Ex. D at p. 3.  It was not sent through the DOD IG.  Instead it was, for unstated reasons, sent thru the Army IG.  However, the Army IG was not authorized by the Secretary of the Army to investigate Ms. Greenhouse's allegations and, upon information and belief, never conducted an investigation of any concern set forth in the October 21, 2004 Request for Investigation.  Complaint, ¶285.

18.     Instead of relying on a sufficient record, LTG Strock attached to his June 3, 2005 memorandum a document referred to as an "analysis" that contains false and misleading information for the purpose of misleading the Secretary of the Army as to the status and sufficiency of the investigation into plaintiff's concerns about improprieties and retaliation. Ex. D, p.20-28; Complaint, ¶¶ 276-283.[2]

19.     At no time did anyone from the DOD IG, the Army IG, or the USACE seek to interview Ms. Greenhouse concerning the allegations set forth in the October 21, 2004 Request for Investigation.  Ex. H, ¶2.

---

[2] Defendants do not assert in their moving papers that the "analysis" is accurate. Defendants also do not assert, in their moving papers, that the Strock memorandum dated June 3, 2005 is accurate.

20.     LTG Strock submitted the "analysis" to the Secretary of the Army to support the request for removal of plaintiff from the SES even though LTG Strock did not authorize the preparation of the "analysis," he had no idea who prepared it, he did not know when it was prepared, he did not know whether the document had been verified, and he submitted it without having even read the "analysis." Ex. F [Testimony of LTG Strock before the EEO fact finding investigation conference], Tr. 2111, 2167-2170; Complaint, ¶¶ 279-280.

21.     The Army IG had no basis to conclude that the analysis was either complete or accurate as it never conducted an investigation of Ms. Greenhouse's allegations and never even sought to interview Ms. Greenhouse. Ex. H, ¶3.

22.     The submission of the "analysis" through the Army IG was nothing more than window dressing for the purpose of misleading the Secretary of the Army as to the sufficiency of an "analysis" that LTG Strock had, himself, not read, and did not know who had prepared it or if the assertions contained therein had been verified. Ex. F, Tr. 2111, 2167-2170; Complaint, ¶214.

23.     LTG Strock falsely states in his June 3, 2005 memorandum to the Secretary of the Army that appropriate approval was previous obtained for the removal of Ms. Greenhouse in the form of a copy of the July 14, 2004 memorandum from ASA Bolton to ASA Brown.  *See* Complaint, ¶¶ 188-212 and 274-275.

24.     On June 27, 2005 Ms. Greenhouse testified before a congressional committee concerning her observations related to contract abuse associated with contracts that had been awarded to Halliburton/KBR with respect to the Iraq War.  A copy of her prepared testimony is attached as Ex. J; Complaint, ¶217.

25.     The day plaintiff appeared before the Congressional Committee, the Army IG released LTG Strock's request for the removal of plaintiff to the then Secretary of the Army, Dr. Francis Harvey. Complaint, ¶219.

26.     On July 14, 2005 the Secretary of the Army, relying on the information contained in the June 3 2005 memorandum and the accompanying attachments, allegedly approved LTG Strock's request to remove Ms. Greenhouse from the SES.  Ex. D, p.4; Complaint, ¶220.

27.     On July 26, 2005 LTG Strock issued to Ms. Greenhouse a memorandum, with attachments, that provided her with notice of the intent to remove her from the SES and supporting documents the U.S. Army Corps of Engineers was relying upon to justify her removal.  Ex. D.

28.     Pursuant to LTG Strock's July 26, 2005 notice, Ms. Greenhouse was removed from the SES and as the Agency's PARC on August 27, 2005.  Ex. D, p.1.

29.     On September 2, 2005, Ms. Greenhouse filed a Fourth Amendment to her pending claims before the Agency's EEO office.  Therein, Ms. Greenhouse alleged that her removal from the SES constituted discriminatory and retaliatory action taken in violation of the WPA and Title VII. Ex. K.

30.     On December 26, 2006 the Agency's EEO office issued a final determination on Ms. Greenhouse's mixed case complaint.  Ex. L.

31.     On September 26, 2007, Ms. Greenhouse filed the underlying mixed case complaint in this matter, alleging, *inter alia*, claims under the Privacy Act, Title VII and the WPA.


                                        Respectfully Submitted,


                                        _____/s/_____
                                        Michael D. Kohn
                                        DC Bar No. 425617

                                        _____/s/_____
                                        David K. Colapinto
                                        DC Bar No. 416390
                                        KOHN, KOHN, COLAPINTO, LLP
                                        3233 P Street, NW
                                        Washington, DC 20007
                                        (Phone) 202-342-6980
                                        (Fax) 202-342-6984



Dated: December 4, 2007

Plaintiff's Exhibit A

**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
WASHINGTON, D.C. 20314-1000

0 2 APR 2003

REPLY TO
ATTENTION OF:

CECG

MEMORANDUM FOR ASSISTANT SECRETARY OF THE ARMY (ACQUISITIONS, LOGISTICS, and TECHNOLOGY), 103 ARMY PENTAGON, WASHINGTON, DC 20310-0103

SUBJECT: SES Unacceptable Performance - Ms. Bunnatine Greenhouse

1. Ms. Bunnatine Greenhouse currently serves as the Principal Assistant Responsible for Contracting, Headquarters, U.S. Army Corps of Engineers. She is a member of the Senior Executive Service under my supervision.

2. On 12 December 2002, Ms. Greenhouse received her initial appraisal of performance from her rater, MG Hans A. VanWinkle. MG VanWinkle concluded that Ms. Greenhouse had performed at a level of "Fails" in four of her performance objectives. (TAB A). By letter dated 16 December 2002, Ms. Greenhouse requested a meeting with MG VanWinkle to discuss her performance and that meeting was held on 10 January 2003. (TAB B). On 24 January 2003, Ms. Greenhouse provided a binder of "comments and documentation" to MG VanWinkle. (TAB C). By memorandum dated 30 January 2003, MG VanWinkle provided his rationale for Ms. Greenhouse's initial rating. (TAB D). Ms. Greenhouse did not request a review of her initial rating by a higher executive level at Army Headquarters. On 11-12 February 2003, the Performance Review Board met to develop its recommended SES evaluations. After considering Ms. Greenhouse's binder of information and MG VanWinkle's memorandum, the Performance Review Board recommended a rating of "Unsuccessful."

3. In deciding Ms. Greenhouse's final rating, I am mindful that under the performance rating rules for members of the SES, if Ms. Greenhouse is given a final rating of "Unsuccessful", she must be removed from her current position and either reassigned to another SES position or she must be removed from the SES and placed in a grade 15 position. Since the Corps of Engineers does not have another SES position for which Ms. Greenhouse is qualified, she would have to be removed from the SES and placed in a grade 15 position.

4. The record reflects that since Ms. Greenhouse assumed her SES position in June 1997, she has received repeated performance counseling for failure to adequately manage and supervise her staff, failure to develop adequate working relationships with other Corps senior executives, other leadership deficiencies, and failure to timely and effective support contracting functions throughout the Corps. Furthermore, three of her last four raters have all commented that Ms. Greenhouse cannot accept valid criticism end effectuate improvement.

-2-

5. Aside from her performance during the rating cycle, we are considering appropriate action involving an allegation of misconduct that was sustained by the Department of the Army Inspector General (DAIG) and I am aware that the DAIG is nearing conclusion of an investigation into serious allegations that Ms. Greenhouse retaliated against a subordinate for making protected disclosures. Those matters will be dealt with separately and are not part of my decision in this performance matter.

6. After considering the entire record and all performance information in this case, including Ms. Greenhouse's responses and submittals, I have concluded that Ms. Greenhouse can no longer serve as the Corps Senior Contracting Executive and that her removal from the Senior Executive Service will best serve the Army. Over time, she has done irreparable harm to members of her office and has not provided our customers with the quality and timeliness of service they deserve. She has had ample time to correct these deficiencies. In accordance with AR 690-900, chapter 920, subchapter 7, paragraphs 7-2(c)(6), I request your permission to remove Ms. Bunnatine Greenhouse from her position and the Senior Executive Service bases on her final performance rating of "Unsuccessful".

Enclosures

Robert B. Flowers
Lieutenant General, U.S. Army
Commanding

Copies furnished:
ASA(M&RA) ATTN: SES Office
OTAG

Plaintiff's Exhibit B

DEPARTMENT OF THE ARMY
OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY
ACQUISITION LOGISTICS AND TECHNOLOGY
103 ARMY PENTAGON
WASHINGTON DC 20310-0103

3 0 MAY 2003

SAAL-ZA

MEMORANDUM FOR ASSISTANT SECRETARY OF THE ARMY
(MANPOWER AND RESERVE AFFAIRS),
111 ARMY PENTAGON, ROOM 2E468,
WASHINGTON, D.C. 20310-0111

SUBJECT: Proposed Removal of Ms. Bunnatine Greenhouse from the
Senior Executive Service (SES) for Unsatisfactory Performance

I have enclosed a memorandum from Lieutenant General (LTG)
Robert B. Flowers, Commander, U.S. Army Corps of Engineers (USACE), dated
April 2, 2003, requesting permission to remove Ms. Bunnatine Greenhouse from
her position as the Principal Assistant Responsible for Contracting,
Headquarters, USACE, and the Senior Executive Service (SES), based on a final
performance rating of "Unsuccessful" (Unsatisfactory). LTG Flowers submitted
to me his request to initiate adverse action against Ms. Greenhouse for my
review and recommendation to you because I have functional responsibility over
acquisition management and procurement. As discussed below, I have reviewed
the proposed adverse action and recommend that you disapprove LTG Flower's
request to proceed with the proposed action.

On December 12, 2002, Major General (MG) Hans Van Winkle,
Ms. Greenhouse's Rater, gave her his initial appraisal of her performance for the
rating period October 1, 2001 through September 30, 2002. MG Van Winkle
concluded that Ms. Greenhouse had failed in 4 of her 25 major performance
objectives. A fails rating in any of the major performance objectives would result
in the evaluation being Unsuccessful, Level-5. Ms. Greenhouse responded to
MG Van Winkle on December 16, 2002. She disagreed with the rating and
requested a meeting. On January 9, 2003, Ms. Greenhouse's attorney wrote
LTG Robert B. Flowers, the USACE Commander and Ms. Greenhouse's Senior
Rater, advising him that the negative performance rating was unwarranted and
legally insufficient. On January 10, 2003, MG Van Winkle and Ms. Greenhouse
met to discuss the Unsuccessful rating. On January 24, 2003, Ms. Greenhouse's
attorney wrote to MG Van Winkle, contesting the Unsuccessful rating. On
January 30, 2003, MG Van Winkle signed a lengthy memorandum justifying the
Unsuccessful rating. On January 31, 2003, Ms. Greenhouse responded to
MG Van Winkle's justification for the Unsuccessful rating. Subsequently, the
rating, with back-up documentation, was submitted to the Performance Review
Board, who recommended an Unsuccessful, Level-5 rating. LTG Flowers, the
Senior Rater, concurred with the Unsuccessful, Level-5 rating.

-2-

Pursuant to SES regulatory provisions promulgated by Office of the Personnel Management, if the final rating is unsatisfactory (unsuccessful), the Executive must be reassigned, transferred or removed. LTG Flowers indicated that the USACE does not have another SES position available to offer as a reassignment or transfer. Accordingly, if the unsuccessful rating is not changed, the USACE will remove Ms. Greenhouse from her current position and the SES, and place her in a newly created GS-15 position within the organization.

In lieu of removing Ms. Greenhouse from the SES, and as the Functional Official responsible for acquisition management and procurement, I considered her reassignment or transfer to another vacant SES position for which she is qualified. However, there are no current vacant SES positions available. Moreover, I do not think it would be in the best interest of the agency to reassign her to another SES position.

The case file is voluminous and the parties disagree on the number of times counseling was held and what information was communicated to Ms. Greenhouse concerning her unsatisfactory performance. There are two written memorandums for record by MG Van Winkle, dated January 4, 2002 and April 24, 2002. In neither memorandum is Ms. Greenhouse specifically told that her performance is unsatisfactory or that she is failing in regard to any of her performance objectives. Paragraph S5-7, AR 690-900, Chapter 920, Senior Executive Service, provides that "At any time during the rating period that a Ratee fails, or is failing, to meet an Objective, the Rater must counsel the Ratee. The Rater should provide written information to the Ratee on specific deficiencies and necessary improvements and establish a reasonable timeframe in which the Ratee must improve before corrective action is initiated. The written notice should also define assistance to be provided to help the Ratee meet expectations, e.g., formal training, on-the-job training, coaching and counseling. Failure to make a sustained improvement will result in a performance based action."

I have reviewed the case file, to include Ms. Greenhouse's most recent submission to you dated April 18, 2003, challenging the proposed unsatisfactory rating. I also met with USACE counsel and shared my concern about the absence of documentary evidence that agency officials specifically put Ms. Greenhouse on notice that her performance was unsatisfactory, and gave her a meaningful opportunity to improve. Counsel acknowledged the absence of such documentary evidence. Counsel, however, is relying on the expected testimony of Senior Management Officials that Ms. Greenhouse was well aware of her performance deficiencies.

-3-

      Accordingly, based on my belief that the evidence is insufficient to support the proposed action, I recommend that you disapprove LTG Flowers' request to proceed with Ms. Greenhouse's proposed removal from the Senior Executive Service because of unsatisfactory performance.

      My point of contact for this action is ██████████████, ████████████, or e-mail: ██████████████████.

                         *Claude M. Bolton*
                    Claude M. Bolton, Jr.
                 Assistant Secretary of the Army
           (Acquisition, Logistics and Technology)

Enclosure

Plaintiff's Exhibit C

02/10/2004 08:25 FAX 7035980140                DAJA LE                                    ☑005
Feb-04-04  14:58    From-Shaw Bransford Vailleux & Roth P.C.          +        T-720  P.005/005  F-578



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY
MANPOWER AND RESERVE AFFAIRS
111 ARMY PENTAGON
WASHINGTON, DC 20310-0111



REPLY TO
ATTENTION OF

July 11, 2003

MEMORANDUM FOR DEPUTY COMMANDER, UNITED STATES ARMY
CORPS OF ENGINEERS, WASHINGTON, D.C.
20314-1000

SUBJECT: Proposed Removal of Ms. Bunnatine Greenhouse from the Senior
Executive Service (SES) for Unsatisfactory Performance

Reference CECG memorandum dated 02 Apr 2003, subject: SES
Unacceptable Performance – Ms. Bunnatine Greenhouse

Based upon Assistant Secretary Bolton's recommendation and my review
of the action, I found insufficient evidence that USACE officials specifically put
Ms. Greenhouse on notice that her performance was unsatisfactory, and gave her
a meaningful opportunity to improve, in accordance with established SES
performance management regulations. Therefore, you failed to justify the level 5
rating for Ms. Greenhouse. Accordingly, her current rating of unsuccessful,
Level 5, must be changed, and appropriate corrective actions should be taken to
implement the change in her rating.

For this reason, I deny your request to remove Ms. Greenhouse from the
SES.

Reginald J. Brown
Assistant Secretary of the Army
(Manpower and Reserve Affairs)

CF:
ASA (ALT)
OTJAG



Printed on  Recycled Paper

Plaintiff's Exhibit D



**DEPARTMENT OF THE ARMY**
OFFICE OF THE CHIEF OF ENGINEERS
WASHINGTON, D.C. 20314-1000

REPLY TO
ATTENTION OF:

2 6 JUL 2005

CECG

MEMORANDUM FOR Ms. Bunnatine Greenhouse, Principal Assistant Responsible for
Contracting, U.S. Army Corps of Engineers

SUBJECT: Notice of Removal from the Senior Executive Service

1. References:

   a. Memorandum, HQ, CECG, 5 October 2004, subject: Notice of Removal from the Senior
Executive Service.

   b. Letter, Kohn, Kohn & Colapinto, LLP, 21 October 2004, subject: Request for
Investigation.

   c. Letter, Labor and Employment Law Division, OTJAG, 22 October 2004, Re: Request for
Investigation.

2. In reference 1.a, I provided you with the notice required by law and regulation that you would
be removed from the Senior Executive Service and your position of Principal Assistant
Responsible for Contracting on 13 November 2004 and provided you with all your appeal and
other rights. In reference 1.b, Mr. Michael D. Kohn, your attorney, wrote to Acting Secretary
Brownlee requesting an investigation into certain alleged procurement irregularities within the
Corps of Engineers and contending that you were facing an adverse personnel action because of
your disclosure of the alleged procurement irregularities identified in his letter. In reference 1.c,
in response to Mr. Kohn, the Army advised that it had referred the matter to the Department of
Defense Inspector General and that Acting Secretary Brownlee was suspending any adverse
action against you until a sufficient record was available to address the matters he raised. The
Secretary of the Army has now authorized me to proceed with the removal action. (copy
enclosed).

3. Accordingly, I am revising the effective date of your removal from 13 November 2004 to
27 August 2005. For your information, I have enclosed a copy of the position description for the
GS-0340-15 position into which you will be placed upon your removal from the Senior
Executive Service. This position is in the Directorate of Civil Works, Engineering and
Construction Division and your first line supervisor will be Mr. Donald L. Basham.

01

CECG
SUBJECT: Notice of Removal from the Senior Executive Service

4. There are administrative details to be resolved, as well as certain tasks that you must complete, prior to and as a consequence of your departure from your Senior Executive Service position. MG Griffin, BG (P) Bostick, the incoming Deputy Commanding General, and I will work with you to ensure a smooth transition to your new position.

5. A Notification of Personnel Action, SF-50, will be forwarded to you once this action has been effected. Failure to acknowledge receipt shall not void the content of this memorandum.

Encls

CARL A. STROCK
Lieutenant General, USA
Commanding

O2



**DEPARTMENT OF THE ARMY**
U.S. Army Corps of Engineers
WASHINGTON, D.C. 20314-1000

REPLY TO
ATTENTION OF:

**JUN 0 3 2005**

MEMORANDUM THRU THE INSPECTOR GENERAL, 1700 ARMY PENTAGON,
WASHINGTON, DC 20310-1700

FOR THE SECRETARY OF THE ARMY, 101 ARMY PENTAGON, WASHINGTON, DC
20310-0101

SUBJECT: Removal of Ms. Bunnatine Greenhouse from the Senior Executive Service

1. References:

   a. SAAL-ZP Memorandum, 14 Jul 2004, subject: Senior Executive Service (SES)
   Unacceptable (Unsuccessful) Performance-Ms. Bunnatine Greenhouse.

   b. Letter, Kohn, Kohn & Colapinto, LLP, October 21, 2004, subject: Request for
   Investigation.

   c. Letter, Labor and Employment Law Division, OTJAG, October 22, 2004, Re: Request for
   Investigation.

2. Reference 1.a. authorized me to remove Ms. Greenhouse from her SES position as Principal
Assistant Responsible for Contracting and place her in a GS-15 position as required by law,
based on her second final performance rating of less than fully successful within a three year
period. In reference 1b, Mr. Michael D. Kohn, representing Ms. Greenhouse, wrote to Acting
Secretary of the Army Brownlee requesting an investigation into certain alleged procurement
irregularities within the Corps of Engineers and contending that Ms. Greenhouse was facing an
adverse personnel action because of her disclosure of the alleged procurement irregularities
identified in his letter. Reference 1c responded to Mr. Kohn advising him that the Army had
referred the matter to the DoD Inspector General and that any adverse action against Ms.
Greenhouse was suspended until a sufficient record was available to address the matters he
raised.

3. Enclosed is an analysis prepared by my staff which clearly demonstrates that Ms.
Greenhouse's removal from the SES is based on her performance and not in retaliation for any
disclosures of alleged improprieties she may have made.

SUBJECT: Removal of Ms. Bunnatine Greenhouse from the Senior Executive Service

4. I request that you authorize me to proceed with Ms. Greenhouse's removal action. I am sending this memorandum through the Inspector General for coordination and to ensure that all relevant information is taken into account.

Encls

CARL A. STROCK
Lieutenant General, USA
Commanding

CF:
General Counsel

14 JUL 2005
_____ APPROVED

_____ DISAPPROVED

2

04

09/30/2004 07:32 FAX 703 588 2423                                      @002



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY
ACQUISITION LOGISTICS AND TECHNOLOGY
103 ARMY PENTAGON
WASHINGTON DC 20310-0103

1 4 JUL 2004

SAAL-ZP

MEMORANDUM FOR ASSISTANT SECRETARY OF THE ARMY (MANPOWER AND
RESERVE AFFAIRS)

SUBJECT: Senior Executive Service (SES) Unacceptable (Unsuccessful)
Performance-Ms. Bunnatine Greenhouse

    I have enclosed a memorandum from Lieutenant General (LTG) Robert B.
Flowers, Commander, U.S. Army Corps of Engineers (USACE), notifying us of his
intent to assign Ms. Bunnatine Greenhouse a final performance rating of Unsuccessful
(Level 5), and seeking approval to take an adverse action against her based on her
performance. Ms. Greenhouse is a member of the SES and currently serves as the
Principal Assistant Responsible for Contracting, Headquarters, USACE. LTG Flowers
submitted his request to initiate adverse action against Ms. Greenhouse through me
for my review and recommendation to you because I have functional responsibility over
acquisition management and procurement.

    As discussed below, I have reviewed the proposed adverse action and
recommend that you disapprove LTG Flower's intent to assign an overall performance
rating of Unsuccessful. However, a rating of Fair (Level 4) appears appropriate.
Therefore, provided LTG Flowers assigns Ms. Greenhouse a Fair rating, she must
be removed from the SES pursuant to Office of Personnel Management regulations
because this would be her second "less than fully successful rating" within three
consecutive years.

    On January 29, 2004, Major General (MG) Robert H. Griffin, Ms. Greenhouse's
Rater, gave her his initial appraisal of her performance for the rating period October 1,
2002 through December 31, 2003. MG Griffin concluded that Ms. Greenhouse had
failed in five of her 10 major performance objectives. A fails rating in any of the
major performance objectives would result in the evaluation being Unsuccessful.
Ms. Greenhouse responded to MG Griffin by memorandum on February 4, 2004.
She amended this memorandum on February 9, 2004. Ms. Greenhouse vehemently
protested the rating. On February 20, 2004, MG Griffin prepared a summary of his
assessment of Ms. Greenhouse's performance. Of the 10 major performance
objectives, he rated Ms. Greenhouse as Fails on five, Needs Improvement on four,
and Excellent on 1. On February 25-26, 2004, Ms. Greenhouse's rating, with back-up
documentation, was submitted to the USACE Performance Review Board. The Board

-2-

recommended an Unsuccessful (Level 5) rating. LTG Flowers, Ms. Greenhouse's Senior Rater, concurred with the Unsuccessful rating.

The case file is voluminous and the parties disagree on most issues, to include the major performance objectives, the method of evaluating her performance, the sufficiency of notice of unsatisfactory performance, the lack of assistance and a reasonable timeframe to improve performance. At the beginning of the rating period, MG Hans Van Winkle, the former USACE Deputy, served as Ms. Greenhouse's rater. In January 2003, Ms. Greenhouse proposed to MG Van Winkle 34 performance objectives. MG Van Winkle reviewed Ms. Greenhouse's submission and developed 10 major performance objectives. Over Ms. Greenhouse's objection, LTG Flowers, the Senior Rater, approved the 10 major performance objectives proposed by MG Van Winkle on June 11, 2003. MG Van Winkle retired in June 2003 and was replaced by MG Griffin.

MG Griffin adopted the 10 performance objectives approved by LTG Flowers and first met with Ms. Greenhouse on July 31, 2003. Also, at this meeting MG Griffin provided Ms. Greenhouse a copy of her evaluation report for the period October 1, 2001 through September 30, 2002, reflecting an Overall Performance Rating of Fair (Level 4). A memorandum of that performance meeting is dated August 28, 2003. MG Griffin met a second time with Ms. Greenhouse on September 3, 2003. The memorandum of that performance meeting is dated September 12, 2003. Their third performance meeting was on November 7, 2003. At this meeting, MG Griffin advised Ms. Greenhouse that he was extending the rating period through December 31, 2003. He also advised Ms. Greenhouse that she was failing in several performance objectives. The memorandum of that performance meeting is dated December 1, 2003. Ms. Greenhouse did not receive this memorandum until December 5, 2003. On December 4, 2003, MG Griffin sent Ms. Greenhouse an e-mail, subject: Performance Meeting Feedback. In that e-mail MG Griffin commented that his review of her staff action control sheets indicates that she is failing to meet the timeliness performance objective. MG Griffin met with Ms. Greenhouse briefly on December 5, 2003. That counseling session did not focus on her failing performance but on current contracting actions. Their fourth and final performance meeting occurred on January 12, 2004. This meeting had been rescheduled from December 19, 2003. MG Griffin reiterated his opinion that Ms. Greenhouse was failing in several performance objectives. The memorandum of that performance meeting is dated January 20, 2004.

Paragraph S5-7, Army Regulation 690-900, Chapter 920, SES, provides that, "At any time during the rating period that a Ratee fails, or is failing, to meet an Objective, the Rater must counsel the Ratee. The Rater should provide written

703 588 2423                                    @004

-3-

information to the Ratee on specific deficiencies and necessary improvements and establish a reasonable timeframe in which the Ratee must improve before corrective action is initiated. The written notice should also define assistance to be provided to help the Ratee meet expectations, e.g., formal training, on-the-job training, coaching and counseling. Failure to make a sustained improvement will result in a performance based action."

I have reviewed the case file, along with Ms. Tina Ballard, Deputy Assistant Secretary for Policy and Procurement. Ms. Ballard also met with MG Griffin and USACE counsel and shared our concern about the brief period of time between formal notice of unsatisfactory performance and a meaningful opportunity to improve. Counsel acknowledged this shortcoming, but he is relying on the expected testimony of Senior Management Officials, including MG Griffin, that Ms. Greenhouse was well aware of her performance deficiencies.

Last year, LTG Flowers recommended that Ms. Greenhouse be removed from her position and the SES based on a final rating of Unsuccessful. This rating was based on an evaluation by MG Van Winkle. LTG Flowers' request was disapproved because the evidence was insufficient to support an Unsuccessful rating. Accordingly, that rating was changed to Fair (Level 4), and Ms. Greenhouse remained in her position. However, as noted in paragraph 1 above, if Ms. Greenhouse were to receive a second "less than fully successful rating" this year, she must be removed from the SES and placed in a GS-15 position within Headquarters, USACE, or another organization.

Accordingly, based on my belief that the evidence is insufficient to support an Unsuccessful (Level 5) rating, I recommend that you disapprove LTG Flowers' intent to assign Ms. Greenhouse an Unsuccessful rating. Assuming that LTG Flowers will replace the Unsuccessful rating with a Fair rating, I recommend that LTG Flowers proceed with Ms. Greenhouse's proposed removal from the SES because of two less than fully successful ratings within the past three years.

My point of contact for this action is Ms. Tina Ballard, (703) 695-2488.

Claude M. Bolton, Jr.
Assistant Secretary of the Army
(Acquisition, Logistics and Technology)

Enclosure

07

# KOHN, KOHN & COLAPINTO, LLP

**ATTORNEYS AT LAW**

3233 P STREET, N.W.

WASHINGTON, DC 20007-2756

WWW.KKC.COM

TELEPHONE (202) 342-6980

FACSIMILE (202) 342-69 34

October 21, 2004

<u>Via Facsimile: 703-697-0720</u>
Hon. Les Brownlee
Office of the Acting Secretary of the Army
102 Army Pentagon
Rm 3E588
Washington, D.C.  20310-0102

Subject:     **Request for Investigation**

Dear Mr. Acting Secretary:

We write you in your official capacity as the Acting Secretary of Army.  Our firm has been retained by Ms. Bunnantine H. Greenhouse to represent her concerning her mandatory duty to "disclose waste, fraud, abuse and corruption to appropriate authorities," as required by Executive Order 12731, signed by President George H.W. Bush on October 19, 1990.  *See*, 5 C.F.R. section 2635.101, *57 Federal Register* 35006.  Ms. Greenhouse currently serves this nation as the United States Army Corps of Engineers ("USACE") Principal Assistant Responsible for Contracting (PARC),[1] as well as the USACE Competition Advocate.[2]

Ms. Greenhouse's concerns directly impact the integrity of the federal contracting program as it relates to a major defense contractor.  Given the gravity of the allegations set forth in this letter, we strongly believe that this matter must be promptly and carefully investigated by

---

[1]     Army acquisition activity is governed by regulations including the Army Federal Acquisition Regulation Supplement ("AFARS").  The AFARS specifies that the PARC  shall be "the senior staff official of the contracting function".  <u>See</u>  AFARS 5101.601(4)(ii)(A).  These regulations further specify that the contracting function "must be organizationally situated to minimize any potential for undue influence and protect contracting officers from intra-organizational pressure to perform improper acts." <u>See</u>  AFARS 5101.602-1(b).

[2]     Pursuant to the Competition in Contracting Act of 1984, the USACE must establish a "competition advocate."  Ms. Greenhouse is the designated "competition advocate" for activity occurring at USACE Headquarters.  The Competition Advocate is responsible for ensuring that fair and open competition exists on government contracting.

an *independent* executive agency and an appropriate congressional committee.[3]  In this regard, we request that you contact the Commander-in-Chief, the United States Attorney General and the Secretary of Defense in order to facilitate the appointment of an independent executive branch investigatory body to review the concerns set forth herein.  Furthermore, we request that your office ensure that Ms. Greenhouse is not subject to any retaliation during the pendency of this investigation or as a result of informing appropriate officials of her concerns pursuant to federal law, including, but not limited to, Executive Order 12731, 5 U.S.C. §7211, 10 U.S.C. §1034 and 18 U.S.C. §1513(e).  We fear that any adverse action against Ms. Greenhouse during the pendency of an investigation will compromise the integrity of any such investigation and have a "chilling effect" on witnesses relevant to the matters set forth herein.

As the USACE PARC and its Competition Advocate, Ms. Greenhouse plays an essential role in making sure that USACE contracting activity is fair and compliant with the letter and spirit of controlling regulations and laws.  Under Ms. Greenhouse's leadership, the Office of the PARC made remarkable progress opening the doors to smaller and minority contracting firms with a substantial stream of contracting dollars flowing from the largest contracting firms to the disadvantaged contractor community.  In a sworn declaration, a former Commander of the USACE, states that Ms. Greenhouse "strictly followed the Federal Acquisition Regulation ("FAR") for contracting and approached her work with high ethical standards. . . She did an outstanding job as PARC while she was under my supervision" but pressure from individuals "associated with favorite companies," resulted in "Ms. Greenhouse's strict and ethical application of the FAR work[ing] against her, when it should have instead been viewed with high regard by the Command."[4]

Resistance to Ms. Greenhouse's strict adherence to contracting requirements peaked as the USACE sought to issue contracts in preparation for the Iraq War.  Ms. Greenhouse experienced repeated interference with her role as the USACE PARC and Competition Advocate.  This interference was largely focused on multi-billion dollar contract issues pertaining to a Halliburton subsidiary, Kellogg Brown and Root ("KBR").  As set forth below, employees of the U.S. government have taken improper action that favored KBR's interests.  This conduct has violated specific regulations and calls into question the independence of the USACE federal procurement process.

Investigation of the following matters should commence immediately:

---

[3]      Pursuant to 5 U.S.C. §7211, Ms. Greenhouse, through counsel, shall be forwarding the appropriate information to responsible members of Congress to ensure that the legislative branch, along with the executive branch, appropriately review the concerns set forth herein.

[4]      A copy of this sworn declaration is in the possession of the USACE.  As a result of privacy concerns, the identity of the declarant and a copy of the declaration is not attached.

O9

1.    **Inclusion of a Five Year Term in the No-Compete RIO Contract**

From the start, Ms. Greenhouse's efforts to ensure integrity of the contracting process and to establish a level playing field for all contractors came into conflict with the USACE Command's desire to award a multiple-year no-compete $7 billion contract to KBR known as "Restore Iraqi Oil" ("RIO"). Federal acquisition regulations require that before a no-compete contract can be awarded, the federal government must prepare a Justification and Approval ("J&A") document setting forth the factual and legal justification for awarding a no-compete contract. J&As concerning contract awards over $10 million are uniformly presented to the PARC for approval and signature. However, before a J&A is drafted, the USACE may issue a letter contract that allows a contractor to begin work before the J&A process is completed and a finalized contract is awarded. A "letter contract" was issued to permit KBR to commence work that would be covered under the RIO Contract. Ms. Greenhouse raised a concern that the justification being relied upon to issue the letter contract was deficient because it did not identify any unique attributes KBR had that did not flow from government-created entitlements. For example, a key requirement for awarding the letter contract was a requirement that the contractor be knowledgeable of the contingency plan for the invasion of Iraq. However, this requirement was government-created because KBR alone drafted the contingency plan based on a modification to a pre-existing KBR contract, known as LOGCAP.[5] No other contractor was permitted to participate in the drafting of the contingency plan thereby limiting the award of the letter contract and the follow-on RIO Contract to KBR. This concern was shared by others.[6] Moreover, Ms. Greenhouse was concerned that the award to KBR conflicted with the usual practice of excluding the contractors who prepare cost estimates and courses of action, such as KBR did in its contingency plan, from bidding on the follow-on implementation contract due to the potential for conflicts of interest and overreaching by the contractor.

Following the issuance of the letter contract, a planning session was held at the Pentagon on February 26, 2003 to discuss, among other things, pre-planning activities and cost issues related to the implementation of the RIO Contract. The meeting was co-chaired by MG Strock (who at the time was the USACE Director of Military Programs, and who currently serves as the USACE Commander and Chief of Engineers). KBR representatives were invited to attend the meeting. As the meeting commenced, Ms. Greenhouse announced her expectation that the costs charged by KBR should be lower than the estimates included in its contingency plans and any request for indemnification should be lower for this contract as KBR was already deployed, which meant that the government should not be charged the initial deployment costs built into the estimates or any indemnification liability covered under the existing contract. Eventually discussions turned to matters that Ms. Greenhouse concluded were outside the scope of information KBR should be privy to until the RIO Contract was formally awarded and definitized. Ms. Greenhouse was so disturbed by KBR's continued participation that she left her seat to whisper in MG Strock's ear that the KBR representatives had to be removed from the

---

[5]    The GAO subsequently concluded that the modification to the LOGCAP Contract was improper because the scope of work did not fit the scope established in the LOGCAP contract.

[6]    See Attached Exhibit 1 (February 19, 2003 e-mail of Gordon Sumner).

meeting. MG Strock did dismiss the KBR representatives; but by that time Ms. Greenhouse felt that the line between government officials and KBR had become so blurred that a perception of a conflict of interest existed in violation of FAR §3.101-1,[7] with potential advantage to be realized by KBR over other potential competitors.

After Ms Greenhouse caused KBR to be removed from the meeting, she voiced strenuously objection to the proposed inclusion of granting KBR a five (5) year contract term. The basis for awarding a no-compete contract to KBR was based on a "compelling emergency" justification. Ms. Greenhouse agreed that the compelling emergency justification was appropriate but could not understand why the emergency conditions would prohibit the USACE from extending the contract the following year or any subsequent years if the prosecution of the war made that necessary, which would be understood by any prudent individual. Ms. Greenhouse argued that if the contract was limited to a one year term it could be extended for additional years by the stroke of a pen if the emergency conditions persisted. Ms. Greenhouse left the meeting insisting that the RIO Contract duration extension be limited to a single year. Nonetheless, when the finalized J&A was presented to Ms. Greenhouse for signature on February 27, 2003, it still included the objectionable five year term. Ms. Greenhouse was told that the decision to keep the five year term was made by MG Strock. However, Ms. Greenhouse, in good conscience, could not sign off on the contract as presented and she ultimately penned the following comment next to her signature line:[8]

> I caution that extending this sole source effort beyond a one year period could convey an invalid perception that there is not strong intent for a limited competition.

As a signatory to the J&A, it was within Ms. Greenhouse's prerogative to exercise her legal and moral obligation to document her objection to the stated duration included in the RIO Contract. In fact, in accordance with Executive Order 12731, Section 101(k), Ms. Greenhouse was required to document her concern. Ms. Greenhouse understood that by including her comments into the body of the J&A that the Army would find it extremely difficult to allow the contract to last for the entire five year duration which otherwise protected the interests of competing contractors. In this manner Ms. Greenhouse could fulfill her obligation under the Executive Order in disclosing potential waste, fraud and abuse in the contracting program.

---

[7]    Pursuant to FAR 3.101-1: "Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships."

[8]    A copy of her signature and comment is attached hereto as Exhibit 2.

-4-

The comment Ms. Greenhouse placed into the J&A for the RIO Contract was eventually released to the public and Congressional oversight hearings were held. The hearings were highly critical of actions taken by the Army in awarding contracts to KBR. On October 15, 2004, USACE Deputy Commander, MG Griffin,[9] admitted under oath that Ms. Greenhouse's decision to write on contracting documents had caused trouble for the USACE and that given the public scrutiny the USACE was under, her continued insistence on writing on contracting documents was intolerable.[10] During counseling sessions conducted by MG Griffin concerning Ms. Greenhouse's performance assessment on upcoming annual reviews, Ms. Greenhouse was told that her continued practice of entering handwritten comments on official contracting documents had to stop. Prior to this, Ms. Greenhouse had made entries on no less than fifty (50) procurement documents without comment from MG Griffin. The decision to restrict Ms. Greenhouse's right to place comments into the body of contracting documentation was improper and aimed at interfering with Ms. Greenhouse's official duties and responsibilities and was an attempt to keep from the public the fact that the PARC and Competition Advocate for the USACE was calling into question aspects of the Army's contracting activity related to KBR. The threatened action of downgrading Ms. Greenhouse's annual evaluations violated both AFARS 5101.602-1(b) (which demands that contracting officials be free of a coercive environment) and Executive Order 12731 (which requires disclosure of potential misconduct).

## 2.    Waiver of KBR Cost and Pricing Data

The RIO Contract came under attack when, on December 11, 2003 the Defense Contract Audit Agency issued a draft report concluding that KBR had overcharged for the purchase of fuel by $61,000,000. A week later, however, the Commander of the USACE, LTG Flowers, took the unusual step of issuing a waiver to KBR's need to comply with the terms in the RIO Contract that required KBR to provide "cost and pricing data" based on the Corps' determination that the price charged for the fuel was "fair and reasonable." By claiming that the price was fair and reasonable, KBR could be relieved of the contract requirement that cost and pricing data be provided.

The action the USACE took to end the political firestorm caused by the DCAA Audit was improper and illegal. At the time the waiver was granted, Ms. Greenhouse, as the USACE PARC, was the only individual authorized to review and evaluate the justification and sign-off on the documents transmitting the waiver request to LTG Flowers, as the USACE Head of Contracting Activity ("HCA") for final approval. However, concerned that Ms. Greenhouse would contest the basis being relied upon to justify the "fair and reasonable" determination set forth in the waiver, the USACE Command intentionally kept knowledge of the waiver request from Ms. Greenhouse. Instead, the USACE Command clandestinely went to a subordinate, LTC

---

[9]    Ms. Greenhouse administratively reports to MG Griffin who is responsible for preparing her annual performance review. MG Griffin is outside Ms. Greenhouse's contracting chain of command.

[10]    A transcript of MG Griffin's comment has not, as of yet, been made available to Ms. Greenhouse.

-5-

12

Albert Castaldo. The USACE Command knew it could trust LTC Castaldo to take actions he knew to be against Ms. Greenhouse's desires because he had previously reported to the Command his willingness to do so. Without telling Ms. Greenhouse of the waiver request, LTC Castaldo was asked to sign the document transmitting the waiver request to LTG Flowers, knowing that Ms. Greenhouse had neither reviewed nor approved it. In fact, Ms. Greenhouse had specifically placed LTC Castaldo and the Command Group on notice that it was her interpretation of the controlling regulations that required that the PARC alone sign specific documents and that the signature authority of the PARC could not be delegated unless specifically permitted by regulation or else the deputy PARC was designated by a letter from the PARC to function for a brief period of time as the "Acting PARC." Having failed to obtain the signature of the PARC, the waiver was immediately presented to LTC Flowers for signature.[11] LTC Flowers signed the waiver knowing that the PARC had been excluded from participation and, by so doing, knowingly violated controlling AFARS regulations specifying that the PARC was to review and approve the waiver. The evidence suggests that LTG Flowers took this action in order to help KBR squelch a political firestorm.

Significantly, Ms. Greenhouse did not learn of the waiver until after it was granted. Upon subsequent review, Ms. Greenhouse determined that she would not have signed off on the waiver because the documentation relied upon to justify the waiver did not provide her with a sufficient basis to allow her to conclude that the fuel charges were fair and reasonable.

In sum, the manner in which the waiver request was prepared and finalized demonstrates that the USACE Command knowingly violated the AFARS by intentionally failing to obtain the sign-off of the PARC. The evidence suggests that the reasons why the PARC was intentionally kept from seeing the waiver request was politically motivated and driven by the Defense Contract Audit Agency's conclusion that KBR had overcharged the government for the fuel by $61,000,000 rather than whether the granting of the waiver was in the interests of the government.

### Evidence of Collusion

Evidence of collusion between the USACE Command group and LTC Castaldo is contained in a memo prepared by LTC Castaldo that was not supposed to see the light of day. In this memo to MG Griffin, LTC Castaldo acknowledges an agreement he had with the USACE Command Group to subvert the decisional authority of the PARC. According to LTC Castaldo:[12]

---

[11]    A copy of the waiver transmittal that was not presented to the PARC for signature but rather bearing the signature of LTC Castaldo and LTG Flowers, is appended as Exhibit 3.

[12]    A redacted copy of LTC Castaldo's memo is attached as Exhibit 4. It has been redacted to protect privacy information.

> [I]t was discussed, well known and even expected by the USACE
> Command Group that I [Castaldo] would have to take adverse positions
> against Ms. Greenhouse's desires in order to protect the command and
> accomplish certain actions for the best of the command mission. It was
> fully understood that I would have to exercise the 'Just Do It' card to
> accomplish my mission for the command.

### 3. Independent Review of the Follow-On RIO Contract

On January 14, 2004, the USACE Deputy Commander, MG Griffin, who is not within the lineage of authority over contracting,[13] took over the contracting responsibilities of the PARC in order to conduct an "independent review" of the second RIO Contract. MG Griffin went behind the back of the PARC and again turned to LTC Castaldo to prepare an "Independent Review" of the contract selection process that resulted in selecting KBR as the major contractor under the follow-on Project RIO Contract. MG Griffin, together with USACE General Counsel Robert Anderson and LTC Castaldo improperly kept Ms. Greenhouse in the dark about the need to conduct the independent review and they apparently orchestrated who would conduct the review without any input from the PARC. MG Griffin is not in the contracting chain of command and his continued exercise of control over the contracting activity that should have been within the purview of the PARC was improper. Indeed, by this point in time, Ms. Greenhouse was generally isolated from participating in issues related to KBR.

### 4. Extension of the Balkans Support Contract to KBR

The Balkans Support Contract, with an estimated worth of $2 billion, is one of the largest services contracts to be awarded by the Army. The Balkans Support Contract was officially awarded to KBR on May 28, 1999 for a one year term with four annual options. The contract was scheduled to expire no later than May 27, 2004.

In January 2002 the USACE PARC convened an inspection team referred to as a Tiger Team to review how the Balkans Contract was being implemented. The PARC prepared an executive summary of the findings. Some of the significant findings were that: "The general feeling in the theater is that the contractor is 'out of control' and that they wait for commander rotations" and during the confusion are able to get what they want; that "[i]t appears that the contractor makes the decisions on what is constructed, purchased or provided and it appears that oftentimes the products and services delivered reflect 'gold-plating,'" i.e., purchasing expensive items when less costly alternatives exist, and that it appeared that the "government has lost

---

[13]  The contracting lineage of authority flows from Congress, to the Secretary of Defense, to the Secretaries of the Services, to the Heads of Contracting Activities ("HCAs"), to the Principal Assistants Responsible for Contracting ("PARCs"), to contracting officers. The HCA for the USACE is the Commander of the Corp who, at the time, was LTG Flowers.

-7-

14

control of who owns the contract."[14] Ms. Greenhouse's intervention, which did not go unnoticed by KBR, enabled the government to improve cost containment over the Balkans Services Contract.

At the time the contract was to expire (May 27, 2004), a "follow-on" contract was in the process of being awarded. However, instead of awarding that contract, the USACE permitted KBR to continue on as the contractor until April 30, 2005. The value of this eleven month extension to KBR of the Balkans Support Contract is estimated by the USACE to be $165,000,000.[15]

A finalized draft of the J&A justifying the eleven month extension of the Balkans contract was presented to Ms. Greenhouse on August 20, 2004.[16] This draft J&A claimed that the extension was necessary as a result of a "Compelling Emergency." However, the explanation contained in the J&A presented to Ms. Greenhouse for review and signature was materially incomplete with respect to the reason that caused the compelling emergency.[17] As a result, Ms. Greenhouse stated her concerns in writing on the J&A presented to her for signature. Therein, Ms. Greenhouse wrote: "The content of this J&A concerns me regarding the on-going source selection process and the decisions made thereon by individuals without authority to make such decisions with total exclusion of the PARC" and that the delay was "intolerable" because "5 years is ample time to complete a follow-on competition regardless of complexity."[18]

---

[14]     A copy of a draft Tiger Team Executive Summary authored by Ms. Greenhouse is appended hereto as Exhibit 5.

[15]     The USACE had determined that the current burn rate under the existing Balkans contract is approximately $15,000,000 per month.

[16]     A prior finalized J&A was presented to Ms. Greenhouse for review and signature seeking to justify the extension of the Balkans Services Contract which included an attempt to expand the scope of work to be conducted under the existing Balkans contract. Ms. Greenhouse found the attempt to expand the scope to be improper and rejected the J&A. A modified J&A was then resubmitted to Ms. Greenhouse for review and signature on August 20, 2004.

[17]     Many of the excluded material facts are presumably set forth in investigatory files maintained by an Integrated Project Team ("IPT") that was formed by and reported directly to MG Griffin. The IPT was formed in June, 2004 without consultation or participation by the USACE PARC. A full understanding of the factual basis for the determination as to why the Balkans follow-on contract could not be timely awarded will necessarily require release of the factual findings of the IPT. We therefore believe that the findings of the IPT should be made available. We request that this document be voluntarily released. However, in the alternative, this letter constitutes a formal request under the Freedom of Information Act directed to the United States Army for the immediate release of said report or assessment.

[18]     A copy of the August 20, 2004 documents bearing the handwritten comments of Ms. Greenhouse is attached as Exhibit 6.

-8-

15

Exactly what occurred after Ms. Greenhouse forwarded her written comments on the J&A is not fully understood. However, MG Griffin asserts that on August 27, 2004 the Deputy Assistant of the Army (Policy and Procurement), Ms. Tina Ballard, communicated to him that Ms. Greenhouse had to be told that she could no longer include handwritten comments on official documents.[19]

In any event, Ms. Greenhouse's handwritten comments impacted the Corps' plan of extending the KBR contract under a compelling emergency justification without fully explaining in the J&A why the Army was unable to timely award the follow-on contract. In this regard, the Department of the Army Headquarters decided to delete reference to a compelling emergency and instead justify the extension based on a "one-and-only-one-source" rationale. Significantly, this is the first time during Ms. Greenhouse's tenure as the USACE PARC (i.e., since June of 1997) that the basis of justification contained in a J&A that was submitted through the PARC for signature was altered. Indeed, the J&A was altered without consultation with the PARC. Instead, the Department of the Army's Office of General Counsel directly instructed the Director of Contracting for the Transatlantic Programs Center ("TAC"), William C. Ryals, to alter the J&A. Ms. Greenhouse learned of the instruction to alter the justification from Mr. Ryals on the morning of October 5, 2004. She thereafter, pursuant to Executive Order 12731, forwarded a memo to USACE Commander LTG Strock stating in relevant part:[20]

> Sir, after reviewing the J&A with the Compelling Emergency Exception, there was never a reference that it was ever considered that Brown and Root was a 'One-and-only-One Source' that could provide the services. It was very disturbing to me that TAC had five years to award the follow-on contract and have not to this date given me a justifiable reason as to why the source selection process was stopped and by whom was it stopped, which drove them to a Compelling Emergency situation . . . [T]he truth should be clearly explained for any prudent individual to assess as to why the good faith source selection process was stopped  . . .

> Sir, having an on-going source selection for a competition, how can USAREUR and TAC justify that there is one-and-only-one source for the requirement. . . I believe that the advice from HQDA Chief Counsel's office is not in the best interest of the Corps nor the Army and I cannot understand why the folks at TAC, after having 5 years to complete the follow-on contract and was well on their way to making an award, how the SSA or whomever made the decision to stop the award could have allowed the Corps to be placed in such a bad situation . . . this was an action that MG Griffin was aware of, did not alert me and did not ask my

---

[19]    MG Griffin, eleven days following his discussion with Ms. Ballard, authored a handwritten note stating that Ms. Ballard "asked me to discuss w/ PARC . . . bottom line - no handwriting on official document & no proviso's." A copy of MG Griffin's handwritten note appears on the top of the Exhibit 6.

[20]    A copy of Ms. Greenhouse's memo to LTG Strock is attached as Exhibit 7.

advice when he discovered the problems, but called in LTC Doyle from his transition leave, who was not officially the Deputy to represent my office . . . I do not understand today why I was excluded from the situation . . .

I believe if the Contract is not extended under Compelling Emergency, telling the complete facts as to why the award could not be made under the source selection process that was on-going, then it should not be extended under the exception of 'One and only One Source', . . .why can't the J&A be rewritten for compelling emergency telling the complete circumstances as to why the source selection process was aborted, which created the compelling emergency situation beyond the control of the government?  The facts of that matter should be within the public trust and cannot be held as a 'secret' . . . Sir, I cannot make the J&A, but as Competition Advocate, I must validate it with whatever exception TAC determines best fits with the advice that I have provided above.

Ms. Greenhouse was never provided with the reasons why the J&A had to be altered. However, at approximately 6:00 PM on October 6, 2004, two individuals entered Ms. Greenhouse's office explaining that a phone call was placed to Ms. Tina Ballard during the course of a meeting related to the J&A and Ms. Ballard was making the change for "political reasons." The final J&A was not presented to Ms Greenhouse; it was rather signed out by LTC Doyle who was not authorized by the PARC to sign the document on her behalf nor could he sign the document on her behalf as the USACE's Competition Advocate.[21]

Conclusion

For the reasons set forth above, we respectfully ask that you take action to protect Ms. Greenhouse from being removed as the USACE PARC until such time as a thorough and complete investigation of the serious matters outlined above are complete.  We ask that you coordinate any investigation with the Commander-in-Chief, the Secretary of Defense and the U.S. Attorney General and ensure that the investigation be conducted by a knowledgeable neutral body that has no ties to the Army or the contracting community.

---

[21]    On October 7, 2004, Ms. Greenhouse signed an earlier copy of the J&A but included handwritten contingencies on her acceptance.  However, Ms. Greenhouse's signed copy bearing her stated contingencies was rejected and a revised J&A was issued on October 8, 2004.  In the revised version Ms. Greenhouse's name is removed and LTC Doyle's name was inserted in its place.  The original and the revised J&A signature pages are attached as Exhibit 9.

-10-

Thank you in advance for your prompt and careful attention to this matter. If you have any questions, please do not hesitate to contact our office. We would appreciate obtaining a response to this letter if at all possible by October 22, 2004.

Respectfully submitted:

Michael D. Kohn
Stephen M. Kohn
David K. Colapinto
Counsel to Ms. Bunnatine H. Greenhouse
Principal Assistant Responsible for Contracting
United States Army Corps of Engineers

-11-

18





**DEPARTMENT OF THE ARMY**
OFFICE OF THE JUDGE ADVOCATE GENERAL
2200 ARMY PENTAGON
WASHINGTON. DC 20310-2200

October 22, 2004

REPLY TO
ATTENTION OF

Labor and Employment
Law Division

Michael D. Kohn, Esquire
Kohn, Kohn, & Colapinto, LLP
Attorneys at Law
3233 P Street, N.W.
Washington, D.C. 20007-2756

Re: Request for Investigation

Dear Mr. Kohn:

This responds to your letter, dated October 21, 2004, to the Acting Secretary of the Army, concerning alleged procurement irregularities within the U.S. Army Corps of Engineers (USACE). Ms. Bunnantine Greenhouse, the current Principal Assistant Responsible for Contracting, Headquarters, USACE, contends that she faces adverse personnel action as the result of her attempts to fulfill her responsibilities to ensure that fair and open competition exists in government contracting.

The Army has referred this matter to the Department of Defense Inspector General for their review and action, as appropriate. Additionally, the Acting Secretary of the Army has directed that the Commander, USACE, suspend any adverse personnel action so that Ms. Greenhouse remains in her current position until a sufficient record is available to address the specific matters you raised.

Although your letter refers to 9 exhibits, we received none, so you may send the exhibits to me so that I can forward them or send them directly to the Department of Defense Inspector General.

I trust that this information is responsive to your letter. If you have any questions concerning these matters, please contact me at (703) 588-6750.

Robert M. Fano
Chief, Civilian Personnel
Law Team

ANALYSIS OF REQUEST FOR INVESTIGATION
KOHN, KOHN &COLAPINTO, LLP
OCTOBER 21, 2004

I. Summary.

The administrative record supports the conclusion that Ms. Greenhouse's removal
from the SES is based on her performance and not in retaliation for any disclosures of
impropriety she may have made. The performance ratings were carefully reviewed by
the ASA(AL&T), the ASA(M&RA), the Army General Counsel's office, and the Office
of the Judge Advocate General and were found to justify Ms. Greenhouse's less than
fully successful performance.

II. Introduction.

By letter dated October 21, 2004, Ms. Bunnatine Greenhouse, by her attorney Michael
D. Kohn, wrote to the Acting Secretary of the Army requesting an independent
investigation into several allegations of contracting improprieties. Mr. Kohn requested
that Ms. Greenhouse not be subject to any retaliation during the pendency of the
investigation or as a result of the allegations she made. By letter dated October 22, 2004,
Mr. Robert M. Fano, Chief, Civilian Personnel Law Team, Labor and Employment Law
Division, Office of the Judge Advocate General, advised Mr. Kohn that the matter had
been referred to the Department of Defense Inspector General and that the Acting
Secretary had directed that the USACE Commander "suspend any adverse action ... until
a sufficient record is available to address the specific matters you raised."

Although not specifically raised by Mr. Kohn, for purposes of this analysis it is
assumed that Ms. Greenhouse is claiming that she is a whistleblower and that any adverse
action against her would be in reprisal for whistleblowing activity.

III. Background.

On April 2, 2003, Ms. Greenhouse was issued a Level 5 (Unsuccessful) final
performance rating by LTG Robert B. Flowers, the USACE Commander and her Senior
Rater for the performance period of October 1, 2001 through September 30, 2002. In
accordance with applicable regulations, LTG Flowers requested authorization from the
Assistant Secretary of the Army (Acquisitions, Logistics & Technology) [ASA(ALT)] to
remove Ms. Greenhouse from her SES position based on the Level 5 rating. On July 11,
2003, the Assistant Secretary of the Army (Manpower and Reserve Affairs)
[ASA(M&RA)] advised the USACE Deputy Commander that the level 5 rating was not
justified because there was "insufficient evidence that USACE officials specifically put
Ms. Greenhouse on notice that her performance was unsatisfactory, and gave her a
meaningful opportunity to improve ... ." In accordance with the Assistant Secretary's
instructions, Ms. Greenhouse's rating was changed to a Level 4 on July 15, 2003.

On January 29, 2004, MG Robert H. Griffin, the USACE Deputy Commander and Ms. Greenhouse's immediate rater issued his initial Level 5 rating for her performance for the period June 11, 2003 through December 31, 2003.[1] In accordance with applicable regulations, on March 16, 2004 LTG Flowers provided notice to the ASA(ALT) and the ASA(M&RA) of his intent to assign a final performance rating of Level 5 to Ms. Greenhouse. On July 14, 2004 the ASA(ALT) recommended to the ASA(M&RA) that he disapprove LTG Flowers' intent to assign a Level 5 rating. The ASA(ALT) further stated that after reviewing the record, a Level 4 rating was appropriate, and assuming that LTG Flowers assigned such a rating he should proceed with Ms. Greenhouse's removal from the SES. After reviewing the record, the ASA(M&RA) noted the recommendation and had it transmitted to the USACE on September 30, 2004.

Therefore, on October 5, 2004, LTG Carl A. Strock, the USACE Commander advised Ms. Greenhouse that she would be removed from her position in the Senior Executive Service (SES) and placed in a GS-15 position effective November 13, 2004. Ms. Greenhouse was advised that the removal action was required by 5 CFR Section 359.501 because she had received two final performance ratings of less than fully successful within a three year period.

IV. Whistleblowing and Whistleblower reprisal.

In order to be a whistleblower, an employee must make a disclosure which he/she reasonably believes evidences: (1) a violation of any law, rule, or regulation; (2) gross mismanagement; (3) gross waste of funds; (4) an abuse of authority; or, (5) a substantial and specific danger to public health or safety. In order to establish a case of reprisal for whistleblowing, he/she must establish that whistleblowing was a contributing factor in the challenged personnel action. The burden is then on the agency to show that it would have taken the same personnel action in the absence of the disclosure.

V. The allegations of contracting improprieties.

In the October 21, 2004 letter, Mr. Kohn identified the following instances of impropriety:

    a. Inclusion of a Five Year Term in the No-Compete RIO Contract;
    b. Waiver of KBR Cost and Pricing Data;
    c. Independent Review of the Follow-On RIO Contract; and,
    d. Extension of the Balkans Support Contract to KBR.

A. Inclusion of a Five Year Term in the No-Compete RIO Contract.

1. Allegation: Ms. Greenhouse claims that her efforts to ensure the integrity of the contracting process was "in conflict with the USACE command's desire to award a multiple year no-compete $7 billion contract" to Kellogg, Brown & Root (KBR) for the

---

[1] The start of the performance period was delayed due to late finalization of performance objectives; the performance period was extended accordingly

Restore Iraqi Oil (RIO) project. She claims that before the Justification & Approval (J&A) to allow the award of the no-compete contract was approved, USACE issued a letter contract to KBR to commence work that would be covered under the RIO contract. Ms. Greenhouse states that she raised a concern that the justification for issuing the letter contract was deficient.

Comment: Both the Army Materiel Command (AMC) and USACE were directly involved in contracting for support in IRAQ. The Contingency Support Plan (CSP) was prepared by KBR under AMC's LOGCAP contract. On February 14, 2003, the ASA(ALT) approved a J&A submitted by AMC to have KBR pre-position personnel and equipment that could be used in support of the execution of the CSP which AMC then accomplished by a letter contract. On 28 February 2003, the ASA(ALT) approved a J&A submitted by USACE to have KBR execute the CSP. A definitized contract was then awarded by USACE on 8 March 2003. It should be noted that the Government Accountability Office found that the Corps' J&A met all legal requirements.

2. Allegation: After AMC's letter contract was issued, Ms. Greenhouse attended a February 26, 2003 Energy Infrastructure Planning Group meeting at the Pentagon where pre-planning activities and cost issues related to the RIO contract were discussed. KBR representatives attended the planning session. At some point during the planning session, Ms. Greenhouse felt that the discussions involved matters that were outside the scope of what should be disclosed to KBR. She told then MG Carl Strock that KBR representatives should leave the room. Ms. Greenhouse states that MG Strock did dismiss the KBR representatives from the room, but she claims that by the time this occurred, "the line between government officials and KBR had become so blurred that a perception of a conflict of interest existed in violation of FAR 3.101-1, with potential advantage to be realized by KBR over other potential competitors." (footnote omitted).

Comment: FAR 3.101-1 is a general section dealing with personal conflicts of interest. It appears that Ms. Greenhouse contends that the discussions during the February 26, 2003 meeting at the Pentagon could be perceived as providing preferential treatment to KBR. However, by the time of that meeting, USACE had already identified KBR as the sole source contractor to execute the CSP as the J&A to authorize the sole source award had already been prepared and had been in the approval process since February 14, 2003. Ms. Greenhouse signed off on the J&A on February 27, 2003 and it was approved by the ASA(ALT) on February 28, 2003.

3. Allegation: Ms. Greenhouse alleges that after KBR representatives were dismissed from the meeting, she voiced strenuous objection to awarding a contract to KBR for a 5-year term, insisting that the contract be limited to a 1-year term with options for yearly extensions. She states that when the J&A was presented to her for approval, it still contained the 5-year term. Accordingly, she made a handwritten notation on the J&A as follows: "I caution that extending this sole source effort beyond a one year period could convey an invalid perception that there is not strong intent for a limited competition."

3

Comment: The approved J&A was for a 2-year period with 3 one-year options and the contract was awarded to KBR on March 8, 2003 for a 2-year base period with 3 one-year options. A solicitation to competitively acquire the services being provided by KBR was issued on July 9, 2003 and awards were made on January 16, 2004. No option to extend the March 8, 2003 contract was exercised.

4. Allegation: Ms. Greenhouse next claims that MG Griffin stated under oath that Ms. Greenhouse's decision to write on contracting documents "had caused trouble for the USACE and that given the public scrutiny the USACE was under, her continued instance on writing on contracting documents was intolerable."

Comment: Ms. Greenhouse was first told not to make handwritten notes on official documents during a July 31, 2003 performance review meeting with MG Griffin. He told her that if comments on an action were necessary, a MFR should be used. MG Griffin has never said that the reason for his instruction was that her comments, when made public, caused problems for the Command. MG Griffin did tell her that it was unprofessional and often created confusion and ambiguity in the document leading the reader or reviewer to guess on the status of approval and additional actions that are required to complete the staff process. It should be noted that Ms. Tina Ballard, the Deputy Assistant Secretary of the Army for Policy and Procurement has expressed the same view as MG Griffin. As the senior Corps contracting official, Ms. Greenhouse is responsible for ensuring that all contracting issues within her authority are finally resolved. Accordingly, actions taken by Ms. Greenhouse must provide definitive decisions and be clear and unambiguous.

5. Allegation: Ms. Greenhouse contends that "the threatened action of downgrading [her] annual evaluations violated both AFARS 5151.602-1(b) (which demands that contracting officials be free of a coercive environment) and Executive Order 12731 (which requires disclosure of potential misconduct)."

Comment: As explained in the concluding paragraph, the performance appraisals requiring the downgrading of Ms. Greenhouse were carefully reviewed by the ASA(AL&T), the ASA(M&RA), the Army General Counsel's office, and the Office of the Judge Advocate General. The administrative record supports only one conclusion, that Ms. Greenhouse's removal from the SES is based on her performance and not in retaliation for any disclosures of impropriety she may have made.

B. Waiver of KBR Cost and Pricing Data.

1. Allegation: Ms. Greenhouse claims that the RIO contract came under attack when the Defense Contract Audit Agency (DCAA) issued a draft report concluding that KBR had overcharged the government by $61 million for fuel that it had purchased under the contract. She asserts that in order to "end the political firestorm caused by the DCAA Audit" the USACE Commander, LTG Flowers issued a waiver to the contract requirement that KBR provide cost and pricing data. Ms. Greenhouse contends this waiver was improper and illegal because she was the "only individual authorized to

4

23

review and evaluate the justification and sign-off on the documents transmitting the waiver request to LTG Flowers ... for final approval."

Comment: Guidance on waivers of cost or pricing data is contained in FAR 15.403-1(b)(4). "The head of the contracting activity (HCA) may, without power of delegation, waive the requirement for submission of cost or pricing data ... . The authorization for the waiver and the supporting rationale shall be in writing." There is no supplementary guidance for this provision found in the DFARS, AFARS, or EFARS.

2. Allegation: Ms. Greenhouse claims that "the USACE Command intentionally kept knowledge of the waiver request from [her]", and instead "clandestinely went to a subordinate, LTC Albert Castaldo." Ms. Greenhouse asserts that the Command chose to utilize LTC Castaldo "to take actions he knew to be against Ms. Greenhouse's desires because he had previously reported to the Command his willingness to do so."

Comment: The request to waive cost or pricing data was submitted by the contracting officer on December 19, 2003. The basis for requesting the waiver was that KBR had initially obtained price competition for gasoline to be delivered in Iraq and awarded a subcontract to the lowest-priced offeror (Altanmia Commercial Marketing Company). Since that time, the Kuwaiti Petroleum Company, an arm of the Kuwaiti government, had refused to grant permission to any other firm other than Altanmia to supply fuel. Altanmia refused to provide cost or pricing data because it claimed that to do so would violate Kuwaiti law. As Ms. Greenhouse was on sick leave from December 15, 2003 through December 24, 2003, the request was processed by LTC Castaldo. The request was approved by LTG Flowers on December 19, 2003.

3. Allegation: Ms. Greenhouse asserts that the waiver request was processed in violation of the AFARS because the regulations require "that the PARC [Ms. Greenhouse] alone sign specific documents and that the signature authority of the PARC could not be delegated unless specifically permitted by regulation or else the deputy PARC was designated by a letter from the PARC to perform for a brief period of time as the 'Acting PARC'."

Comment: The AFARS requirement stated by Ms. Greenhouse simply does not exist.

C. Independent Review of the Follow-On RIO Contract.

Allegation: Ms. Greenhouse claims that MG Griffin "took over the contracting responsibilities of the PARC in order to conduct an 'independent review' of the second RIO contract." Specifically, she claims that MG Griffin again turned to LTC Castaldo to prepare an independent review of the contract selection process that resulted in selecting KBR as the major contractor under the follow-on RIO contract.

Comment: On January 14, 2004, MG Griffin did request that LTC Castaldo conduct an independent review of the final source selection decision documents for the follow-on competitive RIO contract to ensure that the selection process was proper in all respects.

At the request of Ms. Tina Ballard, MG Griffin had the Corps' Chief Counsel perform an independent legal review.

At the time of his requests, MG Griffin had nearly completed the process of finalizing Ms. Greenhouse's initial performance rating for the performance period ending December 31, 2003 which was ultimately issued on January 29, 2004 as a Level 5 – Fails. A critical factor in MG Griffin's rating was Ms. Greenhouse's insistence on restricting her role as the Corps' senior contracting official to merely passing judgment on matters presented to her, instead of personally engaging in a collaborative process with other Corps leaders to pro-actively assist command elements in meeting mission requirements.

Finally, given Ms. Greenhouse's documented poor performance over nearly a three year period, MG Griffin had no confidence that she could provide an objective assessment.

D. Extension of the Balkans Support Contract to KBR.

1. Allegation: The Balkans Support Contract was awarded to KBR on May 28, 1999 for a one-year term with four one-year renewal options. Ms. Greenhouse states that in January 2002, she convened a team to review how the KBR contract was being implemented. Ms. Greenhouse claims that as a result of the team findings, steps were taken to improve cost containment.

Comment: Requires no comment because it alleges no wrongdoing.

2. Allegation: There was a delay in awarding the follow-on contract. A J&A was prepared to extend the contract with KBR, but Ms. Greenhouse rejected it because she felt that it attempted to improperly expand the scope of the existing contract. A second draft of the J&A was sent to Ms. Greenhouse on August 20, 2004.

Comment: While the J&A was proper as a matter of law, it was within Ms. Greenhouse's authority to reject it as a matter of policy. Therefore, the contracting officer revised the J&A in accordance with her instructions.

3. Allegation: Ms. Greenhouse claims that the explanation of the need for the extension that was contained in the August 20, 2004 J&A was materially incomplete with respect to the reason that caused the compelling emergency. She alleges that many of the excluded material facts are set forth in files maintained by an Integrated Project Team that was formed by and reported directly to MG Griffin. Ms. Greenhouse complains that this team was formed without consultation with or participation by her.

Comment: Notwithstanding the claimed deficiencies, Ms. Greenhouse approved the J&A on August 20, 2004. The J&A became necessary when the award of the follow-on Balkans support contract was delayed. When MG Griffin found out from the Public Affairs Office that the Transatlantic Center (TAC) was proposing to make an award

without discussions on a $1.2 billion LOGCAP type contract that was of national significance because the incumbent contractor, and a potential recipient of the award, was Kellogg, Brown & Root, he immediately called the Chief Counsel and discussed the matter with him because Ms. Greenhouse was TDY. Based on the Chief Counsel's advice, he delayed the award and established an executive review team that deployed within two days to review the contract documentation. LTC Doyle, the Deputy PARC was a member of the review team. LTC Doyle provided Ms. Greenhouse an update on the executive review team's activities on 1 July 2004 that clearly identified several of the issues identified by the review team.

4. Allegation: Ms. Greenhouse made a handwritten note on the August 20, 2004 J&A as follows: "The content of this J&A concerns me regarding the on-going source selection process and the decision made thereon by individuals without authority to make such decisions with total exclusion of the PARC' and that the delay was 'intolerable' because '5 years is ample time to compete a follow-on competition regardless of complexity."

Comment: Actually, Ms. Greenhouse made numerous handwritten notes on the J&A. Apparently, she did not consider them to be of significance since she approved the J&A on August 20, 2004. Point Number 3 on the approval memorandum appears to be the comment quoted in Mr. Kohn's October 21, 2004 letter. In addition, Ms. Greenhouse made six other comments on the J&A and its coordination sheet despite MG Griffin's repeated instructions to Ms. Greenhouse not to make handwritten comments on official documents.

5. Allegation: Ms. Greenhouse claims that her handwritten comments "impacted the Corps' plan of extending the KBR contract under a compelling emergency justification without fully explaining in the J&A why the Army was unable to timely award the follow-on contract." Ms. Greenhouse states that DA Headquarters decided to change the basis of the J&A from compelling emergency to "one-and-only-one source" commenting that it was the first time during her tenure as USACE PARC that the basis for a J&A had been altered. Ms. Greenhouse asserts that the Army's Office of General Counsel directly instructed the Director of Contracting at the contracting activity to "alter the J&A."

Comment: Because of its dollar value, the J&A required final approval at the DA level by the ASA(ALT). After review, DA concluded that the J&A was more properly based on the one-and-only-one source, rather than compelling emergency.

6. Allegation: Ms. Greenhouse then complained to the new Corps Commander, LTG Strock about several issues regarding this contract. First, she said she was disturbed that the Transatlantic Programs Center (TAC) "had five years to award the follow-on contract and have not to this date given me a justifiable reason as to why the source selection process was stopped and by whom it was stopped, which drove them to a Compelling Emergency situation ..." Next, she disagreed with changing the basis for the J&A from compelling emergency to one-and-only-one source and stated that she believed that advice from the DA General Counsel's office was not in the best interest of the Corps or

26

Army. She also complained that MG Griffin was aware of the action stopping the source selection, did not alert her of it, and did not ask her advice when problems were discovered, but, instead called in LTC Doyle from his transition leave to his new position as Ms. Greenhouse's deputy.

Comment: Changing the basis for the J&A is addressed immediately above. Ms. Greenhouse's complaint to LTG Strock was made by e-mail on October 5, 2004. By this time she had received two reports from LTC Doyle (July 1, 2004 and July 15, 2004) which clearly explained the reasons for the delay in making award of the follow-on contract. As noted in paragraph 3 above, MG Griffin appointed a team to review the impending award after being told about it by the Public Affairs Office. LTC Doyle, the Deputy PARC was a member of the review team as Ms. Greenhouse was TDY and MG Griffin wanted the review team to deploy immediately.

7. Allegation: Ms. Greenhouse contends that the final J&A, which was changed by Ms. Tina Ballard for political reasons, was never presented to her for review, but was signed by LTC Doyle who was not authorized by her to sign the document on her behalf. Ms. Greenhouse does note she signed the J&A on October 7, 2004 but included handwritten comments. According to Ms. Greenhouse, the "signed copy bearing her stated contingencies was rejected and a revised J&A was issued on October 8, 2004." It was the October 8 J&A that was signed by LTC Doyle.

Comment: The final J&A was faxed and e-mailed to Ms. Greenhouse (at home) on October 7, 2004. Ms. Greenhouse sent back the signed J&A later that day, but included a handwritten comment on it. Ms. Greenhouse was called at home and told that Ms. Tina Ballard wanted a document with no handwritten comments. The next day, Ms. Greenhouse was again called at home and also on her cell phone. Messages were left that Ms. Ballard had reiterated her requirement for a clean copy. Unable to reach Ms. Greenhouse, LTC Doyle signed the J&A after receiving advice from Ms. Ballard that he had the authority to sign the J&A

VI. Conclusion.

Ms. Greenhouse's removal from the SES is based on two final performance ratings of less than fully successful within a three year period. The first rating was issued by LTG Flowers on April 2, 2003. After review by HQDA, the rating was changed to a Level 4 on July 15, 2003. MG Griffin issued his initial Level 5 rating (the second rating) on January 29, 2004. LTG Flowers provided notice to HQDA of his intent to assign a Level 5 rating to Ms. Greenhouse March 16, 2004.

All of the events cited by Mr. Kohn occurred after Ms. Greenhouse's first rating had been finalized, and many occurred after MG Griffin and LTG Flowers had taken action on her second rating. The no-compete KBR contract was awarded on March 8, 2003; the cost or pricing data waiver was issued on December 19, 2003; the independent review of the follow-on RIO contract was established on January 14, 2004; and, the extension of the Balkans Support contract took place in the August 2004 time frame.

Both the 2003 and 2004 ratings were carefully reviewed by the ASA(AL&T), the ASA(M&RA), the Army General Counsel's office, and the Office of the Judge Advocate General and found to justify Ms. Greenhouse's less than fully successful performance. The administrative record supports only one conclusion, that Ms. Greenhouse's removal from the SES is based on her performance and not in retaliation for any disclosures of impropriety she may have made.

Plaintiff's Exhibit E



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
441 G ST. NW
WASHINGTON, D.C. 20314-1000



CECG

5 Oct 04

MEMORANDUM FOR Ms. Bunnatine Greenhouse, Principal Assistant Responsible for Contracting, US Army Corps of Engineers

SUBJECT: Notice of Removal from the Senior Executive Service

1. The purpose of this memorandum is to provide you the notice required by law and regulation that you will be removed from the Senior Executive Service and your position of Principal Assistant Responsible for Contracting, effective November 13, 2004.

2. Pursuant to 5 CFR, Section 359.501, career appointees must be removed from the Senior Executive Service if they have received two final ratings of less than fully successful within three consecutive years. Your last two final performance ratings were less than fully successful, and were received for the past two consecutive annual rating periods. As such, and in accordance with regulation, your removal from the Senior Executive Service is mandatory.

3. Under applicable law and regulations, you have guaranteed placement rights. Accordingly, upon your removal from the Senior Executive Service, you will be assigned to a permanent Program Manager, GS-0340-15, position in the Headquarters, US Army Corps of Engineers for which you meet the qualification requirements. A copy of the position description will be provided to you no later than 10 calendar days before the effective date of this action. The rate of basic pay for this position will be that which you are currently receiving, in accordance with 5 CFR 359.705.

4. You are eligible for an immediate retirement under 5 U.S.C. 8336.

5. This action is not grievable under the Administrative Grievance System, nor is it appealable to the Merit Systems Protection Board. You are, however, entitled to an informal hearing before an official designated by the Board. You must file your request for an informal hearing either by fax, online at **www.mspb.gov** or via regular mail at any time after receipt of this notice but not later than 15 days before the effective date of this action. You may use the attached forms or any other written format to file your request. Please submit any request for an informal hearing to the Clerk of the Merit Systems Protection Board, Mr. Bentley M. Roberts, Jr., at 1615 M Street, NW, Washington, DC 20419. The telephone number for the Merit Systems Protection Board is (202) 653-7200. You may also contact Mr. Seth Shulman, CEHR-D at (202) 761-7277 for additional information.

CECG
Subject:  Notice of Removal from the Senior Executive System

6.  You have the right to request a review of this action through the Equal Employment Opportunity Office if you believe this action is being taken because of race, color, religion, sex, national origin, or physical handicap.  You must present your request to review this action to an EEO Counselor within 45 calendar days from the day you receive this notice.  You may contact Ms. Patricia V. West (CEHEC-EO) at (202) 761-8613 for additional information.

7.  There are administrative details to be resolved, as well as certain tasks that you must complete, prior to and as a consequence of your departure from your Senior Executive Service position.  MG Griffin and I will work with you to ensure a smooth transition to your new position.

8.  A Notification of Personnel Action, SF-50, will be forwarded to you once this action has been effected.  Failure to acknowledge receipt below shall not void the content of this memorandum.

Enclosures
  A. ASA (AL&T) Memorandum, 14 JUL 04
  B. MSPB Appeal Form 185

CARL A. STROCK
Lieutenant General, USA
Commanding

Copy Furnished
Department of the Army Senior Executive Service Office
Assistant Secretary of the Army, (Acquisition, Logistics and Technology)

Receipt Acknowledged:

_____        _____
Ms. Bunnatine Greenhouse                Date

Note: Ms Greenhouse chose not to sign
Copy provided 6 Oct 04. _____

Plaintiff's Exhibit F

DEPARTMENT OF DEFENSE

OFFICE OF COMPLAINT INVESTIGATIONS

ORIGINAL

FACT-FINDING CONFERENCE

INVESTIGATION IN THE EEO

COMPLAINT OF:


Ms. Bunnatine Greenhouse


AGENCY DOCKET NUMBER:

ARHQOSA03AUG0109



HELD AT:

U.S. ARMY, CORPS OF ENGINEERS

WASHINGTON, D.C.

TUESDAY, APRIL 18, 2006



INVESTIGATOR: SUSAN P. ROTH



REPORTED BY: JIM POWERS
FREE STATE REPORTING, INC.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

1                    A P P E A R A N C E S

2   On Behalf of the Complainant:

3        MICHAEL KOHN, ESQUIRE
         DREW LAFAMBOISE, ESQUIRE

4   On Behalf of the Agency:

5        RICHARD FRENETTE, ESQUIRE

6        DAVA-KAY KAITALA, ESQUIRE

7

8                    I N D E X

9   <u>Witness:</u>                                <u>Page:</u>

10  Bunnatine Greenhouse                          2021
                                                  2275
11
    Carl A. Strock                                2111
12
    Robert B. Flowers                             2177
13
    Patricia M. McNabb                            2226
14

15

16

17

18

19

20

21

22

23

24

25

2    THE INVESTIGATOR:  I'll now administer the

3  oath.  Would you please stand here and raise your right

4  hand?  And this is Lieutenant General Carl Strock.

5  (Whereupon,

6               CARL A. STROCK

7  was duly sworn by the Investigator and testified as

8  follows:)

9                 EXAMINATION

10    THE INVESTIGATOR:  Okay, thank you.  Please be

11  seated.  You have been called today as a witness

12  regarding the discrimination complaint of Ms. Bunnatine

13  Greenhouse.  We think you may have firsthand information

14  or involvement concerning the matters at issue in this

15  case.  She alleges she was discriminated against based on

16  her race, color, gender, age, and reprisal, when, on

17  October 6th, 2004, she was provided a Notice of Removal

18  from the Senior Executive Service and from her position

19  as the U.S. Army Corps of Engineers principal assistant

20  responsible for contracting, PARC, with an effective date

21  of November 13th, 2004; and on August 27th, 2005, when

22  the action actually was implemented, which was the actual

23  date of the removal from the SES, and she alleges that,

24  also she was discriminated against when she was removed -

25  - demoted to a 15, GS-15, and when she was placed into

1    MR. KOHN: Okay. And you testified about,

2    in June of 2005, you asked that the action move ahead and

3    you sent it to the Army IG to make him aware of the

4    status.  Why did you send it to Army IG and not the

5    Department of Defense IG?

6              THE WITNESS: Because I don't work for the

7    Department of Defense.  Everything I do goes through the

8    Army.

9              MR. KOHN: And --

10             THE WITNESS: And I -- the appropriate thing

11   for the Department of the Army IG to be would be to go to

12   the Department of Defense IG and clear it before he

13   recommended any course of action to the Secretary of the

14   Army.

15             MR. KOHN: Well, if you would turn a document,

16   it's a letter from Barbara M. Fana (phonetic).  There is

17   says the Army has referred this matter to the Department

18   of Defense Inspector General.

19             THE WITNESS: Um-hum.

20             MR. KOHN: So you knew it had gone to the

21   Department of Defense Inspector General, correct?

22             THE WITNESS: Yes.  And I assumed that the

23   Secretary would not give clearance until he got clearance

24   from the Department of Defense.  That's why I sent it

25   through the Department of the Army IG.

1      MR. KOHN:  And then there's an analysis of

2    request for investigation.  Who authorized you to do this

3    analysis?

4              THE WITNESS:  I don't know that I did this

5    analysis.

6              MR. KOHN:  Did you authorize your staff to do

7    the analysis?

8              THE WITNESS:  I don't recall doing so, no.

9              MR. KOHN:  Did you adopt this analysis?

10             THE WITNESS:  I'm not sure --

11             MR. KOHN:  Did you approve the analysis?

12             THE WITNESS:  There's no formal approval, no,

13   no.

14             MR. KOHN:  Did you know who -- you do not know

15   who authored it?

16             THE WITNESS:  No.  No, I don't know who wrote

17   this.

18             MR. KOHN:  Did you review it for accuracy?

19             THE WITNESS:  I don't recall reviewing it, no.

20             MR. KOHN:  Okay.  Now, until an investigation

21   was done, did you understand that Ms. Greenhouse could

22   not be removed from her position?

23             THE WITNESS:  The Secretary of the Army had

24   asked me to put a hold on the removal and I did that, and

25   it was clear to me that I was not going to proceed until

1 the Secretary of the Army gave me authority to do

2 that or instructed me to do that. But because it had

3 taken so long, we had changed Secretaries, we had an

4 acting Secretary at the time. The decision was made

5 quickly to put the action on hold. I simply felt that I

6 needed to get an answer from the Secretary, that way what

7 he wanted me to do with this -- continue to, to drag out.

8 So I took action to request a decision from the Secretary

9 of the Army about whether to proceed or not.

10      MR. KOHN: And to do that, you needed to have

11 some form of an investigation.

12      THE WITNESS: I didn't know. He was

13 investigating, not me. As I look at this, I'm not sure

14 if he did this investigation. This might be the Army

15 IG's. I don't know who did this. This could -- you

16 know, this attached to the Secretary's note back to me.

17 I don't know if this went forward, the original document.

18      MR. FRENETTE: I'm sorry, sir?

19      THE WITNESS: Did this go forward to the

20 Secretary?

21      THE INVESTIGATOR: Mr. Frenette can't testify.

22      MR. FRENETTE: I can't.

23      THE WITNESS: I don't know, I don't know. I

24 don't know where this came from, unless this was the IG's

25 assessment to the Secretary. I don't know.

1        MR. KOHN:  And by this, you're refer to

2  the document that's headed "Analysis of Report for

3  Investigation, a Telephone Conference" --

4        THE WITNESS:  Yes.

5        MR. KOHN:  -- October 21, 2004?"

6        THE WITNESS:  Yes.  But I don't know --

7        THE INVESTIGATOR:  And -- that General Strock,

8  I believe, has only about 15 more minutes.  Could you

9  wrap up your questions, please?

10        MR. KOHN:  Did you have any direct

11  communications with Susan Duncan concerning the removal

12  or any action concerning Ms. Greenhouse?

13        THE WITNESS:  Only from a process perspective

14  and I don't recall specifics.  I did not ask her an

15  opinion and I think most of this documentation was

16  generated through her office -- but I didn't have any

17  kind of discussion about this.

18        MR. KOHN:  You said that you decided -- did you

19  make the decision it would not be appropriate for

20  Ms. Greenhouse to remain in the PARC office?

21        THE WITNESS:  No, I didn't make any decision.

22  These were recommendations made to me.  I suppose that,

23  you know, there was a tacit decision there that the

24  recommendation was that a GS-15 program manager position

25  in Engineering and Construction would comply with the

Plaintiff's Exhibit G

# KOHN, KOHN & COLAPINTO, LLP

**ATTORNEYS AT LAW**

**3233 P STREET, N.W.**

**WASHINGTON, DC 20007-2756**

**TELEPHONE (202) 342-6980**        **WWW.KKC.COM**        **FACSIMILE (202) 342-6984**

October 14, 2004

<u>Via Facsimile (703) 602-3491 and E-Mail: peguine.taylor@hqda.army.mil</u>

Ms. Peguine M. Taylor
EEO Specialist, Team Leader
HQDA, Directorate of Equal Employment Opportunity
Arlington, VA 22202-3905

**Re:     Discrimination Complaint of Ms. Bunnatine H. Greenhouse
            Agency Number: ARHQOSAO3AUG0109**

Dear Ms. Taylor:

Please be advised that the basis of the amended complaint concerning Ms. Greenhouse's removal from the SES and as USACE PARC is sex, race and age discrimination as well as retaliation and discrimination based on whistleblowing activity in violation of the federal law, including the Federal Whistleblower Protection Act. We also hereby seek to amend the prior pending complainant and amendments thereto to include a claim based on retaliation and discrimination based on whistleblower activity in violation of the federal law including the Federal Whistleblower Protection Act. It is my understanding that this matter now constitutes a "mixed case" that should proceed before your office.

I look forward to hearing from you as soon as possible.

Very truly yours,

Michael D. Kohn
Counsel to Bunnatine H. Greenhouse

Plaintiff's Exhibit H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BUNNATINE H. GREEENHOUSE ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-0182 (EGS) |
| ) | |
| ) | |
| PETE GEREN, ) | |
| Secretary of the Army, et. al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

### AFFIDAVIT OF MICHAEL D. KOHN

My name is Michael D. Kohn.  I am over the age of majority and affirm that I make this statement under the pains and penalty of perjury.

1.  I am counsel to the Plaintiff, Bunnatine H. Greenhouse and have personal knowledge of the facts set forth herein.

2.  At no time, has anyone from the United States Department of the Army Office of Inspector General, the United States Department of Defense Office of the Inspector General or anyone from the Unites States Army Corps of Engineers ever contacted Ms. Greenhouse or her counsel to request an interview or otherwise requested information concerning the allegations raised in the October 21, 2004, Request for Investigation I submitted to the Acting Secretary of the Army on behalf of Ms. Greenhouse.

3.    At no time did the U.S. Army Corps of Engineers request that either Ms.

Greenhouse or her counsel review the analysis submitted to the Secretary of the Army for

completeness or accuracy, nor was a request to interview Ms. Greenhouse made at any

time by anyone associated with the decision to remove Ms. Greenhouse from the Senior

Executive Service.

AFFIANT SAITH FURTH NOT

_____
            Michael D. Kohn

Dated:  December ___, 2007

Plaintiff's Exhibit I

DEPARTMENT OF DEFENSE

OFFICE OF COMPLAINT INVESTIGATION **ORIGINAL**

INVESTIGATION IN THE COMPLAINT OF

BUNNATINE GREENHOUSE

AGENCY DOCKET NUMBER:

ARHQOSA03AUG0109

FACT-FINDING CONFERENCE

Wednesday, April 19, 2006

Alexandria, Virginia

INVESTIGATOR:

REPORTED BY: JIM POWERS,
FREE STATE REPORTING, INC.

1                    A P P E A R A N C E S

2    On Behalf of the Complainant:

3         MICHAEL KOHN, ESQUIRE

4    On Behalf of the Agency:

5         RICHARD FRENETTE, ESQUIRE
          DANA-KAY KAITALA, ESQUIRE

6

7

8                       I N D E X

9    Witness:                                  Page:

10   Donald Basham                             2303

11   Claude Bolton                             2369

12   Susan Duncan                              2414

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. KOHN: What memo?

2    THE WITNESS: I'm sorry?

3    MR. KOHN: What memo did you receive?

4    THE WITNESS: No, I did not receive a memo. I

5 heard that she'd been removed and some of the things that

6 we talked about in the early part of this conversation

7 sounded like what I heard before.

8    MR. KOHN: Okay. So -- in the first instance,

9 you write Secretary Brown issued a formal memo taking

10 action that was recommended to him. It's your

11 understanding that Secretary Brown was supposed to issue

12 such an action in this time, as well?

13    THE WITNESS: I'm unclear as to how he actually

14 executed that decision, whether it's a memo or he said

15 something; I don't know.

16    THE INVESTIGATOR: Let me interject for a

17 minute and ask a question. At the top of this memo,

18 since you don't have it in front of you, that this is the

19 memo that I've been talking about that had your signature

20 on it that you wrote to Assistant Secretary of the Army,

21 Manpower and Reserve Affairs. It looks like it has next

22 to it, that line, that -- in pen it says "noted" and then

23 it looks like it might be RJB or it might be Mr. Brown's

24 initials?

25    THE WITNESS: Okay.

1        THE INVESTIGATOR:  Is that -- do you know

2  what that "noted" means?

3        THE WITNESS:  No, I do not.  Unfortunately,

4  you'd have to ask him.  I'm not sure what he meant by

5  that.

6        MR. KOHN:  Did -- in the memo you sent there

7  was -- you left open the issue as to what Army Corps

8  should do concerning what level they're going to give

9  Ms. Greenhouse, but you indicated that if the record --

10  there is reference in this letter to a meeting with

11  counsel.  Ms. Bowers also met with Mr. Griffin and Army

12  Corps and -- counsel.  Do you know who that counsel was?

13        THE WITNESS:  I do not.

14        MR. KOHN:  And it said counsel's knowledge of

15  shortcoming, that he's relying on the expected testimony

16  of senior management officials including

17  Major General Griffin.  What testimony and where was this

18  testimony to take place?

19        THE WITNESS:  Well, I assume what we're doing

20  right now.

21        MR. KOHN:  Okay.  Now, it -- was it your

22  understanding that it was appropriate to rely on an EEO

23  proceeding and testimony obtained at an EEO proceeding to

24  base a removal action?

25        THE WITNESS:  I wouldn't say that.

Plaintiff's Exhibit J

# Senate Democratic Policy Committee Hearing

### "An Oversight Hearing on Waste, Fraud, and Abuse in U.S. Government Contracting in Iraq"

**Monday, June 27, 2005**
**1:30 p.m. - 3:30 p.m.**
**138 Dirksen Senate Office Building**

### Opening Statements

Senator Byron L. Dorgan
Chairman, Senate Democratic Policy Committee

Senator Harry Reid

Senator James M. Jeffords

Senator Mark Dayton

Senator Frank Lautenberg

Senator Mark Pryor

Representative Henry A. Waxman

### Witnesses

**Bunnatine Greenhouse**
U.S. Army Corps of Engineers

**Rory Mayberry**
Former KBR Food Production Manager

**Alan Waller**
CEO of Lloyd-Owen International

**Gary Butters**
Chairman of Lloyd-Owen International

**Senate Democratic Policy Committee Hearing**

**"An Oversight Hearing on Waste, Fraud, and Abuse
in U.S. Government Contracting in Iraq"**

**Bunnatine Greenhouse**
U.S. Army Corps of Engineers

June 27, 2005

My name is Bunnatine H. Greenhouse. I have agreed to voluntarily appear at this hearing in my personal capacity because I have exhausted all internal avenues to correct contracting abuse I observed while serving this great nation as the United States Army Corps of Engineers ("USACE") senior procurement executive. In order to remain true to my oath of office, I must disclose to appropriate members of Congress serious and ongoing contract abuse I cannot address internally. However, coming forward is not easy. On June 24, 2005, I met with the acting General Counsel of the USACE. During the course of this meeting it was conveyed to me that my voluntary appearance would not be in my best interest. I was also specifically advised to clearly state that I do not appear as a representative of the Department of the Army or the United States Corps of Engineers.

I have been involved with government contracting for over twenty years. On June 9, 1997 I was sworn in as the Principal Assistant Responsible for Contracting ("PARC") for the USACE. Back then, the commander of the Corps asked me to do what I could to end what could be called casual and clubby contracting practices. To curb these practices I required Commanders to strictly follow the Federal Acquisition Regulations and began to institutionalize the contracting practices the Corps had to follow. However, as the command structure at the Corps changed, there was ever increasing pressure to return to the old ways. My determination to ensure that the Corps strictly adhere to contracting regulations was no longer viewed as an asset and I began to experience an increasingly hostile environment. The hostility peaked as the USACE was preparing contracts related to the Iraq War. At this juncture, the interference was primarily focused on contracting activity related to a single contractor, Halliburton subsidiary Kellogg Brown and Root ("KBR"). The abuse I observed called into question the independence of the USACE contracting process. I can unequivocally state that the abuse related to contracts awarded to KBR represents the most blatant and improper contract abuse I have witnessed during the course of my professional career.

The independence of the USACE contracting process was unquestionably compromised with respect to the issuance of the Restore Iraqi Oil contract, known as RIO. I observed, first hand, that essentially every aspect of the RIO contract remained under the control of the Office of the Secretary of Defense ("OSD"). This troubled me and was wrong. However, once the OSD delegated responsibility for the RIO contract to

the Department of the Army, control over the contracting process by the OSD should have ceased. However, the OSD remained in control over the contracting process. In reality, the OSD ultimately controlled the award of the RIO contract to KBR and controlled the terms of the contract that was to be awarded even over my objection to specific terms that were ultimately included in the contract.

As the ramp-up to the Iraqi War escalated I was increasingly excluded from contracting activity related to the war effort. However, given my position, it was simply impossible to completely exclude me from the process. When I did gain access to some of the high level planning meetings related to the implementation of the RIO contract I sensed that the entire contracting process had gone haywire. I immediately questioned whether the Corps had the legal authority to function as the Army's delegated contracting authority. The Corps had absolutely no competencies related to oil production. Restoration of oil production was simply outside of the scope of our congressionally mandated mission. How then, I asked, could executive agency authority for the RIO contract be delegated to the USACE? I openly raised this concern with high level officials of the Department of Defense, the Department of the Army and the U.S. Army Corps of Engineers. I specifically explained that the scope of the RIO contract was outside our mission competencies such that congressional authority had to be obtained before the Corps could properly be delegated contracting authority over the RIO contract. Exactly why USACE was selected remains a mystery to me. I note that no aspect of the contracting work related to restoring the oil fields following the 1991 Persian Gulf War was undertaken by the USACE, and there was no reason why USACE should take over that function for the prosecution of the Iraq War.

I further raised a concern over which contract authorized payment for pre-positioning work KBR was doing in anticipation of being awarded the RIO contract. I was generally familiar with the scope of the LOGCAP contract and was under the impression that the LOGCAP contract was being used to fund the initial preposition work being done by KBR before the Iraq War commenced. I specifically questioned whether using LOGCAP funding was legal and insisted that a new contract be prepared. My concern over this issue ended when I was apparently provided misinformation that a new contract had been issued. This is the first time I can recall being overtly misled about something as fundamental as the existence of an underlying contract authorizing work to be done.

I further raised a concern over the basis used to justify the selection of KBR as the sole source contractor for the RIO contract. I learned that a specific basis to be used for the selection of the contractor was a requirement that the contractor have knowledge of the contingency plan KBR prepared for the restoration of Iraqi oil. The inclusion of this requirement meant that the RIO contract would have to be awarded to KBR because no other contractor participated in the drafting of the contingency plan and no other contractor had knowledge of the contingency plan itself after it had been prepared by KBR. What was particularly troubling about this arrangement was that contractors who are normally selected to prepare cost estimates and courses of action, such as the work KBR did when it prepared the contingency plan, are routinely excluded from being able

to participate in the follow-on contract. The reasons for prohibiting the contractor responsible for preparing costs estimates and course of action from obtaining the follow-on contract is obvious. The fact that it was a no-bid, sole source contract meant that the government was placing KBR in the position of being able to define what the reasonable costs would be to execute the RIO contract and then charging the government what it defined as being reasonable. Given the enormity of the scope of work contemplated under the RIO contract, the exclusion of the contractor responsible for pricing out the scope of work to be done under the RIO contract should have been an imperative. Instead, it formed the basis of awarding the RIO contract to KBR.

Ultimately, I was most concerned over the continuing insistence that the RIO contract be awarded to KBR without competitive bidding for an unreasonable period of time -- two years plus the option to extend the contract an additional three years. I raised this concern with officials representing the Department of Defense, the Department of the Army and the Corps of Engineers. However, when the final Justification and Approval of the RIO contract was forwarded to me for signature -- after the draft had been approved by representatives of the office of the Secretary of Defense -- the five year, no-compete clause remained in place. I could not sign the document in good faith knowing that this extended period was unreasonable. However, we were about to prosecute a war and the only option that remained opened to me was to raise an objection to this requirement. Therefore, next to my signature I hand-wrote the following comment:

> I caution that extending this sole source effort beyond a one year period could convey an invalid perception that there is not strong intent for a limited competition.

I hand-wrote this comment directly onto the original document because experience had taught me that a separate memo outlining my concerns could inexplicably be lost. I wrote my comment on the original J&A to guarantee that my concern was not overlooked. Instead, it was just ignored.

The RIO contract was subjected to public scrutiny when, on December 11, 2003, the Defense Contract Audit Agency (DCAA) issued a draft report concluding that KBR over-charged for the purchase of fuel by $61,000,000. However, the firestorm over this issue was significantly dampened a week later when the Commander of the USACE, Lt. General Flowers, took the unusual step of issuing a waiver absolving KBR of its need, under the RIO contract, to provide "cost and pricing data." The Corps simply asserted that the price charged for the fuel was "fair and reasonable," thereby relieving KBR of the contract requirement that cost and pricing data be provided.

However, the manner in which the waiver request was prepared and finalized demonstrates that the USACE Command knowingly violated the AFARS by intentionally failing to obtain my approval, as the PARC. The evidence suggests that the reasons why I was intentionally kept from seeing the waiver request were politically motivated and driven by the DCAA's conclusion that KBR had overcharged the government for the fuel

by $61,000,000, rather than whether the granting of the waiver was in the interest of the government.

Significantly, it appears that a concerted effort was undertaken to ensure that I was kept in the dark about the waiver request. I have every reason to believe that the USACE knew I would object to the granting of the waiver if it had been presented to me for signature. So, I was specifically kept in the dark and did not learn of the existence of the waiver until I read about it in the press. Having reviewed the documentation used to justify the waiver, I can unequivocally state that I would not have approved it because the documentation relied upon to justify the fuel charges as "fair and reasonable" was grossly insufficient.

Eventually, a copy of the original J&A for the RIO contract was released in response to a Freedom of Information Act Request which prompted Time Magazine to attempt to find out why I felt it necessary to document my concern. Time Magazine contacted the USACE seeking permission for me to be interviewed. I later learned that this caused great consternation. According to sworn testimony given on October 15, 2004 by the Deputy Commander of the USACE, Major General Robert Griffin, the Department of the Army was figuring out how it was going to publicly respond and whether the Army would officially allow me to speak to a Time magazine reporter. According to MG Griffin, the problem was that I did not "know the Army's story" so the Army had to figure out who was going to respond. The difficult position the Army found itself in, according to MG Griffin, "was because she wrote this informal note at the bottom of this document, which actually makes my case, which is, you shouldn't write on official documents because they get taken out of context, somebody reads them and there you go." However, my comment was far from an informal note, and it was not being taken out of context. Rather, my concern had found its way to the light of day.

As public pressure mounted, my involvement and past actions related to the RIO contract became a thorn in the side of the USACE. As a result stating my concern in writing on the original RIO J&A and as a result of expressing other significant concerns over contracting matters related to KBR, I was eventually summoned to a meeting on October 6, 2004 at which time I was issued a memorandum notifying me that I was to be removed from the Senior Executive Service and from my position as PARC. At that point I knew that my ability to resolve the issues within the USACE had terminated. I had no other alterative at that juncture but to file a formal request for investigation with the then-Acting Secretary of the Army and to appropriate members of Congress.

In closing, I would like to thank my attorney, Michael Kohn, and the National Whistleblower Center, for the support and unbelievably hard work they have put forth. Without their effort I could not have survived the political firestorm that burns around me.

**Senate Democratic Policy Committee Hearing**

**"An Oversight Hearing on Waste, Fraud, and Abuse
in U.S. Government Contracting in Iraq"**

**Rory Mayberry**
Former KBR Food Production Manager

June 27, 2005

My name is Rory Mayberry. I'm sorry that I'm not able to be there in person to testify to the Committee, but I returned to Iraq on June 14. I am working as a Medical Examiner and Medic Supervisor for a company called Emergent Services.

I wanted to testify today about my experience working with Halliburton in Iraq. I was hired by Halliburton subsidiary KBR in January 2004 as the Food Production Manager for a dining hall at Camp Anaconda, Iraq. I worked under the Halliburton's LOGCAP contract from February 2004 until April 2004.

When I was assigned to the dining facility, KBR managers informed me that there were KBR practices that were to be followed everyday. These practices led to major overcharges.

First, KBR was supposed to feed 600 Turkish and Filipino workers meals according to their custom. Although KBR charged the government for this service, it didn't prepare the meals. Instead, these workers were given leftover food in boxes and garbage bags after the troops ate. Sometimes there were no leftovers to give them.

Second, KBR charged the government for meals it never served to the troops. Until late 2003, Anaconda was a transition site for army personnel. Because there could be large numbers of extra personnel passing through everyday, KBR would charge for a surge capacity of 5,000 troops per meal. However, KBR continued to charge for the extra headcount even after Anaconda was no longer a transition site.

When I questioned these practices, the managers told me that this needed to be done because KBR lost money in prior months, when the government suspended some of the dining hall payments to the company. The managers said that they were adjusting the numbers to make up for the suspended payments.

I would prepare food orders each week in order to get the food we needed at the camp in the coming week. The KBR managers would triple the order every week to bring in much more food than we needed. They did this because they were charging an extra 5,000 troops they weren't actually feeding. Most of this food went to waste though.

Third, KBR paid too much for the food itself. Initially, a company called Tamimi Catering was KBR's sub-contractor for the food. Tamimi paid local prices for the food products in the towns and cities around the base in addition to orders sent to their main office. Tamimi's pricing was fair for the condition of the country. Then, KBR switched to a new supplier, PWC. PWC's prices were almost triple what Tamimi's were. For example, tomatoes cost about $5 a box locally, but the PWC price was $13 to $15 per box. The local price for a 15-pound box of bacon was $12, compared to PWC's price of $80 per box. PWC charged a lot for transportation because they brought the food from Philadelphia. KBR switched from Tamimi to PWC because Tamimi complained about KBR's poor treatment of its staff; they were living in tents with sand floors and no beds.

There were other problems that were not related to KBR's costs.

Food items were being brought into the base that were outdated or expired as much as a year. We were told by the KBR food service managers to use these items anyway. This food was fed to the troops. A lot of these were frozen foods: chicken, beef, fish, and ice cream. For trucks that were hit by convoy fire and bombings, we were told to go into the trucks and remove the food items and use them after removing the bullets and any shrapnel from the bad food that was hit. We were told to turn the removed bullets over to the managers for souvenirs. When I had the military check some of the food shipments, they would turn the food items away. But there wasn't any marking of the record, so KBR just sent the food to another base for use. The problem with expired food was actually worsened with the switch to PWC because it took longer for the food items to get to the base as they were shipped from the U.S. to a warehouse in Kuwait.

KBR also paid for spoiled food. When Tamimi dropped off food, there was often no place to put it in to the freezers or refrigeration. Food would stay in the refrigeration and freezer trucks until they ran out of fuel. KBR wouldn't refuel the trucks so the food would spoil. This happened quite a bit.

In addition, KBR would cater events for KBR employees, like management parties and barbecues. This happened about 3 times a week. As a result, there were shortages of certain food items, such as beef, chicken, pork, salads, dressings, and sodas for the troops.

The food service personnel were given sanitation rules from the Military Preventive Medicine information programs and rules to follow by the Armed Forces, but KBR managers informed us that the information was not to be followed, that they knew best, and to keep following their instructions. So our employees weren't following sanitation rules as set forth.

Also, the Iraqi subcontract drivers of food convoys that arrived on the base were not fed. They were given MREs, or meals ready to eat, with pork, which they couldn't because of religious reasons. As a result, the drivers would raid the trucks for food.

Government auditors would have caught and fixed many of the problems. But KBR managers told us not to speak with auditors. The managers themselves would leave the base or hide from the auditors when they were on the base and not answer the radios when we called for them. We were told to follow instructions or get off the base. The threat of being sent to a camp under fire was their way of keeping us quiet.
The employees that talked to the auditors were moved to the other bases that were under more fire then Anaconda. If they refused to move, they were fired and sent home.

I personally was sent to Fallujah for 3 weeks. The manager told me I was being sent away until the auditors were gone because I had opened my mouth to the auditors. When I returned from Fallujah, the convoy was attacked. I was put in danger because the KBR managers didn't want me to talk with U.S. government auditors.

When KBR wanted me to go to Tikrit, I headed home on rotation. I wasn't officially fired and I didn't formally quit.

I am happy to answer any questions the Committee may have for me.

Plaintiff's Exhibit K

# KOHN, KOHN & COLAPINTO, LLP

ATTORNEYS AT LAW
3233 P STREET, N.W.
WASHINGTON, DC 20007-2756
WWW.KKC.COM

TELEPHONE (202) 342-6980

FACSIMILE (202) 342-6984

September 2, 2005

VIA FACSIMILE (703) 602-3491 and E-MAIL (Debra.Muse@hqda.army.mil)

Debra A. Muse, Director
Department of the Army
Office of the Administrative Assistant to the Secretary
U.S. Army Reserves and Programs Agency
120 Army Pentagon
Washington, D.C.  20310-0120

Re:     **Fourth Amendment to Discrimination Complaint of Ms. Bunnatine H.
        Greenhouse, Agency Number: ARHQOSAO3AUG0109**

Dear Ms. Muse:

Please be advised that on behalf of Ms. Bunnatine H. Greenhouse, we hereby seek to amend the above-captioned complaint and hereby otherwise file a "mixed case" complaint on behalf of Ms. Greenhouse.  The adverse action consists of the following:

1) Ms. Greenhouse's removal on August 27, 2005 from the Senior Executive Service;

2) Ms. Greenhouse's removal on August 27, 2005 as the United States Army Corps of Engineers Principal Responsible for Contracting ("PARC");

3) Ms. Greenhouse's demotion on August 27, 2005 to a GS-15;

4) Placing Ms. Greenhouse into the Directorate of Civil Works Engineering and Construction Division as a "program manager" which is totally out of the contracting career field where Mrs. Greenhouse has made notable contributions; and

5) The refusal to docket a conflict of interest complaint filed with the Secretary of the Army, Dr. Francis Harvey.  On February 16, 2005, Ms. Greenhouse, through counsel, filed a formal conflict of interest complaint with the Secretary of the Army alleging that the Army had improperly permitted the case to be controlled by the attorney responsible in large part for orchestrating discriminatory action against Ms. Greenhouse.  Pursuant to AR 690-600, 8-12(d)(2) the conflict of

interest complaint had to be docketed.  Nonetheless, the Secretary of the Army failed to docket the conflict of interest complaint in retaliation for Mrs. Greenhouse having engaging in protected whistleblower and Title VII activity.

This amendment constitutes a "mixed case" complaint based on Ms. Greenhouse's protected whistlblower disclosures (including violations of federal law, including the Federal Whistlblower Protection Act, the First Amendment to the United States Constitution and the Lloyd-LaFollette Act,) and on the basis of sex (female), race (African American), and age (61, DOB 07/22/44).

Finally, we request that Ms. Greenhouse's entire EEO case be forwarded to a separate agency EEO office.  The failure to take action on the conflict of interest complaint and the substance of that complaint itself warrants forwarding this matter to a separate agency EEO office.  Otherwise, an air of impropriety will infest these proceedings.

Thank you for your attention to this matter.

Respectfully,

Michael D. Kohn
Counsel to Bunnatine H. Greenhouse

Plaintiff's Exhibit L



**DEPARTMENT OF THE ARMY**
**EQUAL EMPLOYMENT OPPORTUNITY**
**COMPLIANCE AND COMPLAINTS REVIEW**
1901 SOUTH BELL STREET, 1ST FLOOR
ARLINGTON, VA 22202-4508

REPLY TO
ATTENTION OF

2 6 DEC 2006

Equal Employment Opportunity
Compliance and Complaints Review

Michael D. Kohn, Esquire
Kohn, Kohn, & Colapinto, P.C., LLP
3233 P. Street, N.W.
Washington, DC 20007

> Complaint of Bunnatine H. Greenhouse v.
> Francis J. Harvey, Secretary of the Army
> DA Docket Number: ARHQOSA03AUG0109

Dear Mr. Kohn:

This is the Department of the Army's final decision in the equal employment opportunity (EEO) complaint of Ms. Bunnatine H. Greenhouse (hereinafter your client or the Complainant) dated October 14, 2003, and variously amended (the last of which occurred on March 1, 2006), which was filed with the EEO Office, Office of the Administrative Assistant to the Secretary of the Army.

### Procedural Background

In the instant complaint, the following allegations were accepted for processing. Your client claimed that she was subjected to a hostile work environment and discrimination based on race (African American), color (Black), gender (female) and reprisal (prior protected EEO activity) when:

> On June 6, 2003, Major General (MG) Hans Van Winkle issued her a Notice of Proposed 30-day Suspension;
> On July 31, 2003, Lieutenant General (LTG) Robert Flowers and MG Van Winkle issued her a Level 4 rating on her Senior System Evaluation Report for the period of October 1, 2001 through September 30, 2002;
> On January 8, 2002, she received a Level 2 rating on her Senior System Evaluation Report for the period of October 1, 2000 through July 20, 2001;
> On February 13, 2003, she became aware that there was an attempt to reopen a prior closed Inspector General (IG) investigation of allegations against her;
> On July 28, 2003, she became aware that Mr. Donald I. Basham was appointed as Executive Secretary of the Acquisition Corporation Group (ACG), and was given authority by MG Robert Griffin to review her decisions pertaining to career management and support for information provided to HQ, Department of the Army (DA) or Department of Defense (DoD) Contracting executives;