IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BUNNATINE H. GREENHOUSE,     )
                                      )
        Plaintiff,          )
v.                        )     CASE NUMBER 1:07CV 0182 (EGS)
                                        )
PETE GEREN[1],                   )
SECRETARY OF THE ARMY,      )
et al.,                     )
        Defendants.       )

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

In her opposition, Plaintiff fails to respond to Defendants' motion to dismiss the

Administrative Procedures Act ("APA") claim as improperly raised and to dismiss a number of

unnecessary and improper parties as Defendants. Defendants' motion should be deemed

conceded and granted as to these matters.

Plaintiff does attempt to respond to Defendants' motion as to her Whistleblower Protection

Act ("WPA") claims and her Privacy Act claims. However, as to the WPA claims, Plaintiff

admits her performance-based removal from the Senior Executive Service ("SES") was not

directly appealable to the Merit Systems Protection Board ("MSPB"). Instead, she argues that

her lack of an appealable personnel action is "irrelevant" because the MSPB has jurisdiction over

WPA claims filed by an SES employee. (Plaintiff's Opp. at 7.) However, she is incorrect and the

citation she offers for this proposition does not create any appeal, much less one that is beneficial

to Plaintiff. Plaintiff also attempts to argue that her claim is properly before this court because

she filed a "mixed case" complaint with the agency. She is wrong because in order to file a

---

[1] By operation of Federal Rule of Civil Procedure 25(d)(1), Secretary Geren is automatically substituted as the proper party in place of former Secretary of the Army Harvey.

"mixed case" under 5 U.S.C. §7702,  Plaintiff needed to allege prohibited discrimination in

concert with an adverse personnel action which is "otherwise" and directly appealable to the

MSPB, not a WPA action appealable to the MSPB only through the Office of Special (OSC) as

an individual right of action appeal ("IRA").  Furthermore, because Plaintiff never took her WPA

claims to the OSC, she failed to exhaust her WPA claims as required by 5 U.S.C. § 1214,[2] one of

the prerequisites for MSPB jurisdiction over a proper WPA claim. Section 1214 is fatal to

Plaintiff's claim that she can escape the prerequisites of filing and exhausting her WPA claims

with the OSC.

    As to her Privacy Act claims, dismissal is proper because Plaintiff is attempting to use the

Privacy Act to challenge a request that Plaintiff be removed from the SES under circumstances

which amount to an "end run" around an unfavorable agency decision. Plaintiff responds that this

is not her intent.  However, regardless of her intent, her Privacy Act claims must be dismissed

because allowing them to go forward would violate Circuit case law and would frustrate

Congress' intent that the Civil Service Reform Act ("CSRA") provide the comprehensive remedy

for challenges to federal civilian personnel decisions.

---

[2] Plaintiff argues that 5 U.S.C. § 1221 grants her "the right to file an Individual Right of Action appeal with the MSPB." (See Plaintiff's Opp. at 7.)  However,  5 U.S.C. §1221  specifically states that it is subject to  5 U.S.C. § 1214(a)(3) where, as in the present case, Plaintiff has no right to a direct appeal to the MSPB.  As noted below, Congress has denied former members of the SES a direct appeal to the MPSB as to demotions based on performance.  Accordingly, pursuant to  5 U.S.C. §1221 and 5 U.S.C. § 1214(a)(3), Plaintiff was required to bring her WPA claims to the Office of Special Counsel (OSC).  Her failure to do so deprives the MSPB of jurisdiction over her WPA claims.  However, even if she had gone to OSC, Plaintiff still would not have a mixed case under §7702.  See Marren v. Department of Justice, 51 M.S.P.R. 632, 638-39 (1991) ("The [MSPB]'s jurisdiction to review IRA complaints based on personnel actions over which it otherwise does not have appellate jurisdiction is limited to adjudicating the whistleblower allegations.")

Finally, Plaintiff offers a "Counter Statement of Material Facts" containing alleged facts which are not material to Defendants' motion and merely confuse the issues before this Court. Plaintiff's facts also either cite to no supporting document (other than her own Complaint) or cite to documents which speak for themselves and actually damage Plaintiff's position.

## I.   THE ADMINISTRATIVE PROCEDURES ACT CLAIMS MUST BE DISMISSED

Plaintiff claimed that this Court had jurisdiction over this matter pursuant to the APA. Defendant moved to dismiss, noting that the APA was only appropriate when no other remedy was available to her, and, that in the instant case, other remedies are available.  Further, Defendants noted that the APA is not a proper jurisdictional basis for a plaintiff seeking money damages, as is the case here.  Plaintiff failed to respond to Defendants' arguments.

It is well settled in this Circuit that, when a plaintiff files an opposition addressing only certain arguments raised by the defendant, "a court may treat those arguments that the plaintiff failed to address as conceded."  Hopkins v. Women's Div., General Bd. of Global Ministries, 238 F. Supp.2d 174, 178 (D.D.C. 2002) (citing FDIC v. Bender, 127 F.3d 58, 67-68 (D.C. Cir. 1997); see also United States v. Real Property, Parcel No.03179-005R, Civ. A. No. 01-0706, 2003 WL 224053382 at * 12 (D.D.C. Oct. 21, 2003); Bancoult v. McNamara, 227 F. Supp.2d 144, 149 (D.D.C. 2002).   Accordingly, Plaintiff's APA claims should be dismissed.

## II.  IMPROPER PARTIES MUST BE DISMISSED

Defendants noted in their motion a number of improper party Defendants in the instant case. Defendants cite to case law establishing that the only proper party defendant for Title VII discrimination claims is the Secretary of the Army, currently, Mr. Pete Geren, and that the proper party defendant for Privacy Act claims is the Department of the Army.  Plaintiff failed to

respond. Defendants' motion should be deemed conceded and, accordingly, should be granted as to those improper Defendants.

### III.  PLAINTIFF'S WHISTLEBLOWER CLAIMS MUST BE DISMISSED

Plaintiff has not alleged she suffered any personnel action that is directly appealable to the MSPB.  Further, there is no dispute of the fact that Plaintiff never took her WPA claims to the OSC.  Because Plaintiff does not have a directly appealable personnel action to the MSPB there is no mixed complaint.  Morever, because Plaintiff did not go to the OSC with her WPA claims the MSPB has no jurisdiction over her WPA claims as an IRA appeal.  Neither does this Court.

### A.  Plaintiff Does Not Present a Proper Mixed Case Complaint

Plaintiff argues that 5 U.S.C. § 7702 gives her the right to combine her WPA claims into a "mixed case." (Plaintiff's Opp. at 4.)  However, Plaintiff's facts and circumstances do not qualify for a "mixed case" status.  As Plaintiff concedes, in order to qualify for "mixed case" status, Plaintiff must allege she is affected by an adverse personnel action which the applicant "may appeal to the Merit Systems Protection Board." (Plaintiff's Opp. at 4.)  See also 5 U.S.C. § 1214(a)(3); 5 U.S.C. § 7702; Butler v. West, 164 F.3d. 634, 638 (D.C. Cir. 1999).[3]  This is something Plaintiff has not done and cannot do.[4]  The only adverse personnel action relevant to Plaintiff's Complaint is her performance-based demotion from the SES.[5]  While some demotions

---

[3] In Butler, the Plaintiff did have an adverse personnel action which was subject to direct appeal to the MSPB and she proceeded to the MSPB with a proper mixed case appeal.  Such is not the case here.

[4] In her opposition to the instant motion, Plaintiff merely assumes that she has met this requirement.

[5] The Notice of Removal from the SES specifically states that the basis for removal is pursuant to 5 C.F.R. Section 359.501, which states "career appointees must be removed from the Senior

are directly appealable to the MSPB,[6] Congress specifically determined that a performance-based

demotion of a SES employee, once implemented,[7] is not directly appealable to the MSPB.[8] See

5 U.S.C. § 7542.

Realizing this deficiency in her Complaint, Plaintiff alleges that "because her whistleblower

_____

Executive Service if they have received two final ratings of less than fully successful with three consecutive years. Your last two final performance ratings were less than fully successful, and were received for the past two consecutive annual rating periods.  As such, and in accordance with regulation, your removal from the Senior Executive Service is mandatory." (Plaintiff's Opp., Ex. E, ¶ 2.)

[6] See 5 U.S.C. § 7512; 5 C.F.R. §1201.3; 5 U.S.C. § 4303.

[7] In accordance with 5 C.F.R. § 1201.143, the Plaintiff was afforded the right to seek an informal hearing before an MSPB administrative judge prior to the agency implementing the demotion in issue.  (Plaintiff's Opp., Ex. D, Doc. 16-7.)  However, she did not invoke this review right. Rather, through counsel, she wrote to the Acting Secretary of the Army with a "Request for Investigation," asking him to contact the "Commander-in-Chief, the United States Attorney General and the Secretary of Defense in order to facilitate the appointment of an independent executive branch investigatory body to review" Plaintiff's allegations regarding her involvement with contracts in preparation for the Iraq war.  (Plaintiff's Opp., Ex., Doc. 16-6, at 9 -19.) Ironically, had  the Plaintiff contacted OSC with her whistleblower allegations, OSC may have referred them to the Secretary of the Army under the statutory requirement of 5 U.S.C. § 1213 (c), to conduct an investigation. Instead, Plaintiff made a personal "request," which gave rise to no specific legal obligation.  Furthermore, had she exercised her MSPB informal hearing right, the copy of the record, including a verbatim transcript, would have been referred "to the Special Counsel, the Office of Personnel Management, and the [Army] for whatever action may be appropriate."  5 C.F.R. § 1201.144 (c).  The governing regulations make clear, however, that "there is no right under 5 U.S.C. § 7703 to appeal the agency's action . . . in cases arising under § 1201.143(a). . . ."  5 C.F.R. §1201.145.

[8] Stella v. Mineta, 284 F.3d 135 is another example of how Congress can specifically choose to deny certain employee appeals to the OSC and MSPB.  In 1995, Congress decided that employees of the Federal Aviation Administration (where Stella worked) would not be subject to the usual Title 5 provisions. Stella could not bring her WPA claims to the OSC and as an employee of the FAA she was denied appeals to the MSPB of any other claim.  Id. at 141.  When Congress changed the procedure and made the change retroactive, the Court of Appeals noted that the District Court still did not have jurisdiction over Stella's WPA claims because she had not first raised her claims with the OSC.  The Court of Appeals made it clear that the "mixed case" argument did not save her claims.  Stella, 284 F.3d at 143-44.

claims are ultimately appealable to the MSPB" (Plaintiff's Opp. at 5) she satisfies the mixed case

requirements of §7702.  Plaintiff attempts to bolster this assertion by claiming that it is

"uncontested . . .that [Plaintiff] filed a mixed case complaint with the Agency's EEO office."

(Plaintiff's Opp. at. 4.)  This is inaccurate.  Instead, the administrative record indicates that

Plaintiff merely attempted to file such a complaint, which the agency repeatedly rejected and

dismissed because her attempt to pursue allegations of retaliation for whistle blowing as Equal

Employment Opportunity complaints was improper.  (Reply Ex. 1, Final Agency Decision at 5.)[9]

   Plaintiff's failure to establish an appealable personnel action under §7702 means there is no

mixed case to give this Court jurisdiction over Plaintiff's WPA claims.  Instead, Plaintiff puts

forth a novel legal theory suggesting that because her WPA claims are ultimately appealable to

the MSPB via an IRA appeal, that satisfies the requirement for a mixed case.  This is false and

contrary to statute.  However, even if Plaintiff's assumption were correct, her failure to exhaust

her WPA claims before the OSC eliminates this theoretical basis for a mixed case complaint and

defeats this Court's jurisdiction over Plaintiff's WPA claims.

---

[9] Plaintiff provides only the first page of the Final Agency Decision at Plaintiff's Opp., Ex. L in
alleging it is "undisputed that she filed a mixed case with the agency."  The complete copy of the
Final Agency Decision makes clear that the agency repeatedly rejected Plaintiff's attempt to file a
mixed case as improper. (Reply, Ex. 1.)  When a defendant challenges the substance of
jurisdictional allegations, it may use extraneous evidence to test those allegations without
converting the motion into one for summary judgment.  See Land v. Dollar, 330 U.S. 731, 735 n.
4 (1947); Herbert v. National Academy of Sciences, 974 F.2d 192, 197-98 (D.C. Cir. 1992).
Similarly, A court may consider allegations attached, incorporated, or otherwise contained in a
complaint without converting a 12(b)(6) motion into a motion for summary judgment. Vanover
v. Hantman, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) ("where a document is referred to in the
complaint and is central to plaintiff's claim, such a document attached to the motion papers may
be considered without converting the motion to one for summary judgment.")

**B.  Plaintiff Failed to File Her WPA Claims With The OSC As Required By Statute to Bring an IRA Appeal**.

Defendants' motion cited to controlling statute and Circuit case law establishing that Plaintiff could not bring her WPA claims to the MSPB until she first went to the OSC, whose "primary mission is to safeguard the merit system by protecting federal employees . . . from prohibited personnel practices, especially reprisal for whistleblowing."[10]  Plaintiff must bring her WPA claims to OSC because a plaintiff is <u>required</u> first to bring her WPA claims to the OSC <u>unless</u> she has a separate appealable personnel action giving her the right to appeal directly to the MSPB.  Plaintiff argues that she was not required to go to the OSC because 5 U.S.C. § 2302(a)(2)(B) "explicitly extend[s] MSPB appeal jurisdiction of whistleblower claims to members of the Senior Executive Service."  (Plaintiff's Opp. at 7.)  This position is without merit.  The statutory provision, 5 U.S.C. § 2302(a)(2)(B), is contained within a chapter/subchapter titled "Merit System Principles," and a subchapter titled "Prohibited Personnel Practices."  The referenced subsection is merely a definitional  provision relating to "prohibited personnel practices" and defines the term "covered employee" to include, among others,  some members of the SES.  The statutory provision neither addresses MSPB appeal jurisdiction nor provides Plaintiff with an avenue to bypass the requirement to bring her WPA claims to the OSC.

Plaintiff next asserts that 5 U.S.C. § 1221 gives her the right to file an "Individual Right of Action" appeal with the MSPB without going to the OSC.  (Plaintiff's Opp. at 7.)  5 U.S.C. §

---

[10] OSC Website, http:www.osc.gov/intro.htm, "Our Mission."

1221[11] shows that it does not give Plaintiff this unqualified right.  Instead, §1221 specifically

states that it is subject to the provisions of 5 U.S.C. § 1214(a)(3),[12] which requires Plaintiff to

first bring WPA claims[13] to the OSC.

### C. The Caselaw Cited By Plaintiff Is Distinguishable Because It Involves Cases With An Otherwise Directly Appealable Personnel Action To The MSPB.

Plaintiff argues that several courts have held that plaintiffs are not required to take WPA

claims to the OSC (Plaintiff's Opp. at 5-6.)  However, these cases involve actions where the

plaintiff had an adverse personnel action *directly* appealable to the MSPB, which, unlike

Plaintiff's situation,  are not required to first proceed to the OSC.  For instance, Plaintiff cites to

Wells v. Shalala, 228 F.3d 1137 (10th Cir. 2000), noting that the court rejected the defendant's

---

[11] 5 U.S.C. § 1221 (a) provides that: subject to the provisions of subsection (b) of this section and and 5 U.S.C. § 1214(a)(3)], an employee ... may, with respect to any personnel action taken, or proposed to be taken, against such employee ... as a result of a prohibited personnel practice described in 5 U.S.C. § 2302(b)(8), seek corrective action from the Merit Systems Protection Board.

[12] 5 U.S.C. § 1214(a)(3) provides that "Except in a case in which an employee ... has the right to appeal directly to the Merit Systems Protection Board under any law, rule, or regulation, any such employee ... shall seek corrective action from the Special Counsel before seeking corrective action from the Board. An employee ... may seek corrective action from the Board under section 1221, if such employee ... seeks corrective action for a prohibited personnel practice described in § 2302(b)(8) from the Special Counsel and–
A) (i) the Special Counsel notifies such employee, former employee, or applicant that an investigation concerning such employee, former employee, or applicant has been terminated; and (ii) no more than 60 days have elapsed since notification was provided to such employee, former employee, or applicant for employment that such investigation was terminated; or
(B) 120 days after seeking corrective action from the Special Counsel, such employee, former employee, or applicant has not been notified by the Special Counsel that the Special Counsel shall seek corrective action on behalf of such employee, former employee, or applicant."

In the instant case, Plaintiff can not show that she had the right to directly appeal to the MSPB. Further, there is no dispute that Plaintiff never sought corrective action from the OSC.

[13] Claims alleging violations under 5 U.S.C. § 2302(b)(8).

jurisdictional contention and found that plaintiff need not first take her WPA claims to the OSC. Wells, 228 F.3d at 1142-43.  However, Wells is easily distinguished because the plaintiff in that case presented a claim that could be appealed directly to the MSPB and, as such, was not required to first go to the OSC. As discussed above, in the instant case, Plaintiff cannot show that she has an *adverse personnel action* which could be *directly appealed* to the MSPB.   Thus, pursuant to 5 U.S.C. § 1214(a)(3) Plaintiff was required to take her WPA claims to the OSC, after which she had to the option to file an "IRA" appeal with the MSPB.

### D. Plaintiff's Judicial Economy Argument Is Not Applicable In The Instant Case.

Plaintiff makes a judicial economy argument in which she invites this Court to reject Congress' intent and the specific controlling statutes and simply accept her WPA claims as properly before this Court.  This invitation should not be accepted.  Plaintiff offers two cases in support of her argument.  The first, Woodman v. Runyon, 132 F.3d 1330 (10th Cir. 1997), while mentioning the term "judicial economy," has no relation to the issue before this Court.  The holding of the Tenth Circuit had no relation to WPA claims nor to the required method of claim exhaustion.  Rather, Woodman involved the timing of a Rehabilitation Act claim relative to a change in the law.   The other case cited by Plaintiff, Wells v. Shalala, 228 F.3d 1137 (10th Cir. 2000), supports judicial economy only to the extent it recognized that the applicable statutes in that case provided the most economical manner in which to proceed and rejected a party's attempt to deviate from the statutes.  In this case, Defendants want no deviation, but instead merely submit that the statutes should be complied with as written and in accordance with

Congressional intent.[14]

**E. Plaintiff Lack Of A Personnel Action Directly Appealable To The MSPB Deprives This Court Of Jurisdiction Over Her WPA Claims Regardless of Whether She Exhausted Her WPA Claims With The OSC.**

Plaintiff's failure to bring her WPA claims before the OSC deprives the MSPB of jurisdiction over her WPA claims and eliminates any colorable argument that Plaintiff has a mixed case. However, assuming arguendo that Plaintiff had gone to OSC, and the MSPB could review her WPA claims, she still would not have had a mixed complaint properly before this Court because she would still lack an *appealable personnel action* under §7702. If Plaintiff exhausted her WPA claims with OSC, the MSPB would then have had jurisdiction over Plaintiff's WPA claims via an IRA appeal. However, the MSPB would still not have jurisdiction over Plaintiff's discrimination claims related to her performance-based removal from the SES. Therefore, Plaintiff still would not have an appealable personnel action under §7702. See Marren v. Department of Justice, 51 M.S.P.R. 632, 638-39 (1991) ("The [MSB]'s jurisdiction to review IRA [WPA] complaints based on personnel actions over which it otherwise does not have appellate jurisdiction is limited to adjudicating the whistleblower allegations.") See also Koszola v. FDIC, 393 F.3d 1294, 1300 (D.C. Cir. Cir 2005) (citing Marren favorably to support the proposition that the Resolution Trust Corporation WPA only allows district courts to evaluate the merits of the retaliatory claim, not the underlying personnel action). Instead, had Plaintiff taken

---

[14] See Horton v. Department of the Navy, 47 M.S.P.R. 475 (1991) (specifically rejecting this judicial economy argument for combining a WPA claim and a discrimination claim because the procedures Congress set out for a WPA claim via OSC differ from the procedures set out for an appealable action with a discrimination claim under §7702).

her WPA claims to the OSC, she could have appealed the MSPB's decision to the Court of
Appeals for the Federal Circuit and continued to pursue her discrimination claims before this
Court. See 5 U.S.C. § 7703 ; Weber v. U.S. 341, F.3d 756, 758 (D.C. Cir. 2000); Stella, 284 F.3d
at 142.  However, because the MSPB  lacked authority to review Plaintiff's performance based
removal from the SES, Plaintiff still would fail to make out a mixed case complaint under §7702
that is properly before a federal district court.  For these reasons Plaintiff's WPA claims should
be dismissed.

## IV.  PLAINTIFF'S PRIVACY ACT CLAIMS MUST BE DISMISSED

The CSRA is the "comprehensive system for reviewing personnel action taken against federal
employees." United States v. Fausto, 484 U.S. 439, 455 (1988).  Plaintiff's Privacy Act claims
must be dismissed because they frustrate Congress' intent that the CSRA provide the
comprehensive remedy for challenges to personnel decisions.   Plaintiff argues that she is not
attempting to "seek review of her 'demotion from the SES' under the Privacy Act.  (Plaintiff's
Opp. at 8.)  Instead, she claims that she is limiting her Privacy Act claims to allegations of the
"failure to collect information directly from plaintiff when the information may result in adverse
determinations about an individual's rights, benefits, and privileges, and for the failure to
maintain accurate records to assure fairness to plaintiff."  (Id.)  Plaintiff's statement is at odds
with the fact that a determination of her Privacy Act claims goes to the very essence of her
demotion, i.e. "the adverse determination" which she seeks to challenge under the Privacy Act.
In fact, in order to prove the existence of her Privacy Act claims she will have to prove a "causal
relationship between the allegedly erroneous record and an adverse determination based on that
record." Hubbard v. EPA,  809 F.2d 1 (D.C. Cir. 1986) citing with approval  Clarkson v. IRS,

11

678 F.2d 1368, 1377 (11th Cir. 1982) (quoting Edison v. Department of the Army, 672 F.2d 840,

845 (11th Cir. 1982)). See also Mailer v. FBI, 749 F.2d 815, 826 (D.C. Cir. 1984). It is not

possible for Plaintiff to establish this causal connection without challenging her demotion.

Plaintiff's complaint that there was a "failure to collect information directly from plaintiff

when the information may result in adverse determinations about an individual's rights, benefits,

and privileges, and for the failure to maintain accurate records to assure fairness to plaintiff" is

compromised by the exhibits she has attached to her opposition. As explained above, the

"adverse determination" of which Plaintiff complains is her demotion from the SES and

reassignment to a GS-15 position. In the process of effecting that action, Plaintiff was afforded

many opportunities to provide information in response to the adverse determination. Plaintiff

was given notice on October 5, 2004, that she would be removed from the SES. (Plaintiff's Opp.,

Ex. E.) In that notice she was informed of the basis for her demotion and her rights. (Id., at ¶¶ 5-

6). Plaintiff's rights included the right to a predecisional informal hearing before an MSPB

administrative judge. (Id.; see footnote 7, infra.) It is also clear, just from the exhibits attached

to her opposition, that Plaintiff provided a great deal of information to the Army in response to

the notice. (Plaintiff's Opp., Ex. D at 10) (letter dated October 21, 2004 from Plaintiff's attorney

in which she asks that the demotion from her position be stayed until an investigation is

conducted; also note that this letter is referenced in many of the agency memos in Plaintiff's

Opp., Ex. D.)

Plaintiff cites to Hubbard for the general proposition that federal employees may allege

violations of the Privacy Act for an adverse personnel action caused by an inaccurate record.[15]

(Plaintiff's Opp. at 9.)  However, in selectively parsing that general language from Hubbard

Plaintiff ignores the actual holding of the case which affirmed the dismissal of that plaintiff's

Privacy Act claims.[16]  The Hubbard Court went on to hold that "[p]rohibited personnel practice

claims may only be brought to the OSC, which has discretion (not normally reviewable by any

court) to seek relief on behalf of a petitioner." Hubbard, 809 F.2d at 11, citing Carducci v. Regan,

714 F.2d 171, 175 (D.C. Cir. 1983).  Further, the Court of Appeals held that "[s]ince Congress

specifically chose to oust the district courts of jurisdiction to review government personnel

practices, it would be anomalous to construe the pre-existing Privacy Act to grant the district

court power to do indirectly that which Congress precluded directly." Id.

Plaintiff would invite this Court to compromise the purposes of the CSRA by subjecting

plaintiff's demotion, and all the steps that are a part of it, to review not only under the CSRA, but

also under the Privacy Act. This Court must reject Plaintiff's request.

## V.  STATEMENT OF FACTS

Plaintiff offers a counter statement of facts which presents facts not relevant to Defendant's

---

[15]A Privacy Act claim can not be a separate claim (from a CSRA claim) where Plaintiff does not put forward any facts that indicate that " but for" inaccuracies in the challenged document, she would not have been demoted.  Hubbard, 809 F.2d at 14.  In the instant case it was not the proposed removal or analysis that caused Plaintiff to be demoted.  It was her two less than fully successful performance evaluations.

[16]Hubbard held that the "CSRA deprives the district court of jurisdiction to review prohibited personnel practices" because "more serious infractions are appealable to the Merit Systems Protection Board, with further review in the Courts of Appeal."  Hubbard, 809 F.2d at 11. Surely, a demotion from the SES falls within the type of "serious infractions" this Circuit held were prohibited from district court review.

motion, but instead draws attention away from the actual issues raised by the motion. Although not relevant to the instant motion, as some of the alleged facts are misleading, they must be addressed.

Plaintiff implies that Assistant Secretary of the Army ("ASA") Brown was required to complete some sort of written memorandum of approval to remove Plaintiff from her SES position. (Plaintiff's Opp., Counter Statement of Facts, ¶¶ 10-11.)  However, there is no such requirement and Plaintiff presents no authority to prove otherwise.  Those allegations are self serving, uncorroborated, and baseless.

Plaintiff implies that the United States Army Corps of Engineers ("USACE") did something improper when they "somehow obtained access" to a copy of ASA Bolton's memorandum recommending removal of Plaintiff.  (Id. ¶ 10.)  ASA Bolton's memorandum was just one the documents created concerning the removal of Plaintiff from her job.  Plaintiff has no basis to suggest that it was somehow classified or something which USACE could not review.  Her suggestion is unfair and unsupportable.

Plaintiff makes an unsupported (except by reference to her own complaint) assertion that ASA Brown did not approve Plaintiff's removal from the SES.  (Id. ¶ 12.)  The documents[17]

---

[17] Plaintiff's Exhibit C contains ASA Reginald J. Brown's decision (dated July 11, 2003) to deny the First request to remove Plaintiff from the SES.  In that memo, he explains that he was following ASA Bolton's recommendation and that as of that time there was insufficient evidence that Plaintiff had been put on notice that her performance was unsatisfactory. (Id.).  Plaintiff's Exhibit D contains ASA Bolton's recommendation to ASA Brown (dated July 14, 2004) that Plaintiff must be removed from the SES pursuant to Office of Personnel Management regulations, among other reasons. (Id.).  It is undisputed that on this occasion and no time after that ASA Brown never took any action to deny this request (or otherwise denying the request to remove Plaintiff from the SES).  Instead, the recommendation was returned from ASA Brown's office with the comments "noted" and ASA Brown's initials.

indicate that ASA Brown did approve of the demotion and did nothing to prevent it from being completed. Her suggestion is her own self serving opinion.

Plaintiff claims that she filed a mixed case complaint with the agency EEO office. (Id. ¶ 13.) While true that Plaintiff attempted to file such a complaint, as noted above, Defendants dismissed this complaint as improperly filed. Her statement implies that she filed a mixed case, that he was accepted by the agency, and that it was investigated. This is false and counter to the evidence.

Plaintiff appears to challenge the authentication of the document with ASA Brown's initials, however, the document is a properly maintained as a business record. (Id., fn 1.) Plaintiff asserts that ASA Bolton testified that the word "noted" does not equate to approval. (Id.). However, that is not what he said according to the actual testimony. ASA Bolton testified that he did not personally know what the word "noted" meant. Further, it is not relevant what he thought the words meant. Plaintiff suggestions that the documents are not authentic is unsupported and baseless.

The statement in paragraph 14 of Plaintiff's counter statement of facts has nothing to do with the motion at hand, specifically, whether Plaintiff's WPA, Privacy Act, and APA claims are properly before this Court. Plaintiff claims that her allegations were so significant that the Army referred them to the Inspector General. (Id. ¶ 15.) However, while the allegations were significant and serious, Plaintiff's own exhibits demonstrate that these allegations were ultimately determined to be unfounded. (See Plaintiff's Opp., Ex. D.)[18]

---

[18] Plaintiff also improperly suggests, without support, that there was some obligation to interview her before taking action to remove her. (Plaintiff's Opp., Counter Statement of Facts, ¶¶ 16, 19, 21.) Interestingly, Plaintiff's attorney makes himself a potential witness by offering a

Plaintiff argues, without support, that the Army inspector general had no authority to review Lieutenant General ("LTG") Strock's June 3, 2005 memorandum concerning Plaintiff's removal from the SES.  (Id. ¶ 17.)  This argument is also baseless and unsupportable.

Plaintiff makes conclusory assertions that LTG Strock acted on an insufficient record and that the "analysis" contains false and misleading information for the purpose of misleading the Secretary of the Army.  (Id. ¶ 18.)  These baseless conclusions are speculation, baseless, and false.

Plaintiff implies that LTG Strock needed additional authority beyond that inherent in his Command and position to obtain and use an analysis that was submitted to the Secretary of the Army supporting Plaintiff's removal from the SES.  (Id. ¶ 20.)  Again, this conclusion is baseless.

Plaintiff offers more unsupported conclusions concerning the Army IG.  (Id. ¶ 21.)  The conclusion that the analysis was window dressing is self serving and based on Plaintiff's own opinion and speculation.   (Id. ¶ 22.)  Plaintiff criticizes  LTG Strock for not remembering who authored the analysis, but provides no independent basis for the criticism of it.  (Id.)   Plaintiff's assertion that LTG Strock was wrong when he stated that he had obtained ASA Brown's approval to proceed with her demotion is denied as her own misinterpretation of the facts.  (Id. ¶ 23.)  Plaintiff's June 27, 2005 testimony before Congress is immaterial to the issues presented in Defendants' pending motion.  (Id. ¶ 24.)

The Secretary of the Army did approve the request to remove Plaintiff from the SES, the

---

declaration in support of this immaterial fact.

word "allegedly" has no basis in fact.  (Id, ¶ 26.)  The implication that Plaintiff was given the

documents which justified her removal from the SES only on July 26, 2005 is denied.  (Id. ¶ 27.)

The documents collectively spell out the events and demonstrate that Plaintiff was informed on

October 5, 2004 the basis for her demotion, namely two less than fully successful performance

evaluations.   Further, she was given the opportunity for an informal hearing.  On July 26, 2005

she was informed of the effective date of the removal.  Plaintiff filed a claim with the EEO

office.  However, as discussed above, her WPA claims were not accepted.  (Id. ¶ 29.)

Finally, Plaintiff misstates her complaint.  She did not have a mixed case complaint before

the EEO office.  Further, she provides the Court with only one page of the Final Agency

Decision.  (Id. ¶ 30; Plaintiff's Opp., Ex. L.)   As noted above, a complete copy of the Final

Agency Decision is attached for completeness, and page 5 establishes that the WPA claims were

dismissed and not part of the complaint or investigation.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court grant Defendants'

Motion for Partial Judgment on the Pleadings or, in the alternative, for partial summary

judgment.

_____ Respectfully submitted,


_____
       /s/
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____
       /s/
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

17

_____/s/_____

BRIAN C. BALDRATE
Special Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
202-353-9895
Attorneys for Defendants

Of Counsel:
THOMAS M. RAY
U.S. Army Litigation Division

18

Exhibit 1



**DEPARTMENT OF THE ARMY**
**EQUAL EMPLOYMENT OPPORTUNITY**
**COMPLIANCE AND COMPLAINTS REVIEW**
1901 SOUTH BELL STREET, 1ST FLOOR
ARLINGTON, VA 22202-4508

REPLY TO
ATTENTION OF

**2 6 DEC 2006**

Equal Employment Opportunity
Compliance and Complaints Review

Michael D. Kohn, Esquire
Kohn, Kohn, & Colapinto, P.C., LLP
3233 P. Street, N.W.
Washington, DC 20007

Complaint of Bunnatine H. Greenhouse v.
Francis J. Harvey, Secretary of the Army
DA Docket Number: ARHQOSA03AUG0109

Dear Mr. Kohn:

This is the Department of the Army's final decision in the equal employment opportunity (EEO) complaint of Ms. Bunnatine H. Greenhouse (hereinafter your client or the Complainant) dated October 14, 2003, and variously amended (the last of which occurred on March 1, 2006), which was filed with the EEO Office, Office of the Administrative Assistant to the Secretary of the Army.

**Procedural Background**

In the instant complaint, the following allegations were accepted for processing. Your client claimed that she was subjected to a hostile work environment and discrimination based on race (African American), color (Black), gender (female) and reprisal (prior protected EEO activity) when:

On June 6, 2003, Major General (MG) Hans Van Winkle issued her a Notice of Proposed 30-day Suspension;

On July 31, 2003, Lieutenant General (LTG) Robert Flowers and MG Van Winkle issued her a Level 4 rating on her Senior System Evaluation Report for the period of October 1, 2001 through September 30, 2002;

On January 8, 2002, she received a Level 2 rating on her Senior System Evaluation Report for the period of October 1, 2000 through July 20, 2001;

On February 13, 2003, she became aware that there was an attempt to reopen a prior closed Inspector General (IG) investigation of allegations against her;

On July 28, 2003, she became aware that Mr. Donald I. Basham was appointed as Executive Secretary of the Acquisition Corporation Group (ACG), and was given authority by MG Robert Griffin to review her decisions pertaining to career management and support for information provided to HQ, Department of the Army (DA) or Department of Defense (DoD) Contracting executives;

f.  On March 6, 2002, she was informed by LTG Flowers that he wanted her to have recurrent sensing sessions conducted by the US Army Corps of Engineers (USACE), IG office; which resulted in a requirement that she develop a plan to remedy any accusations and the results of which were used as a performance measure for her;

g.  On December 4, 2003, MG Griffin sent a survey to her subordinates asking them to assess her performance as the Principal Assistant Responsible for Contracting (PARC), using the findings from an IG investigation;

h.  On January 30, 2003, MG Van Winkle disapproved a support form that she prepared for one of her GS-15 subordinates, on the grounds that the performance standards did not contain measurable outcomes;

i.  On April 2, 2003, and in January 2002, MG Van Winkle required a Colonel (COL) to be present during counseling sessions with her;

j.  In January 2003 and November 2003 meetings regarding her fiscal year 2002-2003 performance evaluation, MG Griffin stated that if he had to rate her on those dates that he would have issued her an unsatisfactory rating;

k.  On October 31, 2003, she received a second notice from MG Griffin requesting additional documentation from her in order to complete her performance evaluation for 2002-2003;

l.  From 2000 through February 2004, Mr. Anderson, General Counsel, and MG Griffin constantly interfered with the contracting process by taking over, interfering with or usurping her duties as the PARC; the most recent incidents of which occurred on  February 13, 2004, when MG Griffin removed her authority to handle a congressional inquiry and instead required the General Counsel to handle it, and on July 28, 2003, she became aware that Mr. Anderson placed the Chief of Contracting directly under the operational control of the District General Counsel;

m.  On an unknown date, Mr. Anderson stated to others that he was going to get her fired when she was informed[1] by Corps Inspector General, LTC Willie James that Mr. Anderson stated he was going to "bring the bitch down";

n.  On June 11, 2003, MG Van Winkle and LTG Flowers changed her performance standards for her 2002-2003 performance appraisal;

o.  On December 11, 2002, MG Van Winkle issued her a Level 5 rating on her initial performance appraisal for the 2001-2002 rating period;

p.  On July 31, 2002,[2] In a meeting with MG Griffin, your client became aware that MG Van Winkle, LTG Flowers and Mr. Anderson proposed that she be removed from the Senior Executive Service (SES) for alleged deficient performance;

q.  During the 2002-2003 performance rating period, she was not permitted to participate onsite during the Northwestern Division Command Staff Inspection (CSI) visit in October 4-5, 2003, and the Southwestern Division CSI;

---

[1] Changed during the Fact Finding Conference to read she learned from "Lieutenant General Ballard's witness statement" that Mr. Anderson, USACE General Counsel made this statement to Joe Levy, USACE Deputy Director.  The Complainant states that LTC James did not provide this information (TR pp 7, 216, 219).

[2] The Complainant states that this may have occurred in 2003 vice 2002 (TR p 226).

- 3 -

r. In November 2002, MG Van Winkle denied her request to travel to Korea to attend a function sponsored by the Korea Trade Center, Congressman Jones, and the Renaissance Foundation; and

s. In approximately April 2003 and May 2002, MG Van Winkle disapproved continuing development and SES education training that was sponsored by the HQDA SES office.[3]

**AMENDMENT 1:** On January 26, 2004, your client claimed discrimination based on her race (African American), color (Black), gender (female) and reprisal (prior protected EEO activity) when:[4]

t. On November 20, 2003, LTG James J. Lovelace, Director for Army Staff, issued her a written reprimand for "failure to fulfill the duties and responsibilities as a rating official under the Officer Evaluation Reporting System"; and

u. In a January 20, 2004, staff meeting MG Griffin took away her role as the Corps Procurement Executive (CPE) as to representation at interagency meetings on procurement in Iraq and, appointed COL Mark Tilletson, Executive Officer for Military Programs, to perform this function.

**AMENDMENT 2:** On March 15, 2004, your client claimed discrimination based on her race (African American), color (Black), gender (female) and reprisal (prior protected EEO activity) when:

v. On her FY 2002-2003 performance appraisal, MG Griffin issued her a Level 5 rating[5];

w. In February 2004, her office staff members were removed from her daily operational control and placed under the control of other non-contracting SES members, resulting in a staff reduction from 20 to 15 and movement of the positions to other areas;

x. On March 12, 2004, she became aware that management had delayed issuing Lieutenant Colonel (LTC) Albert Castaldo (Latin, Caucasian/Mediterranean, male), Deputy PARC, his Officer Evaluation Report (OER) for a year, and instead was attempting to change the rating that she gave him;

y. On March 6, 2004, MG Griffin signed and issued immeasurable performance standards to her;

z. Management denied her step increases for the performance periods of 2000-2001, 2001-2002, and 2002-2003 (Investigative File [IF] pages [pp] 634-643).

---

[3] The record evidence indicates that this incident did not occur in May 2003, as alleged; rather it occurred in May - September 2002, and March 2003 (TR pp 540-549, 1572-1586).

[4] For purposes of this decision, the accepted allegations will be addressed by the sequential numbers assigned herein regardless of whether they were a part of the original complaint or one of the amendments. Allegations asserted as separate incidents will be adjudicated together with similar allegations arising from the same set of facts.

[5] The Level 5 rating was mitigated to a Level 4 rating by HQDA on July 14, 2004.

**AMENDMENT 3:** On August 20, 2004, your client claimed discrimination based on reprisal (prior protected EEO activity) when:

aa. On July 6, 2004, during her 2003-2004 mid-point review, MG Griffin informed her that she was failing the performance objectives related to being proactive in notifying him of actions occurring in the contracting process, and he provided her a table that she alleges indicates that he had gone to "GAO Security" and made a chart to monitor her attendance, including dates and times of her arrival, absences, and temporary duty;

bb. In a July 6, 2004 letter and a July 16, 2004 email, respectively, MG Griffin interfered with her PARC responsibilities by 1) dictating how she should set up the "IPT" on Administrative Contracting Officer Warrants for Engineers, and 2) by informing her that he was assigning LTC Norbert S. Doyle, (incoming) Deputy PARC, as the contracting representative to support Transatlantic Command (TAC) (IF pp 648- 649).

**AMENDMENT 4:** On October 14, 2004, your client claimed discrimination based on her race (African American), gender (female), age (date of birth [DOB]: 7/22/44), and reprisal (prior protected EEO activity) when:

cc. On October 6, 2004, she was provided a Notice of Removal from the SES and her USACE PARC position, effective November 13, 2004 (IF pp 649b-649d).

**AMENDMENT 5:** On September 5, 2005, your client claimed discrimination based on her race (African American), gender (female), age (DOB: 7/22/44), and reprisal (prior protected EEO activity) when:

dd. On August 27, 2005, she was removed from the SES and from the USACE PARC position, demoted to a GS-15, and was placed as a Program Manager in the Engineering and Construction Division (E & C), Directorate of Civil Works (IF p 649hh).

**AMENDMENT 6:** On February 23, 2006, your client claimed discrimination based on her race (African American), age (DOB: 7/22/44), gender (female), and reprisal (prior protected EEO activity) since her transfer into the Engineering and Construction Division when:

ee. On approximately August 28, 2005, she was not issued an appropriate 1) position description (PD), 2) performance standard, 3) work assignments; 4) she was excluded from participation in management/mission meetings and otherwise isolated; and 5) she was denied return to her career field, including a transfer to another agency, if necessary (IF pp 649ss-649tt).

- 5 -

**AMENDMENT 7:** On March 1, 2006, your client claimed discrimination based on her race (African American), age (DOB: 7/22/44), gender (female), and reprisal (prior protected EEO activity) when:

ff.  On February 14, 2006, Ms. Sandra R. Riley (Caucasian, White, age: 57), was appointed as the USACE Director of Contracting (IF p 649vv-649yy, TR p 2287).

Attachment A contains a chronological chart of the above incidents and key procedural dates and is color coded to reflect the responsible management official(s) for each incident.

On June 26, 2003, your client contacted an EEO Counselor and filed an informal EEO complaint. The complaint was not successful resolved, and on October 14, 2003, your client received her Notice of Right to File (NRTF) a Formal EEO complaint. On October 14, 2003, your client filed this formal EEO complaint, which she amended 7 times on January 26, 2004, March 15, 2004, August 20, 2004, October 14, 2004, September 5, 2005, February 23, 2006, and March 1, 2006, respectively. I note that an investigation was conducted by the Department of Defense Office of Complaint Investigations during the period of September 7, 2004 - May 23, 2006. On June 16, 2006, your client was notified of the option to request either a hearing before an Equal Employment Opportunity Commission administrative judge or a final Army decision based upon the evidence in the case file. In a July 19, 2006 letter, you requested that a final Army decision be issued only after the acceptance and investigation of an 8th amendment to the instant complaint apparently submitted in May 2006, and docketed as new complaint number ARHQOSA06MAY02234. On September 14, 2006, your client was issued a second post-investigative options letter. This letter was issued due to your failure to receive the Army's response to your client's 8th complaint amendment prior to your client's response to the original post-investigative options letter. This decision is issued pursuant to your client's failure to make an election within the allotted 30 day period.

As an initial matter, I hereby adopt by reference the October 28, 2004, and February 9, 2006, decisions of the EEO Officer to dismiss your client's allegations of reprisal due to whistleblower activity (for failure to state a claim under the purview of EEO law and regulation), and failure to docket a conflict of interest complaint and delay of the administrative process (for complaints about the processing of an existing EEO matter) (IF pp 649b-649e, 649hh-649nn). The regulatory bases for these decisions can be found at 29, Code of Federal Regulations (CFR) §1614.107(a)(1) and (a)(8).

Further, the following incidents (c & z-2001, d, f, h, i-2002, r, and s-2002[6]) are discrete events which occurred before February 18, 2003 (45 days before your client first contacted an EEO counselor on April 3, 2003) and were not timely brought to the

---

[6] The record evidence indicates that this incident did not occur in May 2003, as alleged; rather 2 training denials occurred in May - September 2002, and March 2003, respectively (TR pp 540-549, 1572-1586).

attention of an EEO counselor; hence, these claims are dismissed and will not be considered for purposes of disparate treatment or reprisal. As a senior level manager, your client knew or should have known of the requirement to contact an EEO counselor within 45 days of the alleged discriminatory events. The regulatory basis for this decision can be found at 29 C.F.R. §1614.107(a)(2). However, these issues may be considered as background information regarding the alleged hostile work environment.

Finally, the following incidents (j, o, and p) are preliminary actions that do not render a complainant aggrieved under EEO law and regulation. An employee does not become aggrieved until a final action is taken, i.e., a mere proposal to take an action should not be raised until such time as a final decision to take the action is made. Accordingly, the allegations regarding the January 2003 and November 2003 "failing" verbal performance assessment, December 11, 2002, Level 5 initial 2002 performance rating, and the July 31, 2002, proposed removal from the SES are dismissed because they are mere proposals to take personnel actions, or do not constitute final actions. The regulatory basis for this decision is found at 29 CFR §1614.107(a)(5). However, incident "j." may be considered as to the alleged hostile work environment; while, incidents "o." and "p." will be considered with the final actions, incidents "b." and "cc.," respectively, into which they merged.

### Factual Background

During the time of the initial matters at issue, the Complainant was employed as the PARC, SES-02, at the Headquarters (HQ) USACE, located in Washington, D.C. She entered this position in 1997. Beginning with her performance appraisal for the 2000-2001 rating period, and continuing through the rest of her employment as the PARC, her supervisors were:

First Level

• Major General (MG) Hans Van Winkle (Caucasian, White, male) then Deputy Commanding General (DCG) USACE from August 1, 2001 - mid June 2003.
• MG Robert Griffin (Caucasian, White, male), then DCG USACE starting in July 2003.

Second Level

• Lieutenant General (LTG) Robert Flowers (Caucasian, White, male, DOB: 7/9/47) then Chief of Engineers, Commander of the USACE and Head of the Contracting Activity (HCA) from October 23, 2000 - July 1, 2004.
• LTG Carl Strock (Caucasian, White, male, DOB: 7/20/48) Commander of USACE starting July 1, 2004.

After her August 27, 2005, removal from the PARC position and the SES, and placement in the GS-340-15, Program Manager, position in the Directorate of Civil

Works, Engineering and Construction Division (E & C) (IF pp 3342 - 3348) her supervisor was:

> • Mr. Donald Basham (Caucasian, White, male, DOB: 11/30/46), SES, Chief of Engineering and Construction Division.

Background information for Complainant's performance ratings from 2001-2003 is as follows:

> • For the rating period October 1, 2000 - July 20, 2001, MG Milton Hunter (race and color not available, male), departing DCG of USACE and Complainant's previous first line supervisor, gave her an undated initial rating of Level 1 (Excellence on 75% or more objectives) (IF p 3158). The USACE Performance Review Board (PRB), which reviews SES ratings, recommended a Level 2 (Excellence on 25-74% objectives) for Complainant, and LTG Flowers gave her a Level 2 as her final rating (IF pp 3153-3163).

> • For the rating period October 1, 2001 - September 30, 2002, MG Van Winkle gave Complainant an initial rating of Level 5 (Fails 1 or more objectives) and submitted his justification to the PRB on January 30, 2003 (IF pp 1939-2080). The PRB also recommended a Level 5 for Complainant. On April 2, 2003, LTG Flowers sent a memorandum to Mr. Claude Bolton (Black, brown, male, DOB: 12/13/45), Assistant Secretary of the Army (Acquisitions, Logistics and Technology) wherein he requested removing the Complainant from her position and from the SES based on her final performance rating of Level 5 (IF pp 1705-1706). By memorandum dated July 11, 2003, Mr. Reginald Brown (Black, brown, male, date of birth not available) [now deceased] Assistant Secretary of the Army (Manpower and Reserve Affairs) denied LTG Flower's request to remove Complainant from the SES due to "insufficient evidence that USACE officials specifically put Complainant on notice that her performance was unsatisfactory and gave her a meaningful opportunity to improve" and failure to justify the Level 5 rating (IF p 704). LTG Flowers then issued the final rating as a Level 4 (Needs Improvement/Fair) (IF pp 1697-1703).

> • For the rating period October 1, 2002 - September 30, 2003 (extended to December 31, 2003), MG Griffin gave Complainant an initial rating of Level 5 on January 29, 2004 (IF pp 2233-2242). On February 9, 2004, the Complainant responded to the initial rating (IF pp 2243-2284) and on February 20, 2004, MG Griffin forwarded his initial rating of Complainant to the PRB, along with the Complainant's response (IF pp 2285-2312) with numerous attachments (IF pp 2313-2918). The PRB recommended a Level 5 for Complainant, which on March 14, 2004, LTG Flowers sent to Assistant Secretary Brown through Assistant Secretary Bolton, and provided notice of his intent to assign a final performance rating of Level 5 to Complainant and seeking approval to remove her from SES and place her in a GS-15 position (IF pp 2228-2229). On July 14, 2004, Assistant Secretary Bolton recommended that Assistant Secretary

Brown disapprove LTG Flower's intent to assign an overall performance rating of Level 5 (Unsuccessful) and stated that a Level 4 (Needs Improvement/Fair) was warranted. A second Level 4 rating of Complainant required that she be removed from the SES pursuant to Office of Personnel Management regulations because this would be her second "less than fully successful rating" within three consecutive years. Assistant Secretary Brown wrote "Noted" on the memorandum (IF pp 3284 - 3286).

On October 5, 2004, LTG Carl Strock, Commanding General USACE, issued Complainant a Notice of Removal from the SES and from her position as the PARC effective November 13, 2004 (IF pp 3287-3288). This action was suspended pending a resolution of other matters raised by Complainant to the Acting Secretary of the Army (IF pp 3289-3300). LTG Strock later notified Complainant, by letter dated July 26, 2005, that the effective date of her removal from the SES would be August 27, 2005 (IF pp 3313 -3314), at which time the Complainant was placed into a GS-340-15, Program Manager position in the Directorate of Civil Works, Engineering and Construction Division (IF pp 3342 - 3348) under the supervision of Mr. Donald Basham (Caucasian, white, male, DOB: 11/30/46), SES, Chief of Engineering and Construction Division.

## Legal Framework

In any proceeding, either judicial or administrative, involving a charge of discrimination, it is the complainant's burden to prove that prohibited discrimination was the motivating factor in the actions or policies challenged. To satisfy this burden by circumstantial evidence, the complainant must first establish a *prima facie* case of discrimination. *See* McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973); Furnco Construction Company v. Waters, 438 U.S. 567 (1978). This means that the complainant must present a body of evidence such that, were it not rebutted, the finder of fact could conclude that unlawful discrimination did occur.

The analysis in McDonnell Douglas prescribes that if the complainant meets his/her burden of presenting a *prima facie* case, then the employer or Agency must articulate some legitimate, nondiscriminatory reason(s) for its actions. That is, the employer must ". . . introduce evidence which if, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993). Once the employer or Agency carries this burden of production, the presumption of discrimination created by the *prima facie* "finding drops from the case."

The complainant then must demonstrate that the proffered reason was not the true reason for the employment decision and that unlawful discrimination was. The complainant retains the ultimate burden of persuading the finder of fact that the Agency intentionally discriminated against the complainant.

## Analysis and Findings[7]

**Disparate Treatment**. To establish a *prima facie* case of discrimination based upon race, color, sex, or age your client, must show that: (1) she is a member of groups protected by Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act (ADEA), as amended; (2) she was adversely affected by an agency personnel decision, action or change; and (3) she was treated less favorably than similarly situated individuals outside of her protected groups or, in the alternative, that there is some other evidence raising an inference of prohibited discrimination. In cases involving a claim of age discrimination, your client must show that age was a determining factor in the decision to take the adverse action against her.

To establish a *prima facie* case of discrimination based upon race, color, sex, or age with regard to a promotion or hiring issue, your client must show that: (1) she is a member of groups protected by Title VII, or the ADEA; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, she was not selected; and (4) after her rejection, the position remained open and the employer continued to seek applications from persons of her qualifications, or that she applied for a vacant position, for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.

**Reprisal**. To establish a *prima facie* case of reprisal, your client must show that: (1) she engaged in activity protected by Title VII of the Civil Rights Act of 1964, or the ADEA, as amended, of which management was aware; (2) after the protected activity, her employment situation was adversely changed; and (3) there is a causal nexus between the protected activity and the adverse action, or the adverse action occurred within so short of a time period that a retaliatory motive may be inferred, or other evidence exists from which to infer there was a nexus between the two actions. *See* Mack v. Department of the Army, EEOC Appeal No. 01921446 (May 6, 1993).

**Prima Facie Case Analysis**. In your client's complaint, she met the following disparate treatment and/or reprisal *prima facie* elements:

**Element 1** (Disparate Treatment and Reprisal) was established by virtue of evidence that she is a member of the following protected groups: race (African American), color (black), gender (female), age (DOB: July 22, 1944), and reprisal (prior EEO activity between April 3, 2003[8] and March 1, 2006). The reprisal requirement that

---

[7] Due to the number of allegations, bases, and theories of alleged discrimination, this decision will focus on delineating the conclusions supported or not supported by the evidence of record for each of the standards of proof. In the interest of brevity, relevant evidence of record supporting the conclusions, as to establishment of a *prima facie* case, will be referred to vice being quoted or paraphrased herein. Evidence of the nondiscriminatory reasons and pretext will be paraphrased with a citation to the location of the evidence of record.

[8] The Complainant alleged that she first opposed discriminatory practices in a letter dated March 5, 2002. However, a review of this document does not reveal an express statement that she believed she was the victim of discrimination (TR p 28, IF pp 773-779). The record also refers to an EEO office contact on

- 10 -

management be aware of the Complainant's protected EEO activity is satisfied by record evidence showing that management became aware of the Complainant's protected EEO activity on the following dates:

| | |
|---|---|
| MG Van Winkle | Uncertain, but denies any direct recollection (TR pp 426-427)[9]; |
| MG Griffin | September 2003 (TR pp 885- 888); |
| LTG Flowers | April 2003; no recall of the March 5, 2002 letter (TR pp 670-673); |
| LTG Lovelace | June 2003 (proposed suspension documents) (TR pp 1150-1151); |
| LTG Strock | Date uncertain, but knew of alleged discriminatory ratings (IF p 3669); |
| Mr. Bolton, ASA | July 14, 2004 (TR pp 2371-2376); |
| Ms. Ballard | January 2005 (TR pp 2383); |
| Mr. Basham | Mid to late March 2006 (TR pp 2305-2306). |

**Element 2** (Disparate Treatment) requires your client to prove that she suffered an adverse employment action. An adverse employment action in a case under Title VII or the ADEA's anti-discrimination clause, require an employee to show a "*serious and material (emphasis in the original)* adverse change in the terms, conditions, or privileges of employment." Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.  Congress simply did not intend for Title VII to be implicated where comparatively little is at stake.  <u>Davis v. Town of Lake Park</u>, 245 F.3d 1232 (11th Cir. 2001).

"Courts have equated adverse employment actions with 'ultimate' employment decisions, such as hiring, granting leave, discharging, promoting, and compensating; not every decision made by an employer that arguably has some tangential effect on those ultimate decisions is actionable." To be aggrieved, one must have suffered an actual injury, *i.e.*, there must be an action that negatively affects a *substantive (emphasis added)* term, privilege, or condition of the individual's employment in a real and demonstrable way.  *See* <u>Dollis v. Rubin</u>, 77 F.3d 777 (5th Cir. 1995); <u>Page v. Bolger</u>, 645 F.2d 227, 233 (4th Cir. 1981).

I find sufficient supporting evidence to prove that the following discrete adverse employment actions occurred on or after February 18, 2003 (45 days prior to contacting an EEO counselor on April 3, 2003), and were sufficiently serious and materially adverse to be ultimate employment decisions:

| Incident | Incident Description | Supporting Evidence |
|---|---|---|
| a.[10] & t. | Proposed 30 day suspension on June 6, 2003, | (TR pp 95-110, 118; |

April 4, 2003; however, only LTG Flowers indicates that he became aware of the Complainant's EEO activity during this timeframe (TR p 32).

[9] Knowledge of EEO activity is inferred to have occurred on or after the filing of the informal EEO complaint in June 2003.

[10] Incident (a) is adjudicated with incident (t) because they arise from the same set of facts and because incident (a) is a proposed action which is not separately actionable under EEO law and regulation. 29 C.F.R §1614.107(a)(5).

| Incident | Incident Description | Supporting Evidence |
|---|---|---|
|  | which was mitigated to a written reprimand on November 20, 2003; | IF pp 697-702-Ex F-4) |
| o./b. & z-2002 | July 31, 2003, Level 4 rating and step increase denial on the Senior System Evaluation Report for October 1, 2001 through September 30, 2002; | Ex F-8; IF pp 1696-1714 |
| v.[11] & z. 2003 only, no age. | January 29, 2004, Level 5 rating and step increase denial on the Senior System Evaluation for October 1, 2002 - December 31, 2003, | Ex F-8; IF pp 2226-2237, 3288a |
| cc./p. & dd. | October 6, 2004, proposed removal from the SES and the USACE PARC position, which was effectuated on August 27, 2005, when your client was demoted to a GS-15 Program Manager in the Engineering and Construction Division, Directorate of Civil Works; and, | IF pp 649b-649d, 649hh |
| ee. | On approximately August 28, 2005, she was not issued an appropriate 1) position description (PD), 2) performance standard, 3) work assignments; 4) she was excluded from participation in management/mission meetings and otherwise isolated; and 5) she was denied return to her career field, including a transfer to another agency, if necessary. | IF pp 649ss-649tt |

I find that the remaining incidents (e, g, i-2003, k, l, m,[12] n, q, s-2003, u, w,[13] x, y, aa, and bb) do not rise to the level of being a "serious and materially adverse" change to your client's employment since they do not rise to the level of "ultimate employment decision[s]," such that Title VII's disparate treatment provision is implicated.

Incident (ff.), the February 14, 2006, appointment of Ms. Sandra R. Riley, as the USACE Director of Contracting, is a nonselection allegation for which the record must support a finding of application and "qualification" for the position. However, I find that the Complainant neither applied for the position, nor was "qualified" for appointment to the USACE Director of Contracting position by virtue of her removal from the SES and

---

[11] The Level 5 rating was mitigated to a Level 4 rating by HQDA on July 14, 2004.

[12] The record does not support a finding that this allegation occurred as alleged. The Complainant admits that she did not personally hear this statement and indicates that she knows of no reason why Mr. Anderson would discriminate against her other than her actions in "revolutionizing contracting" (TR p 225).

[13] The record indicates that personnel was taken from areas other than contracting and used to form Regional Integration Teams (RIT) to service each of the USACE districts. Accordingly, it is reasonable to infer that the work which these employees would have performed also migrated with them to the RIT, hence, the PARC organization would not have been disadvantaged by the reassignment, and certainly no more so than any of the other areas from which staff was also taken.

- 12 -

the substantially similar PARC position just one year earlier[14]  Likewise, she was not eligible for reassignment into the position because she was no longer a member of the SES.  Accordingly, this *prima facie* element is not supported as to nonselection allegation "ff."

Element 2 (Reprisal) may be established in the above cited non-discrete incidents (e, g, i-2003, k, l, m, n, q, s-2003, u, w, x, y, aa, bb, and ff) as to Title VII's anti-reprisal provisions if sufficient evidence of their occurrence and propensity to deter EEO activity is extant.  In Burlington Northern & Santa Fe Railway Co. v. White, No. 05-259 (SCt. June 22, 2006) the U.S. Supreme Court established the standard of "adversity" for claims of reprisal in holding that:

> The anti-retaliation provision's purpose [is to] '[m]aintain unfettered access to statutory remedial mechanisms,' [citing] Robinson v. Shell Oil Co., 519 U. S. 337, 346 (1997).  Th[i]s purpose reinforces what the language says, namely, that the anti-retaliation provision is not limited to actions affecting employment terms and conditions.  Neither this Court's precedent nor the EEOC's interpretations support a contrary conclusion.  Nor is it anomalous to read the statute to provide broader protection for retaliation victims than for victims of discrimination.  Congress provided similar protection from retaliation in comparable statutes; and differences in the purpose of the two Title VII provisions remove any perceived 'anomaly,' for they justify this difference in interpretation. ... The anti-retaliation provision covers only those employer actions that would have been materially adverse to a reasonable employee or applicant.  This Court agrees with the Seventh and District of Columbia Circuits that the proper formulation requires a retaliation plaintiff to show that the challenged action 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination' [citing] Rochon v. Gonzales, 438 F.3d 1211, 1219 (DC Cir. 2006).  The Court refers to *material* adversity to separate significant from trivial harms.  The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms by prohibiting employer actions that are likely to deter discrimination victims from complaining to the EEOC, the courts, and employers. Robinson, *supra*, at 346.

However, I do not find that sufficient evidence exists to prove either that the incidents (e, g, i-2003, k, l, m, n, q, s-2003 only, u, w, x, y, aa, bb, and ff) occurred as alleged, or if they did occur, that they were so materially adverse, such that they would have deterred a reasonable employee from complaining to the EEOC, the courts, or the employer.  Many of these incidents were wholly within management's purview, were not supported by the evidence of record, or did not represent a sufficient change to your

---

[14] Even if a *prima facie* case had been proven, I note that management asserts that the decision to place Ms. Riley in the position was made at the Pentagon by an office under the Secretary of the Army and the USACE was informed of the decision; hence, none of the identified responsible management officials made the decision in question (TR pp 2130-2132).  Also, no *prima facie* case exists as to sex and age because Ms. Riley is female and age 57, only 4 years younger than the Complainant (TR p 2287).

client's terms and conditions of employment such that they would deter a reasonable employee from seeking redress through the EEO process. Unlike the complainant in Burlington Northern Santa Fe v. White, it does not appear that the alleged changes were outside the normal types of decisions which might be expected to occur as to any manager, regardless of prior EEO activity and did not materially change any term or condition of your client' employment. While your client may have perceived these changes to be significant or retaliatory, such subjective beliefs are not sufficient to prove this *prima facie* element. Further, I find that the Complainant was in no way deterred from using the EEO process, as evidenced by her multiple EEO complaint amendments. Accordingly, insufficient evidence exists to prove the second *prima facie* element of reprisal.

Even though it is clear that your client was not deterred from using the EEO process, I find that a reasonable person could be deterred from using the EEO process by the following timely discrete incidents, which are sufficient to prove reprisal *prima facie* element 2:

| Incident No. | Incident Description |
|---|---|
| a. & t. | Written reprimand on November 20, 2003; |
| o./b. & z-2002 | July 31, 2003, Level 4 rating and step increase denial on the Senior System Evaluation Report for October 1, 2001 through September 30, 2002; |
| v. & z, 2003 only. | January 29, 2004, Level 5 performance rating and step increase denial for October 1, 2002 - December 31, 2003; |
| cc./p. & dd. | October 6, 2004, proposed removal from the SES and the USACE PARC position, followed by the August 27, 2005, removal and demotion to a GS-15; and, |
| ee. | On approximately August 28, 2005, she was not issued an appropriate 1) position description (PD); 2) performance standard; 3) work assignments; 4) she was excluded from participation in management/mission meetings and otherwise isolated; and 5) she was denied return to her career field, including a transfer to another agency, if necessary. |

Element 3 (Disparate Treatment) of a *prima facie* case requires proof that your client was treated less favorably than similarly situated individuals outside of her protected groups or, in the alternative, that there is some other evidence raising an inference of prohibited discrimination. In cases involving a claim of age discrimination, your client must show that age was a determining factor in the decision to take the adverse action against her.

The third *prima facie* element of race based disparate treatment is supported as to the timely filed discrete adverse employment action, indicated below, because your client identified a similarly situated person who was treated more favorably in similar circumstances, or identified other evidence from which an inference of discriminatory animus could be drawn. Since the comparator is the same sex as your client, and her

- 14 -

age is unknown, the third *prima facie* element has not been proven as to the bases of sex and age:

| Incident No. | Incident Description | Supporting Evidence |
|---|---|---|
| cc/p. & dd. | October 6, 2004, proposed removal from the SES and the USACE PARC position, which was effectuated on August 27, 2005, when she was demoted to a GS-15 Program Manager in the Engineering and Construction Division, Directorate of Civil Works. | Barbara Porter[15] (Caucasian/white female, unknown age or EEO activity) SES, removed from job, but remained an SES (TR p 2042-2044) |

However, insufficient evidence is extant in the record to raise an inference that the remaining incidents indicated below were motivated by discriminatory animus.

| Incident No. | Incident Description | Supporting Evidence |
|---|---|---|
| a. & t. | Proposed 30 day suspension on June 6, 2003, which was mitigated to a written reprimand on November 20, 2003; | No similarly situated comparator identified (TR p 103, 109; IF p 739) |
| o./b. & z-2002. | July 31, 2003, Level 4 rating and step increase denial on the Senior System Evaluation Report for October 1, 2001 through September 30, 2002; | No similarly situated comparator identified (TR pp 81-82, 92, 94) |
| v. & z-2003 | January 29, 2004, Level 5 rating and step increase denial on the Senior System Evaluation for October 1, 2002 - December 31, 2003; and | No similarly situated comparator identified (TR pp 89, 94) |
| ee. | On approximately August 28, 2005, she was not issued an appropriate 1) position description (PD), 2) performance standard, 3) work assignments; 4) she was excluded from participation in management/mission meetings and otherwise isolated; and 5) she was denied return to her career field, including a transfer to | No similarly situated E&C GS-15 comparator who was reassigned under similar circumstances, but was treated more favorably was |

---

[15] This comparator was subsequently identified, in management's testimony, as Dr. Barbara "Sitorin" (TR p 2189). Also, I note that the Complainant asserted that the genesis of the strain in her relationship with LTG Flowers was her challenge to his statement that "Linda Garvin is the only person here who is corporate," which occurred shortly after his assignment (TR p 229). This evidence appears to belie her assertion that her protected bases were the cause of the alleged disparate treatment. Finally, the Complainant admits that she heard no statements indicating discriminatory animus (TR p 366).

| | another agency, if necessary. | identified (TR pp 2054-2072).[16] |
|---|---|---|

Data provided by the agency indicates there were 6 (5 Caucasian, 1 Hispanic; 2 female, 4 male; none with prior EEO activity) other SES employees at the HQ USACE from 2000-2003 with the same rater and senior rater as the Complainant (IF p 1590). Data on 2001-2002 SES performance ratings reflects that the Complainant received a Senior Rater Decision of Level 5; while the others received a Level 1 (IF pp 1598-1599). Data on the 2002-2003 SES performance ratings reflects that Complainant received a Senior Rater Decision of Level 5; while the others received a Level 1 (IF pp 1602-1603).

Data provided by the agency also indicates that the Engineering and Construction Division had 12 other GS-15 employees, besides the Complainant (10 White, 1 Black, 1 Asian; 12 male, 0 female; 2 between age 40-49, 8 between ages 50-59, 2 age 60 or over) (IF p 3324). However, the Complainant did not identify how these other SES and GS-15 employees, outside her protected groups, were similarly situated to her but were treated more favorably in similar circumstances. Specifically, the Complainant did not allege that any of these other SES employees had similar performance concerns but received higher ratings; nor did she identify any other E & C GS -15 employees who had been reassigned under similar circumstances but received more favorable treatment. Contrary to the Complainant's assertion that it is the investigator's responsibility to find similarly situated people who were treated differently than she, the burden of proof is at all times on the Complainant; hence, it is the Complainant's burden to identify similarly situated individuals who were treated more favorably, and the investigator's responsibility to gather evidence to support or refute her assertions (TR p 102).

I note the Complainant's primary stated reasons for her belief that her protected bases were a motivating factor were that she "was the first black female in the PARC position," and that "they" believed she had "too much power." However, the Complainant did not articulate from whom she specifically heard these statements (TR pp 81-83). Even if this assertion is viewed as asserting that all other SESs in USACE are her comparators, it is clear that she is not similarly situated to all of these comparators since her allegations are against USACE managers within her chain of command and all other USACE SESs are not under the same supervision as the Complainant. Also, the Complainant's performance appraisals below Level 1 were given by 2 separate supervisors, LTG Flowers and MG Van Winkle, followed by MG Griffin (TR pp 2031-2032). Finally, the Complainant's removal was effected by LTG Strock. Court precedent states that in order for comparative employees to be considered similarly situated, all relevant aspects of the Complainant's situation must be nearly identical to those of a comparative employee. O'Neal v. Postmaster General, EEOC Request No. 05910490 (July 23, 1991); Powell v. Postmaster General, EEOC

---

[16] The Complainant identified two people who had been reassigned due to performance or conduct issues, but they were not similarly situated to her because they did not work within the USACE and the actions were not accomplished by USACE personnel (TR pp 2108-2109).

- 16 -

Appeal No. 01911979 (November 25, 1991). Thus, in order to be similarly situated, the comparative employee must have dealt with the same supervisor and have been subject to the same standards. Mitchell v. Toledo Hospital, 964 F.2d 577, 59 FEP Cases 76 (6th Cir. 1992).

The Complainant also states that her removal from the SES position was based on her race and gender because she was the first African American female SES at the USACE (TR p 2024). This assertion alone does not necessitate a finding of discriminatory animus against the Complainant. Absent preponderant evidence to substantiate this reason, the Complainant's mere speculations are insufficient to raise an inference of discriminatory animus. See Autry v. North Carolina Dep't of Human Resources, 820 F.2d 1384, 1386 (4th Cir. 1987); ("the fact-finder must not be permitted to engage in surmise and conjecture but rather causation must be shown by probability rather than mere possibility"); Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241-46 (4th Cir. 1982). A suspicion or mere allegation of a discriminatory motive is not enough. Accordingly, sufficient evidence is extant to prove the third disparate treatment *prima facie* element only as to the Complainant's removal from the SES and demotion to a GS-15, incidents (cc./p.& dd.).

**Element 3 (Reprisal)** may be proven by evidence of the temporal proximity between the protected activity and the adverse employment action. In Clark County School Board v. Breeden, 532 U.S. 268 (2001), the U.S. Supreme Court held that the temporal proximity of the two actions must be "very close" and cited with approval lower court holdings that a three (3) to four (4) month time difference was too distant to infer a causal connection.

The third reprisal *prima facie* element is supported as to the following allegations, for which the second reprisal *prima facie* element was also proven, because they occurred either within 3 to 4 months of a management official becoming aware of the Complainant's protected EEO activity or within a similar temporal proximity to an EEO complaint event, i.e., Counselor contact, complaint filing, or complaint amendment:

| Incident | Incident Description | Supporting Evidence |
|---|---|---|
| a. & l. | November 20, 2003, written reprimand | Issued within 1 month of October 14, 2003, formal complaint filing. |
| o./b. & z-2002 | July 31, 2003; Level 4 rating and step increase denial on the Senior System Evaluation Report for October 1, 2001 through September 30, 2002; | Issued within 1 month of the June 23, 2003, informal complaint filing. |
| v. & z, 2003 only. | January 29, 2004, Level 5 performance rating and step increase denial for October 1, 2002 - December 31, 2003 | Issued within 3 days of complaint amendment on January 26, 2004. |
| cc./p. & dd. | October 6, 2004, SES and USACE PARC position proposed removal, followed by the August 27, 2005, | Occurred within 2 months of EEO complaint amendment on August 20, 2004. |

| Incident | Incident Description | Supporting Evidence |
|----------|---------------------|---------------------|
|          | removal and demotion to a GS-15. |          |

However, the third reprisal *prima facie* element is not supported as to allegation (ee.), since its occurrence began on August 28, 2005, while the Complainant's last incident of protected EEO activity occurred when she last amended her complaint on October 14, 2004, some 10 months earlier; and the closest date on which a management official previously became aware of the Complainant's protected EEO activity occurred in January 2005, some 7 months earlier. Accordingly, the temporal proximity of these events is too distant to infer a causal connection.

**Management's Nondiscriminatory Reasons.** Assuming, *arguendo*, that the Complainant met her disparate treatment and reprisal *prima facie* burden as to the timely filed claims, management's responses have been examined and found to be legitimate and nondiscriminatory.[17] Although not specifically addressed herein, I note that management articulated legitimate nondiscriminatory reasons for all of the claims, including those deemed to be untimely filed. Evidence as to the nondiscriminatory reasons for the dismissed issues can be found in the record as follow:

| Incident | Supporting Evidence |
|----------|---------------------|
| c & z-2001 | TR pp 429-438, 444, 575-628, 673-693, 1650-1651; IF pp1955-1959 |
| d. | TR pp 490-497, 630-636, 717-720, 854, 1036-1047, 1058, 1202-1205, 1257-1271, 1548-1550, 1641-1649 |
| f. | TR pp 503-511, 723-731, 946-948, 1343-1344, 1353-1354, 1359, 1366-1368 ; IF pp 2335-2336, 2834-2836 |
| h. | TR pp 511-515; IF p 3151 |
| i.-2002 | TR pp 169-171, 515-520 |
| j. | TR pp 172-174, 950-953 |
| r. | TR pp 252, 535-539, 1076; IF pp 3180 - 3188d |
| s.-2002 | TR pp 263-264, 543-547, 1577-1581; IF pp 3193b-3193 |

The evidence of record supports the following articulated nondiscriminatory reasons for the remaining timely issues:

**Incidents a. & t. - June 6, 2003 Proposed suspension mitigated to a written reprimand on November 20, 2003**

- The 30 day suspension was proposed based on the seriousness of the offense of reprisal against an Officer via their Officer Evaluation (OER), which was found by the IG, as well as the unfavorable work climate in the PARC office. Based on

---

[17] Incidents c, d, f, h, i-2002, j, r, s-2002, and z -pre 2002 were deemed to be discrete events which occurred before February 18, 2003 (45 days before your client first contacted an EEO counselor on April 3, 2003) and were not timely brought to the attention of an EEO counselor; hence, these incidents were dismissed, *infra*, and are not considered here, but may be considered as incidents of alleged harassment.

input from Counsel, Human Resources (HR), and the facts of the case, the proposed 30 day suspension was deemed appropriate. In 2002, the same proposing official was the deciding official in a disciplinary matter of an SES (White) and he removed her from a position of authority and reassigned her to another position (TR pp 477-490. 1540-1548). Disciplinary action involving an SES member must go up to HQDA for decision, so the matter was forwarded for concurrence.

- Review of the proposed suspension was delegated by the Acting Chief of Staff and Vice Chief of Staff of the Army to LTG Lovelace. The options were to sustain the proposed 30-day suspension, do nothing, or impose lesser discipline. The SES system does not have a provision for issuing a suspension for 14 days or less; hence the discipline options were a reprimand, a warning letter, or a suspension of more than 14 days (TR pp 1427-1428).

- The Army IG substantiated reprisal by Complainant, but also found that LTG Flowers had not committed reprisal, which raised doubt in the decision maker's mind. However, it was obvious that COL Frye and Complainant had not operated within the bounds of the Officer Evaluation System, since it appeared the support form was not developed when it was supposed to, and no quarterly counseling had been done; but COL Frye did have an opportunity to submit his own support form. Also, it was clear there was a concern about the work environment within the PARC office. So, the suspension was mitigated to a written reprimand, which was not to be entered into the Complainant's official personnel file and was to be a communication of "helpfulness and counseling" to Complainant, and was not considered formal discipline (TR pp 1147-1189).

**Incidents o/b. & z. - 2002 Level 4 rating and step increase denial**

Management states that three counseling sessions were held with Complainant, and group sessions were held with the SESs explaining priorities, but she made no progress in that regard. Her rater had supervised Complainant for a year when he gave her the Level 5 rating for the following reasons (TR pp 447-473, 637-661; IF pp 1939-1954):

- He had continued the process established by MG Hunter to elicit feedback from the field regarding each SES member, and received feedback indicating a perception from the field of untimeliness of responses from the PARC office. He counseled her to delegate and assign authority to her own staff to address the field's questions, but the Complainant denied there was a timeliness problem. He asked her to develop a tracking system for the actions, but she never did so (TR pp 606-611). He received complaints about the Complainant's non-responsiveness from General Waterman, the Deputy Chief of Staff of Logistics in Europe (TR pp 463, 1528-1536).

- In a January 4, 2002, counseling discussion about the Complainant's performance standards, he asked her to do a functional "laydown" of her office, but the submission contained no analysis; so on April 24, 2002, he told her that she did not successfully accomplish the task (TR p 465-466, 575-628; IF p 2069).

- She was unwilling to perform as part of the team and resisted any attempt to alter or improve her performance (TR pp 694-711, 770).

- After the first sensing session results, continued sensing sessions were held to assess how things were going in the PARC office; and the feedback was that she intimidated people, but she was unwilling to accept his suggestions, so the results of the next sensing session continued to show there were problems.

- Senior field leadership was asked to give their assessments of HQ leadership, the results of which indicated that they tried to find ways to work around the Complainant because working with her was very hard due to problems with timeliness of actions, warrants for contracting officers, and generally low morale within the contracting community.

- Complainant took a very strict interpretation of the Defense Acquisition Workforce Improvement Act (DAWIA), which specifies the criteria for holding a contracting warrant, so she was unwilling to delegate any discretion regarding the grant of warrants, causing angst in the organization and demonstrating insensitivity to contracting issues and problems in the field. She was unwilling to work with field personnel or explain why she was doing what she was doing, as opposed to just saying no. She would grant some people a regular warrant and others a provisional warrant, without a consistent rationale, and they were the only service using provisional warrants (TR p 703).

- There was a Fort Hood rail facility issue that took too long, for which she gave an unsatisfactory explanation (TR p 706).

- Management acknowledges that, at the mid point review, Complainant was told she was one of the hardest working SESs, but that she was failing in her performance in a number of areas; however, if she improved her performance, she was promoteable (TR p 740). A Level 5 SES rating needs HQDA concurrence, and HQDA's recommendation came back as a Level 4.

- Regarding the step increase denial (pay ranges 1-6); management states that the Performance Review Board (PRB) looks at the breaks in scores and the money available, to recommend the distribution of bonuses and pay increases. The minimum requirement for an increase in pay is a fully successful (Level 1-3) rating, so the PRB did not recommend Complainant for a pay increase (TR pp 1425-1426; IF pp 2097-2098).

**e. July 28, 2003 change of duties upon establishment of the Acquisition Corporation Group (ACG)**

- The ACG was not established to review Complainant's decisions; rather, it was a senior level advisory group that met once a quarter to examine how the acquisition strategy was doing, look at results of their activities, and identify new areas of concern. The group reviewed the overall contracting strategy, as contracting was not just the purview of the PARC. Its mission was to get the entire command organized and thinking about the organization's contractual strategies. Similar groups were set up to look at other areas (such as HR and Small Business) in order to create a team approach to doing business (TR pp 497-502, 569-574).

- The regulation establishing the ACG states that it was not intended to replace normal business procedures, but was designed to facilitate resolution of policy issues among all of the players including contracting, civil works, military programs, and legal counsel; and was intended to provide policy review and resolve confusing issues that came from the field (TR pp 940-946; IF pp 2191-2192).

**g. December 4, 2003 survey of PARC employees to assess PARC performance**

- Management asserts that it developed the questions for the Complainant's subordinates to directly assess the correction of morale concerns raised in the IG report. Nothing similar was done for other supervisors' subordinates because there were no IG findings of morale issues in any other office (TR pp 948-950).

**i. April 2003 presence of a Colonel in the Complainant's counseling session.**

- Management states that the Chief of Staff was present at the initial 2002 meeting of the new DCG and each SES staff member because each SES was expected work with the Chief of Staff in an integrated manner. Because the Complainant had some special challenges in working with the rest of the staff, management asked the Chief of Staff to try to assist Complainant in working more proactively within the staff. In April 2003 the Chief of Staff was present because 1) the Chief of Staff coordinates all staff functions, and 2) the Complainant claimed that management had never told her of any deficiencies; so, management wanted someone else present while she received the details of deficient areas in order to verify that the areas of concerns had been discussed with her. The Chief of Staff was dismissed at the end of the session, at which time management met privately with the Complainant. Management acknowledges that the Complainant objected to someone else being present in these meetings. Management states that someone else was not present in other SES counseling

sessions because only the Complainant had the "same set of challenges" (TR pp 515-520).[16]

### k. October 31, 2003 second request for 2002-2003 performance evaluation data

- Complainant was asked to provide copies of staff action control logs because one of her performance standard metrics was timeliness, and the field had repeatedly complained that the PARC office was not timely. The Complainant was asked in September 2003 to provide status on establishment of the warrant officer tracking system. Management states that no similar action was taken as to other subordinate supervisors because there were no others with similar repetitive complaints (TR pp 954-958).

### l. 2000 - February 2004 Interference with PARC duties (assignment of a procurement related congressional inquiry to the General Counsel, Competition in Contracting Act (CICA) overrides, Norfolk District contracts organizational structure, and OGC review of contracts matters)

- The PARC and legal counsel should have a very close working relationship. Legal Counsel's office is very closely involved in the work, not only of the Contracting office, but also Real Estate, Regulatory and Civil Works, Military Programs, and other areas. Almost any action that involves Contracting requires input from the Legal office. The agency was dealing with some very fast moving world events (recovery from 9/11, war in Afghanistan, and the war in Iraq), as well as continuing regular USACE work. The staff was organized in order to meet all the demands (TR p 741). There was friction between Complainant and almost every other member of the SES, just as there was between Mr. Anderson and every other SES (TR pp 748, 1589). Mr. Anderson has a strong personality, states his opinion and is abrupt, but he never overstepped his boundaries (TR p 748).

- The "Congressional" to which Complainant refers was a removal action and was appropriate for Legal office action (TR pp 732-738, 789).

- The Legal office is required to sign off on CICA overrides, as is the PARC office (TR pp 1216-1220).

---

[16] I note that the Complainant contradicts herself by stating that these witnesses were subordinate to her, but then stating that she was not their supervisor; followed by a statement that the witnesses were of lower rank than she ("one star equivalent"). Without according any weight to the Complainant's assertions regarding the witnesses rank, I note that the Complainant admitted that both witnesses were BG promoteable (TR pp 169-171). Even if the witnesses were of lower rank, I note that the Complainant did not identify any Army regulation which prohibited a lower ranking witness from being present at the counseling session of a higher ranking employee.
— —

- 22 -

- Regarding the alleged placement, by Mr. Anderson, of the Norfolk District Chief of Contracting under the operational control (OPCON) of the District General Counsel.  The division commanders do not work for Mr. Anderson, so he would have no authority to do as the Complainant alleges (TR pp 958-967).

- Other witnesses confirmed that Mr. Anderson was an abrupt individual who had problems getting along with other SES members, including White and male SES members (TR pp 1252-1253, 1303-1304).  He was characterized as a "bully" who "picked on" people he perceived to be "weaker than himself" (TR p 2462).

**m. Alleged statement by Mr. Anderson that he was going to "get that bitch fired."**

- Management's witnesses denied this allegation and insufficient corroborating evidence exists (TR pp 1236, 1340, 1439, 1442, 1494-1496; IF p 828).[19]

**n. & y. - June 11, 2003 change of 2002-2003 performance standards; and issuance of immeasurable performance standards on March 6, 2004.**

- The Complainant had more performance objectives than any other SES (30 objectives), which were too vague.  Management denies that Complainant was not allowed to provide input to her standards; rather, when she was asked to craft fewer, more measurable objectives, she declined to do so because she thought the 30 objectives were fine.  So, her objectives were unilaterally changed by her supervisor based on her performance counseling and areas of deficiency.

- The objectives included such things as "Executes and delegates authority in a timely manner" and spoke to getting actions accomplished, tracking them and developing her own procedures to measure success.  She was directed to establish a system to measure her performance, and to show the field that her actions were handled in a timely manner, but she did not do so.

- Some changes were made to almost all of the SES members' performance objectives so they would focus on people, process and communications, and making them measurable.  Other SES members negotiated the objective changes, but the Complainant refused to participate in such negotiation (TR pp 550-563, 749-751, 863-868, 1550-1562, 1599-1605).

- The focus for SES and General Officers' standards was on fewer and more encompassing strategic objectives instead of technical work.  Management

---

[19] I note that the declaration in which this statement was made does not indicate that the witness heard this statement himself; rather that he "learned on several different occasions" that the statement was made (IF p 828), which constitutes hearsay evidence that is accorded little weight in the face of the sworn denials by the parties involved (Mr. Levy, LTC James, and Mr. Anderson) that any such statement ever occurred (TR pp 1236, 1340, 1439, 1442, 1494-1496).

believed Complainant's revised standards were reasonable, fair, and measurable (TR pp 982-995; IF pp 1693-1694).

- The standards Complainant wanted had almost nothing to do with remedying her performance shortfalls. The standards regarding special projects, membership on boards, and etc ... that she mentioned were not contributing to fixing her performance shortfalls (TR pp 778-781).

## q. Denial of Command Staff Inspection (CSI) attendance during the 2002-2003 performance rating period[20]

- In 2003, the CSI changed to a Command Strategic Review, which focused more on the strategic direction of the Corps than on support functions. The review included a functional inspection prior to the review visit. The second component, the on-site inspection, focused on strategic matters and covered three different areas (people, process, and communication) using interactive, inter-disciplinary teams. Management selected three SESs (1 male, 1 female, 1 unspecified) to head the teams, but the deciding official did not recall the selection criteria. The number of team members was cut significantly, partially due to budgetary constraints. Before the change, almost all of the functional experts including Complainant would attend; however after the change in focus of the CSI, only a couple would go. After a CSI, information was passed on to the functional areas via debriefing and reports were made available, and items were often covered in staff meetings (TR pp 520-534).

- The PARC was not the only area not represented at the command strategic reviews. For example, Ms. Garvin is in charge of Real Estate, but participated in the command strategic reviews as the chairman of the "people" committee, not as the person responsible for the Real Estate portion of the Corps.

- The Complainant's assertion that she was disadvantaged by not learning of concerns in her area until after the CSI was incorrect. The comment on one of the CSI slides to "review current contracting policies that are hindering project/ program execution," referred to the field's issues with contracting warrants. The Complainant was already aware of this issue and her participation would not have solved this process concern. Complaints about the PARC not supporting the mission, timeliness, confusion about changing standards, and provisional warrants had already been received from almost every division (TR pp 968-972).

---

[20] The Complainant inferred her belief that her exclusion from CSI visits was motivated by her asking too many questions, and jealousy of the positive attention brought to her, at such visits (TR pp 240-241). These reasons would seem to belie her assertions that her protected bases were the motivating factors.

- 24 -

**s. March 2003 training request denial**

- The Complainant's March 2003 request to attend the National Security Leadership training was denied because management felt she needed training in other areas (such as standard leadership) instead and did not feel that this high senior level training addressed her most pressing areas of deficiency. This course focused on the psychology of decision making, crisis management, and the effects, nature, and quality of national security decisions and policies. The course is a high level course for senior decision makers; however, the Complainant was not a decision maker in national security decisions and policies, since she was making decisions on USACE contractual policy.

- The Complainant requested this course at the time that the military was going into Iraq and they were right in the middle of a combat operation, so the staff needed to be doing staff functions supporting the troops in the field; it was not a time for career development. Finally, there were severe budget constraints at the time and they had to be prudent in the use of resources (TR pp 540-549).

**u. January 20, 2004 reassignment of Iraq and interagency representation duties to the Director of Military Programs, COL Tilletson**

- The Military Programs area has an Interagency and International Services Division (I & I), which is charged with coordinating all of the interagency activities. Management denies that it changed the Complainant's role as the Procurement Executive for procurement in Iraq (TR pp 973-977).

**v. & z. - 2003 Level 5 rating & step increase denial**

- The Complainant's prior performance appraisal was a Level 4, which indicated that she was failing the mission. She was given some tasks that were meant to focus on certain areas in which she was failing (TR pp 889-891). Because her new objectives were signed in June 2003, her rating period, which should have ended in October 2003, was extended until January 2004. Complainant received performance meetings in July, September, November, and December 2003, during which she was provided very detailed documentation regarding her performance including discussion about Iraq acquisition timeliness issues and the issue concerning the incorporation of the Chief Engineer's warrant direction into the Engineer Federal Acquisition Regulations (EFARS) (TR pp 892-893, 903-904; IF pp 2226-2928). She was rated at Level 5 because she failed in the following mission responsibilities:

  ◊ **Timeliness.** Several complaints from the field were received on Complainant's inability to execute actions in a timely manner, specifically with respect to warrants. Management gave Complainant standards to follow in processing various acquisition documents. In Complainant's final performance review, she only met the timeliness standards between 30 to 45

percent of the time (TR pp 894-895). For example, General Madsen inquired about whether the PARC was going to sign the "Bartholet warrant," and if not, what was needed to get it approved. The Complainant never did sign the warrant; rather, LTC Castaldo, Deputy PARC, was serving as the acting PARC at the time and finally approved the warrant (TR pp 895-896).

Another example was the Complainant's failure to appear for a functional area analysis (FAA) process committee in-depth review for the USACE 2012 initiative. Each staff section was permitted to comment on the second USACE 2012 draft report, but the Complainant was the only one who failed to show up at the FAA process committee meeting at the appointed place and time. USACE 2012 was a new Corps structuring concept to organize eight teams to support each major subordinate command rather than organizing along functional lines, as it had been for 200 years. On October 24, 2003 (after the October 1, 2003, USACE 2012 implementation, the Complainant submitted her comments expressing concerns about pulling staff members to create the teams. Her untimely comments had to be reviewed by legal counsel and the process committee, after which a decision was made to let USACE 2012 stand (TR pp 904-908).

◊ **Communications**. It was very difficult for Complainant to summarize issues and explain them in a succinct way. For example, in August 2002, the Chief of Engineers issued a letter directing that division commanders have warrant officer approval for simplified acquisitions up to the $100,000.00 threshold level; and directing the PARC to incorporate it into the EFARS. In July 2003, the Complainant said that this had not been done because "[HQ]DA said it could not be done." It was later determined that a HQDA staff level attorney had signed off on the letter directing the change; but this direction was not implemented (TR pp 896-898).

◊ **Organizational Leadership**. The Complainant did not take ownership or work as a "project delivery team" (PDT) member. For example, Complainant got an inquiry from a DoD acquisition executive wanting information on Iraq contracts. During the Iraq reconstruction period when restoration of electricity and oil production was paramount, many contracting actions were accomplished via the PDT process. The Complainant tried to return the DoD inquiry to her manager, rather than find her PDT team members to help work on it before sending the information forward (TR pp 898-900). Also, despite being asked to use the PDT approach to develop a standard operating procedure (SOP) for obtaining warrants, the Complainant simply did not complete the assignment (TR p 900).

◊ **Human capital supervision and management**. The 2002 IG report identified problems in Complainant's organization in the areas of communication, morale, hostile work environment claims, and management style for which the Complainant was to develop an action plan within 45 days.

At the time of the Complainant's performance rating, 9 of 15 of her subordinates made comments regarding the PARC office and the Complainant such as "hostile work environment," "not communicative," "barricades herself in," "the Corps is never going to solve this," "numb," and "disillusioned." Management considered these comments as indicative of another failure (TR pp 901-903).

◊ **Other examples** of Complainant's performance deficiencies during the 2002-2003 rating year included her failure to develop a tracking system for provisional warrants, and not being at work during core hours. Management denied telling Complainant that she should have taken other SESs to lunch, admitted that she was encouraged to work as a team with Mr. Anderson (Chief, Legal Counsel), Mr. Adams (acquisition lawyer), and Mr. Basham (Engineering and Construction contract representative) because legal and contracting are intertwined and require a close working relationship (TR pp 913-918).

• The Complainant was not supporting the Corps mission because she did not collaborate with her peers to get work done, as senior leaders should; she did not advance the Corps in innovative solutions and she was not leading her office such that there was good office morale/working environment (TR pp 1766-1767).

• Regarding the step increase denial (pay ranges 1 -6). Management states that the PRB looks at the breaks in scores and the money available to recommend the distribution of bonuses and pay increases. The minimum requirement for an increase in pay is a Fully Successful rating, so the PRB did not recommend Complainant for a pay increase (TR pp 1424-1426; IF pp 2097-2098).

**w. February 2004 transfer of 5 PARC office staff members to non-contracting SES members**

• USACE 2012 was an attempt to better matrix the organization to change the focus to one that was more responsive to those they serve. For HQ, 8 interdisciplinary Regional Integration Teams (RITs) were created and were staffed with people from the Civil Works, Military Programs, Real Estate, Contracting, and Public Affairs divisions. All of the teams sat together, and each one handled a specific geographic/regional area. Others placed on the RITs had the same concerns as Complainant about the RIT concept, but it was a command decision as to where people sat and how they functioned (TR pp 755-766). Eight people were taken from each function. The legal review that was accomplished indicated that the Complainant's concerns about violating regulations which prohibit splintering contracting were unfounded (TR pp 977-982).

**x. March 12, 2004 delay issuing, and change of a military subordinate's OER**

- If an OER block is checked other than "promote immediately," the report is issued as a "referred" report. The OER was initially returned to the Complainant due to a concern that she might have been unfamiliar with the OER system. The intent was not that the OER had to be changed, but to make sure she knew it was an adverse report. It is not unusual to hold OERs from going to HQDA due to "senior rater profiles," but management asserts that it was not aware that LTC Castaldo's OER was held, nor of any attempt to have the OER changed (TR pp 766-777, 1670-1675).

**aa. July 6, 2004 "failing" midpoint review assessment and attendance monitoring**

- Management asserted the following rationale for telling Complainant that she was failing her performance objectives (IF pp 3199-3205).

    ◊ Failure to be proactive. Complainant was counseled about her failure in July 2004, to advise the front office of a billion dollar plus contract that Transatlantic Command (TAC), USAREUR, was about to request congressional notification to potentially award to KBR/Halliburton, at a time when the USACE was under tremendous congressional scrutiny because of Halliburton/KBR's other contracts. Since the Complainant was on TDY, management had to hurriedly form a PDT (with LTC Doyle as the PARC representative) to review the action, which resulted in a delay of the request for congressional notification due to irregularities found by the PDT (TR pp 995-1001). The Complainant said that she looks at these items "when they cross her desk," which management believed did not connote situational awareness (TR pp 1001-1004).

    ◊ Time and Attendance. Complainant's time and attendance records were accessed and shared with her as an indicator for performance measurement because she had been asked to be present during core hours (0900 to 1500). The records showed that Complainant had arrived to work by 0900 hours only 6 times in 6 months. The time and attendance records of other employees were not checked because management only had indications that Complainant was not around in the mornings, not other SES employees (TR pp 987-994).[21]

    ◊ Performance Errors. The Complainant "dropped the situation" in management's lap, implying that the two contracts to which "Dr. Oscar" had

---

[21] The Complainant identified "Pat Rivers" (unknown protected bases) as someone who was allowed to work at home on one occasion rather report to work; however, the Complainant also states that when she mentioned this to MG Griffin he stated that she could work at home periodically (TR p 368). Accordingly, even if this assertion is true it does not appear that the Complainant was treated differently than the comparator she identified.

referred in a Procurement Conference were 'show-stoppers,' for which the solicitations should be delayed or cancelled. The Complainant sent a copy of mail about this issue to Dr. Oscar, who by that time was employed with a contractor (IF p 3632). Upon legal review of these actions, no wrong-doing was found with them. Management expected the Complainant to have the actions legally reviewed before raising a concern (TR pp 1004-1007).

**bb. July 6, 2004 & July 16, 2004 letter and email, interfering with PARC responsibilities**

- July 6, 2004 letter. Management had not received an SOP on contracting warrants, Complainant was directed to set up a PDT to accomplish this task. The field was still asking for guidance from HQ on grandfathering provisional warrants, and the number of Administrative Contracting Officers (ACO) needed, as many ACOs were retiring simultaneous to an increase in contract actions created by the war on terrorism in Afghanistan and Iraq. The Complainant was asked to provide the information by September 1, 2004, but had not done so at the time of the EEO investigation. The Complainant did not contact the PDT members until the "last day of August," leaving them insufficient time to prepare a response (TR pp 1008-1011, 1012, 1013).

- July 16, 2004 email. LTC Doyle was assigned as the PARC representative to support TAC because the Chief Counsel stated that a PARC representative was needed the next day and Complainant was on TDY. Contrary to Complainant's assertion, the Chief Counsel indicated that LTC Doyle's appointment to assist in writing the Justification and Approval (J & A) was appropriate (TR pp 1014-1019).

**cc./p. & dd.- October 2004 SES Removal & Demotion to a GS-15 Program Manager**

- Management stated that during the 2002-2003 rating period, continued efforts were taken to improve the Complainant's performance, but there was no improvement in her performance. A Level 5 rating and removal from the SES was recommended because she continued to believe everyone else was wrong, refused to accept any counseling, and was not willing to take the steps that were recommended to help her be successful (TR pp 2181-2182). There continued to be a lot of feedback from the leadership of the organization that it was very difficult to work with her and that the personnel in her office did not feel empowered (TR p 2182). No vacant SES positions in USACE were available, and the PARC was the only USACE contracting SES, so demotion was the only option (TR pp 2187-2188).

- The performance rating process was followed and the conclusions that were reached were reasonable and were supported by the documents in the file (TR p 2391). Senior management decided that a Level 5 rating was not supported by the record because the Complainant was not assigned a "Fails" in every element; however, a Level 4 rating was strongly substantiated by the documented basis

- 29 -

for the rating given by the rater (TR p 2392). Per 5 CFR Section 359.501, career
SES appointees must be removed if they receive two less than fully successful
ratings in a three year period (TR pp 2400-2427; IF pp 2112, 3600).

- Management acknowledges that Dr. Barbara Sitorin was reassigned to a
  different SES position because she was a technical SES, as director of a
  laboratory, and hence, could be placed in a different technical SES position. In
  contrast to the Complainant, Dr. Sitorin agreed that supervision was not one of
  her strengths; even so, she worked very hard with leadership to try to improve
  and do whatever was necessary prior to the reassignment. She did not receive a
  less than fully successful rating because she was effective in performance of her
  duties and was working very hard as part of her team (TR pp 2189-2192). The
  Complainant had received two less than fully successful ratings within a 3 year
  period, which required removal from the SES (TR pp 2376-2383, 2387, 2388-
  2398; IF pp 3569-3576).

- Complainant was placed in another directorate because leaving her in the PARC
  office at a reduced grade would have been an uncomfortable situation for her
  and for the PARC office employees. Management explains that the Engineering
  and Construction Division is the heart of the USACE, 100% of the construction is
  done through contracting, and depending on the program 60-75% of the
  engineering work is done through contracts. Accordingly, acquisition is a very
  important element in the Engineering and Construction Division and it was
  believed that division was a reasonable place for Complainant to go as a
  Program Manager with acquisition experience (TR pp 2119-2120, 2172).

- An HQDA management official responsible of oversight of all DA PARCs stated
  that it was too difficult to work with the Complainant. Specifically, most PARCs
  could be quickly contacted and relied upon to handle an issue. However, this
  was not the case with the Complainant (TR pp 2413-2414). Accordingly, many
  PARC issues were relayed through the Complainant's supervisor, MG Griffin,
  instead and he was relied upon to get things done since the Complainant would
  not be there to get things done, and would not give the Deputy PARC the
  authority to act in her absence (TR pp 2412-2413). This witness also states that
  the Complainant's performance issues included:

  o Failure to implement policy throughout the USACE in a timely manner
    regarding the Acquisition Services Strategy (TR p 2411);
  o Failure to take action to resolve all issues before presenting a document to
    HQDA for approval, as evidenced by her handwriting exceptions on the
    documents (TR pp 2418-2419), which was not the normal procedure on
    official documents (TR p 2419-2420); and,
  o Failure to engage with the Division Commanders, as was typically evident
    for the PARCs (TR p 2422-2424);

Management decided not to reassign the Complainant as an SES elsewhere in
DA because she was failing to perform in her USACE job and it would be unfair
to reassign a failing employee to another organization, and because there was
no other vacant PARC position to reassign her to in DA (TR p 2427)

**ee. August 28, 2005 alleged denial of Program Manager position description,
performance standards, work assignments; management meeting exclusion, and
transfer denial**

- <u>Position Description, Performance Standards and work assignment denial</u>.
Management states that the Complainant was given a position description,
performance standards and an initial list of 8 tasks on her first day of
employment.  The position description and performance standards were
developed by HR (TR pp 2307, 2322).  The position description was
appropriate; however due to the Complainant's removal from the PARC position, it would be
difficult to have her deal with the PARC on behalf of E & C (TR p 2323; IF pp
3366-3379).  Because the Complainant stated her belief that the position
description and performance standards were inappropriate since they contained
elements that were part of the job description from which she had been removed,
management asked her to review them and make changes to the areas of
concern.  After two further interim meetings, management again met with
Complainant on September 7, 2005, to discuss the matter, but she still felt the
PD and duties were inappropriate because they were PARC related.
Management believed that acquisition was larger than just contracting, as it
involves planning, design, construction, and operations, with which Complainant
could help (TR pp 2310-2312, 2325).  However, she believed that E & C had no
say in any type of acquisition activities.  Management agreed to try to make
changes to de-emphasize the acquisition piece of her job description and review
the tasks and focus more on programmatic activities (TR pp 2312, 2325-2326; IF
pp 3380-3387).  Management acknowledges that it did not meet again with
Complainant until February 24, 2006, due to the emergence of the Hurricane
Katrina disaster and reconstruction of the levees in New Orleans (TR p 2314).

The Complainant's immediate supervisor developed the list of work assignments
as an interface between design/acquisition and construction, which were
appropriate to Complainant's background in acquisition and contracting (TR pp
2312-2313, 2325, 2327-2330).  The Complainant was also working on the
Defense Base Act "DVA" Insurance Pilot Program that she brought with her.  On
February 24, 2006, management met with Complainant and learned that she had a
Program Manager Certification degree and an Engineering Management
degree, so they started looking to see if she could use that experience in some of
the division's engineering acquisition programs (TR pp 2315-2316).  A few weeks
after February 24, 2006, Complainant received a marked-up job description and
a new set of draft standards; however she still felt the position description was
inappropriate and the standards did not fit her career field, so she rewrote them
and presented them to management on April 4, 2006.  She generally agreed to

the new standards even though she still found the job description unacceptable. Management believed that the position description was acceptable since E & C had people in the districts that developed proposal requests, and negotiated contracts along with contracting people (TR pp 2317-2322, 2331). Also, on February 24, 2006, the Complainant was informed that management was going to recommend her to be a "Black Belt" for the Lean Sigma Six program (TR pp 2337-2339; IF p 3389).

- Management meeting exclusion and isolation. Complainant was assigned to sit in the same area as other GS-15s and the E & C Deputy (TR p 2308). She was told that she could attend the Thursday team leaders' meetings; however the meetings were sporadically held after Hurricane Katrina hit, but eventually were restarted (TR p 2340). Management states that since the Complainant disagreed with most of her assignments, if there were other meetings which she did not attend, it was because she did not have any activity in those areas. Military Construction (MILCON) transformation meetings were held; however, this was one of the tasks initially assigned to Complainant that she believed was outside of the purview of E & C. Regarding other mission meetings, a half hour meeting is held every morning, but this is with the four branch chiefs (TR pp 2340-2341).

- Career field transfer denial. A "career field" is something unique to DA, and does not transfer to other agencies. Only about half the Army workforce positions have a career field. All of the CP-14 (contracts) career field employees are in the Contracting/PARC Office. Employees move in and out of different career programs when they take different jobs, so it is not viewed as detrimental that Complainant is no longer in a CP-14 position (TR pp 2128, 2426-2428). Placing Complainant into a 340 series Program Manager position met the requirement to offer her a position for which she was qualified (TR p 2126). Even so, management attempted to address Complainant's concerns; however, it was a challenge because there are no GS-15 acquisition employees outside the PARC office within the USACE, and management considered her current position to be appropriate because HR opined that the position description into which Complainant was placed was properly classified in accordance with current personnel procedures. Although the position description is not within CP 14, it is still a Defense Acquisition Workforce Improvement Act position and is part of the acquisitions, logistics, and technology workforce (TR pp 2252-2258, 2240-2249, 2316-2317).

These explanations by management for the actions it took are reasonable and non-discriminatory. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Pretext. It remains for your client to show that in spite of the articulated non-discriminatory explanations, an overall inference of discrimination can be discerned by a preponderance of the evidence. U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711, 714-17 (1983). In other words, you must show that the Army was "more likely

motivated by discriminatory reasons, [citation omitted]" than not. Hill v. Social Security Administration, EEOC Appeal No. 01970512 (June 8, 2000); or, you may show that the proffered explanation of the Army is unworthy of credence. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). Essentially, the record must show that the Army articulated a false reason and that its real reason was discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993).

At this stage of the analysis, according to the United States Supreme Court, the burden of the Army is not onerous. Burdine, supra, 450 U.S. at 254-256. See also Rosser v. Department of Transportation, EEOC Appeal No. 01970650 (December 12, 1999). And even if you showed, for the sake of argument only (because you have not done so), that the Army engaged in an action that was an unsound business decision, was unfair, or was motivated by an ill feeling or arbitrariness, that is insufficient to show pretext. Keyes v. Secretary of the Navy, 853 F.2d 1016, 1026 (1st Cir. 1988).

You and your client were afforded several opportunities to provide a pretext statement (February 2005, April 19, 2006, and May 16, 2006); however, no pretext evidence, beyond her original assertions, was provided (IF pp 3673-3675, 3691; TR pp 2471-2472). Accordingly, you have not shown that the explanation of the Army for its actions was simply a pretext for discrimination. Mere speculation and/or conjecture that the Army had a discriminatory motive without proof are insufficient for proving pretext. See Autry v. North Carolina Dep't of Human Resources, 820 F.2d 1384, 1386 (4th Cir. 1987); ("the fact-finder must not be permitted to engage in surmise and conjecture but rather causation must be shown by probability rather than mere possibility"); Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241-46 (4th Cir. 1982). A suspicion or mere allegation of a discriminatory motive is not enough.

Your client's allegations are general and unspecific as they relate to her efforts to provide a connection between the actions taken and unlawful discrimination. They are, furthermore, unsupported by the totality of the record. In other words, there is nothing that shows by a preponderance of the evidence that the legitimate explanations given by the Army were pretexts for illegal discrimination. Hammons v. HUD, EEOC Request No. 05971093, EEOC Appeal No. 01955704 (May 5, 1999).

Accordingly, other than your client's initial assertions, she has failed to provide sufficient evidence that would confirm her claims that management's actions were based upon race (African American), color (black), gender (female), age (DOB 7/22/44) or reprisal (prior protected EEO activity).

**Hostile Work Environment Analysis and Findings**

Harassment is defined as ongoing and continuous, rather than isolated or sporadic conduct, which creates a hostile work environment, so pervasive that a reasonable person would find it hostile and abusive. See Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993). The severity of the alleged harassing acts must be

determined from the totality of the circumstances.  See Gilbert v. City of Little Rock, 722 F.2d 1390, 1394 (8th Cir. 1983).  The U.S. Supreme Court has held that a violation of Title VII may be predicated on either of two types of harassment:  (1) harassment that conditions concrete employment benefits in return for sexual favors, i.e., "quid pro quo" sexual harassment, and (2) harassment that, while not directly affecting economic benefits, creates a hostile and offensive work environment.  See Meritor Savings Bank F.S.B. v. Vinson, 477 U.S. 57, 62-67 (1986).

To establish a prima facie case of hostile working environment, your client must show:  (1) membership in a group protected under Title VII or the ADEA; (2) that she was subjected to unwelcome verbal or physical conduct; (3) that the harassment complained of was based on her protected group status; (4) that the harassment complained of affected a "term, condition or privilege of employment", i.e., the harassment must be sufficiently severe or pervasive as to alter the conditions of employment and create an abusive work environment; and (5) that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

A showing of discriminatory harassment "must include discrete comments directed against the Complainant or disparate treatment which supports an inference of discriminatory harassment."  Lin v. U.S. Postal Service, EEOC Appeal No. 01932880 (December 23, 1993).  Accordingly, it is appropriate to review your client's allegations under a disparate treatment analysis where there is no direct evidence of discriminatory harassment, that is - as in the instant case - where there is no evidence of personal slurs or other denigrating or insulting verbal or physical conduct relating to your client's membership in a protected group.

For harassment to be considered discriminatory, it must be severe or pervasive. Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993).  Actual psychological or emotional injury is not required.  Harris, p 228.  However, unless the conduct is very severe or persistent, a single incident or group of isolated incidents will not be regarded as discriminatory harassment.  See e.g. Scott v. Sears Roebuck and Co., 798 F.2d 210, 41 FEP Cases 805 (7th Cir. 1986); Hansen v. Rice, EEOC Appeal No. 01920621 (September 10, 1992).  "Harassment, as the term is used in Title VII cases, refers to more than being subjected to stress."  Lin v. U.S. Postal Service, EEOC Appeal No. 01932880 (December 23, 1993).  The following factors are pertinent to determining whether a work environment is hostile, intimidating, or abusive:  (1) whether the conduct in question is verbal or physical, or both, (2) whether the conduct was repeated and, if so, how frequently, (3) whether the conduct was hostile or patently offensive, (4) whether the alleged harasser was a supervisor or a coworker, (5) whether more than one person joined in the harassment, and (6) whether the harassment was directed at more than one individual.  King v. Hillen, 21 F.3d 1572, 64 FEP Cases 754 (Fed. Cir. 1994); Crane, EEOC Appeal No. 01924585 (April 22, 1993).  Evidence of the general working atmosphere involving employees other than your client is also relevant to the issue of whether a hostile work environment exists.  Vinson v. Taylor, 753 F.2d 141, 36 FEP Cases 1423 (D.C. Cir. 1985), aff'd in relevant part and rev'd in part, sub nom

- 34 -

<u>Meritor Federal Savings Bank v. Vinson</u>, 477 U.S. 57, 40 FEP Cases 1822 (1986);
<u>Delgado v. Lehman</u>, 665 F. Supp. 460 (E.D. Va. 1987).

     The conduct in question should be evaluated from the standpoint of a reasonable
person, taking into account the particular context in which it occurred.  <u>Highlander v.</u>
<u>K.F.C. National Management Co.</u>, 805 F.2d 804, 42 FEP Cases 654 (6th Cir. 1986).
Conduct that is not severe or pervasive enough to create an objectively hostile or
abusive environment -- an environment that a reasonable person would find hostile or
abusive -- is beyond Title VII's purview.  <u>Harris</u>, p 228.  Furthermore, if your client did
not subjectively perceive the environment to be abusive, the conduct has not altered the
conditions of her employment, and there is no Title VII violation.  <u>Harris</u>, pp 227, 228.

     If the evidence establishes a *prima facie* case of harassment, the agency may
articulate an affirmative defense to the harassment claim.  When harassment does not
result in a tangible employment action, the agency can raise an affirmative defense to
liability by demonstrating that it exercised reasonable care to prevent and correct
promptly any harassing behavior and that the employee unreasonably failed either to
take advantage of preventive or corrective opportunities provided by the agency or
otherwise avoid harm. <u>Burlington Industries</u>, *supra*, 524 U.S. at 765; <u>Faragher v. City of</u>
<u>Boca Raton</u>, 524 U.S. 775, at 807 (1998).

     At the outset, I find that because there is insufficient proof of disparate treatment
or reprisal as to incidents (a & t), (o/o.& z-2002), e, g, i-2003, k, l, m, n, q, s-2003, u, (v
& z-2003), w, x, y, aa, bb, (cc./p.& dd.), ee, and ff, analyzed above, insufficient evidence
also exists to prove harassment element # 3 (the conduct was based upon the
Complainant's protected group status); thus, these incidents will not be considered
further in this analysis.

     The incidents remaining for consideration are incidents c & z-2001, d, f, h, i-2002,
j, r, and s-2002, which were not considered for disparate treatment purposes due to
untimely EEO counselor contact, but which may be considered under a hostile work
environment claim.

     Accordingly, a determination as to the existence of a prohibited hostile work
environment under EEO law and regulation requires proof of the following:

## Did the conduct occur?

     The record contains 8 alleged incidents of harassment which occurred over the
22 month period of January 2002 to November 2003.  Of the 8 alleged incidents,
sufficient sworn witness testimony and other evidence is present to prove that all 8
incidents occurred.  Specifically, the evidence of record indicates the following as to
each of the 8 remaining incidents:

| Incident No. | Incident Description | Supporting Evidence |
|---|---|---|
| c. & z-2001 | January 8, 2002, Level 2 2001 performance | (TR pp 429-438, 575- |

| | rating and step increase denial | 628) |
|---|---|---|
| d. | February 13, 2003 IG investigation reopening attempt | Different management version (TR pp 490-497, 630-636, 1548-1550) |
| f. | March 6, 2002 recurring IG sensing sessions | (TR pp 723-731) |
| h. | January 30, 2003 GS-15 support form disapproval | (TR pp 511-515) |
| i-2002. | January 2002 witness in counseling sessions | (TR pp 515-520) |
| j. | January 2004 and November 2003 "failing" performance assessment by MG Griffin | (TR pp 950-953) |
| r. | November 2002 Korea travel request denial | (IF pp 3180 - 3188d) |
| s-2002. | May 2002 SES training denial | (TR pp 540-549) |

## Does this conduct constitute illegal harassment?

As discussed above, determining whether the proven conduct constitutes harassment requires inquiry into the 5 following elements:

1. Membership in a protected class;
2. Unwelcome or insulting verbal or physical conduct;
3. Conduct based on your client's membership in the protected class;
4. Harassment that was sufficiently severe or pervasive to affect a term or condition of employment; and,
5. The employer knew or should have known of the harassment in question and failed to take prompt remedial action.

1. _Protected group membership_. Your client has proven membership in the following protected groups: race (African American), color (Black), gender (female), age (DOB - July 22, 1944), and reprisal (prior EEO activity between April 3, 2003 and March 1, 2006).

2. _Unwelcome conduct_. We will assume, for argument's sake, that your client met the second _prima facie_ element by virtue of your client's eventual complaints about the matters at issue.

3. _Conduct based upon protected groups status_. The weight of the evidence of record is insufficient to prove the third _prima facie_ element as to any of the incidents because the record does not support a finding that these incidents occurred because of your client's protected group status. Specifically, the record does not support a finding that the Complainant identified any similarly situated comparators who were treated differently in similar circumstances, or any other evidence from which to infer

- 36 -

discriminatory animus; while, management's articulated nondiscriminatory reasons were not pretextual,[22] as indicated in the evidence referenced below:

| Incident No. | Incident Description | Supporting Evidence |
|---|---|---|
| c. & z. - 2001 | January 8, 2002 Level 2 2001 performance rating and step increase denial | No evidence of discriminatory animus[23] |
| d. | February 13, 2003 IG investigation reopening attempt | (TR pp 121, 490-497, 630-636, 717-720, 854, 1036-1047, 1058, 1202-1205, 1257-1271, 1548-1550, 1641-1649) |
| f. | March 6, 2002 recurring IG sensing sessions | (TR pp 135, 503-511, 723-731, 946-948, 1343-1344, 1353-1354, 1359, 1366-1368 ; IF pp 2335-2336, 2834-2836)[24] |
| h. | January 30, 2003 GS-15 support form disapproval | (TR pp 157, 511-515; IF p 3151) |
| i-2002. | January 2002 witness in counseling sessions | (TR pp 169-171, 515-520)[25] |
| j. | January 2004 and November 2003 "failing" performance assessment by MG Griffin | (TR pp 172-174, 950-953) |
| r. | November 2002 Korea travel request denial | (TR pp 252, 535-539, 1076; IF pp 3180 - 3188d) |

[22] I note that despite several requests, the Complainant did not provide a pretext statement (IF pp 3673-3675, 3691; TR pp 2471-2472).

[23] The Complainant alleges only that she was perceived as too powerful, and that "they" did not want a black female in the position (TR pp 61-62); however, the record contains no evidence to corroborate this assertion. Likewise, no corroborating evidence is extant as to the bare assertion that upon the Complainant's 1997 appointment to the PARC position, it was implied that she was appointed due to her race (TR p 62-64). While the Complainant was the only SES in her chain of command whose rating changed, management articulated legitimate reasons for the change without a showing of pretext (TR pp 429-438, 444, 673-693, 575-628, 1650-1651; IF pp 1955-1958).

[24] Contrary to Complainant's assertions, other SESs also had sensing sessions (TR pp 729-730).

[25] The Complainant contradicts herself by stating that these witnesses were subordinate to her, but then stating that she was not their supervisor; followed by a statement that the witnesses were of lower rank than she ("one star equivalent"). Without according any weight to the Complainant's assertions regarding the witnesses rank, I note that the Complainant admitted that both witnesses were BG promoteable (TR pp 169-171). Even if the witnesses were of lower rank, I note that the Complainant did not identify any Army regulation which prohibited a lower ranking witness from being present at the counseling session of a higher ranking employee.

| s-2002. | May 2002 SES training denial | (TR pp 263-264, 543-547, 1577-1581; IF pp 3193b-3193c) |
|---------|------------------------------|--------------------------------------------------------|

**4 and 5.** <u>Conduct Sufficiently Severe and/or Pervasive and Employer Liability</u>. In the absence of proof of the above 3 elements, it is unnecessary to make a finding as to the remaining *prima facie* elements of a hostile work environment. I find that the weight of the evidence is insufficient to prove the existence of an illegal hostile work environment.

## Conclusion

Pursuant to my authority to decide this matter on behalf of the Secretary of the Army, I find that your client was not the victim of discrimination based upon the evidence in the case file and for the reasons cited above.

Since your client is not a prevailing party, although represented by an attorney, she is not entitled to any relief, including attorney's fees or costs. Also, attorney's fees are not payable during the administrative processing of age discrimination complaints.

If your client is not satisfied with this decision, her appeal rights follow:

## APPEAL RIGHTS FOR NONMIXED COMPLAINT CLAIMS

An appeal may be filed with the Equal Employment Opportunity Commission [Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, DC 20036] within <u>30 calendar days</u> of the date of receipt of this decision. The <u>30-day</u> period for filing an appeal begins on the date of receipt of this decision. An appeal shall be deemed timely if it is delivered in person, transmitted by facsimile or postmarked before the expiration of the filing period or, in the absence of a legible postmark, the appeal is received by the Commission by mail within 5 days after the expiration of the filing period. The complainant will serve a copy of the Notice of Appeal/Petition, EEOC Form 573, to the agency [Deputy for Equal Employment Opportunity Compliance and Complaints Review, Department of the Army, ATTN: SAMR-EO-CCR, 1901 South Bell Street, Suite 109B, Arlington, Virginia 22202-4508] <u>[and furnish a copy to the agency representative at the address on the enclosed Certificate of Service (Enclosure 1)]</u> at the same time it is filed with the Commission. In or attached to the appeal to the Commission, the complainant must certify the date and method by which service was made to the agency [Deputy for Equal Employment Opportunity Compliance and Complaints Review].

The complainant may file a brief or statement in support of his/her appeal with the Office of Federal Operations. The brief or statement must be filed within <u>30 calendar days</u> from the date the appeal is filed. The complainant will serve a copy of the brief or statement in support of his/her appeal to the agency [Deputy for Equal Employment Opportunity Compliance and Complaints Review and to the agency

- 38 -

representative at the addresses shown above] at the same time the brief or statement is filed with the Commission. The regulation providing for appeal rights is contained in Title 29 of the Code of Federal Regulations, a section of which is reproduced below:

**Section 1614.401  Appeals to the Commission.**

(a)  A complainant may appeal an agency's final action or complaint dismissal.

(b)  An agency may appeal as provided in Section 1614.110(a).

(c)  A class agent or an agency may appeal an administrative judge's decision accepting or dismissing all or part of a class complaint; a class agent may appeal a final decision on a class complaint; a class member may appeal a final decision on a claim for individual relief under a class complaint; and a class member, a class agent or an agency may appeal a final decision on a petition pursuant to Section 1614.204(g)(4).

(d)  A grievant may appeal the final decision of the agency, the arbitrator or the Federal Labor Relations Authority (FLRA) on the grievance when an issue of employment discrimination was raised in a negotiated grievance procedure that permits such issues to be raised. A grievant may not appeal under this part, however, when the matter initially raised in the negotiated grievance procedure is still ongoing in that process, is in arbitration, is before the FLRA, is appealable to the MSPB [Merit Systems Protection Board] or if 5 U.S.C. 7121(d) is inapplicable to the involved agency.

(e)  A complainant, agent or individual class claimant may appeal to the Commission an agency's alleged noncompliance with a settlement agreement or final decision in accordance with Section 1614.504.

**Section 1614.402  Time for appeals to the Commission**

(a)  Appeals described in Section 1614.401(a) and (c) must be filed within 30 days of receipt of the dismissal, final action or decision. Appeals described in Section 1614.401(b) must be filed within 40 days of receipt of the hearing file and decision. Where a complainant has notified the EEO Director [Deputy for Equal Employment Opportunity Compliance and Complaints Review] of alleged noncompliance with a settlement agreement in accordance with Section 1614.504, the complainant may file an appeal 35 days after service of the allegations of noncompliance, but no later than 30 days after receipt of the agency's determination.

(b)  If the complainant is represented by an attorney of record, then the 30-day time period provided in paragraph (a) of this section within which to appeal shall be calculated from the receipt of the required document by the attorney. In all other instances, the time within which to appeal shall be calculated from the receipt of the required document by the complainant.

**Section 1614.403  How to appeal.**

(a)  The complainant, agency, agent, grievant or individual class claimant (hereinafter appellant) must file an appeal with the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, DC 20036, or by personal delivery or facsimile.  Please use EEOC Form 573, Notice of Appeal/Petition [copy enclosed], and indicate what is being appealed.

(b)  The appellant shall furnish a copy of the appeal to the opposing party [Deputy for Equal Employment Opportunity Compliance and Complaints Review and to the agency representative – addresses shown above] at the same time it is filed with the Commission.  In or attached to the appeal to the Commission, the appellant must certify the date and method by which service was made on the opposing party [Deputy for Equal Employment Opportunity Compliance and Complaints Review].

(c)  If an appellant does not file an appeal within the time limits of this subpart, the appeal shall be dismissed by the Commission as untimely.

(d)  Any statement or brief on behalf of a complainant in support of the appeal must be submitted to the Office of Federal Operations within 30 days of filing the notice of appeal.  Any statement or brief on behalf of the agency in support of its appeal must be submitted to the Office of Federal Operations within 20 days of filing the notice of appeal.  The Office of Federal Operations will accept statements or briefs in support of an appeal by facsimile transmittal, provided they are no more than 10 pages long.

(e)  The agency must submit the complaint file to the Office of Federal Operations within 30 days of initial notification that the complainant has filed an appeal or within 30 days of submission of an appeal by the agency.

(f)  Any statement or brief in opposition to an appeal must be submitted to the Commission and served on the opposing party within 30 days of receipt of the statement or brief supporting the appeal, or, if no statement or brief supporting the appeal is filed, within 60 days of receipt of the appeal.  The Office of Federal Operations will accept statements or briefs in opposition to an appeal by facsimile provided they are no more than 10 pages long.

**Section 1614.407  Civil action: Title VII, Age Discrimination in Employment Act and Rehabilitation Act.**

A complainant who has filed an individual complaint, an agent who has filed a class complaint or a claimant who has filed a claim for individual relief pursuant to a class complaint is authorized under Title VII, the ADEA [Age Discrimination in Employment Act] and the Rehabilitation Act to file a civil action in an appropriate United States District Court:

(a) *Within 90 calendar days of receipt of the final action on an individual or class complaint if no appeal has been filed;*

(b) *After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and final action has not been taken;*

(c) *Within 90 days of receipt of the Commission's final decision on an appeal; or*

(d) *After 180 days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.*

**Section 1614.409  Effect of filing a civil action.**

*Filing a civil action under § 1614.408 or § 1614.409 shall terminate Commission processing of the appeal.  If private suit is filed subsequent to the filing of an appeal, the parties are requested to notify the Commission in writing.*

If a civil action is filed and complainant does not have or is unable to obtain the services of a lawyer, the complainant may request the court to appoint a lawyer.  In such circumstances as the court may deem just, the court may appoint a lawyer to represent the complainant and may authorize the commencement of the action without the payment of fees, costs, or security.  Any such request must be made within the 90-day time limit for filing suit and in such form and manner as the court may require.

You are further notified that if your client files a civil action, she must name the appropriate Department or Agency head as the defendant and provide his or her official title.  **DO NOT NAME JUST THE AGENCY OR DEPARTMENT.**  Failure to name the head of the Department or Agency or to state her or her official title may result in the dismissal of the case.  The appropriate agency is the Department of the Army.  The head of the Department of the Army is the Honorable Francis J. Harvey, who is the Secretary of the Army.

**DOCKET NUMBER**

The docket number identified on page one of this letter should be used on all correspondence.

Sincerely,

Ramón Suris-Fernandez, Esq.
Deputy Assistant Secretary
   (Equal Employment Opportunity and Civil Rights)

Enclosure

ATTACHMENT A
Page 1

CHRONOLOGICAL CHART

| | A<br>Date | B<br>Issue # | C<br>Issue | D<br>Incidents in Chronological Order With RMO color codes | E<br>RMO |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | 2/18/2003 | | Timely Issue<br>Cutoff Date | Cutoff for timely issues: 45 Days Before Initial EEO Counselor Contact on April 3, 2003 | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | 6/23/2003 | | EEO Contact | Informal EEO Complaint Filed | |
| 15 | | | | | |
| 16 | | | | | |

ATTACHMENT A
Page 2

CHRONOLOGICAL CHART

| | A | B | C | D | E |
|---|---|---|---|---|---|
| | Date | Issue # | Issue | Incidents in Chronological Order With RMO color codes | RMO |
| 1 | | | | | |
| 17 | | | | | |
| 18 | 10/14/2003 | | NRTF Rec'd | Notice of Right to File a Formal Complaint Received | |
| 19 | 10/14/2003 | | Filed Formal | Formal EEO Complaint Filed | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | 1/28/2004 | | Amendment 1 | Amendment No. 1 | |
| 25 | | | | | |
| 26 | 1/29/2004 | 2. | Step Increase Denials | Management denied her step increases for the performance periods of 2000-2001 (unknown), 2001-2002 (July 31, 2003), and 2002-2003 (January 29, 2004) | MG Van Winkle |
| 27 | | | | | |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |

ATTACHMENT A
Page 3

CHRONOLOGICAL CHART

| | A Date | B Issue # | C Issue | D Incidents in Chronological Order With RMO color codes | E RMO |
|---|---|---|---|---|---|
| 1 | | | | | |
| 32 | 3/15/2004 | | Amendment 2 | Amendment No. 2 | PROGRAM |
| 33 | | | | | PROGRAM |
| 34 | | | | | |
| 35 | 8/20/2004 | | Amendment 3 | Amendment No. 3 | |
| 36 | | | | | |
| 37 | 10/14/2004 | | Amendment 4 | Amendment No. 4 | |
| 38 | | | | | |
| 39 | 9/5/2005 | | Amendment 5 | Amendment No. 5 | |
| 40 | | | | | |
| 41 | | | | | |
| 42 | 2/23/2006 | | Amendment 6 | Amendment No. 6 | |
| 43 | 3/1/2006 | | Amendment 7 | Amendment No. 7 | |
| 44 | | | | | |

## NOTICE OF APEAL/PETITION
## TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### OFFICE OF FEDERAL OPERATIONS
P. O. Box 19848
Washington, DC 20036

**Complainant Information: (Please Print or Type)**

Complainant's Name
(Last, First M.I.):

Home/Mailing Address:

City, State, ZIP Code:

Daytime Telephone #
(with Area Code)

E-mail address (if any):

**Attorney/Representative Information ( any):**

Attorney Name:

Non-Attorney Representative
Name:

Address:

City, State, ZIP Code:

Telephone Number
(if applicable):

E-mail address (if any):

EEOC Form 573 REV 1/01

## General Information

Name of the agency being
Charged with discrimination:

_____

Identify the Agency's
Complaint Number:

_____

Location of the duty station or
Local facility in which the
complaint arose:

_____

Has a final action been taken          _____Yes;  Date Received _____  (Attach Copy)
by the agency, an Arbitrator,
FLRA, or MSPB on this                   _____No;
Complaint?                              This appeal alleges a breach of settlement agreement.

_____

Has a complaint been filed on           _____No
this same matter with the
EEOC, another agency, or                 _____Yes   (Indicate the agency or procedure,
through any other                        complaint/docket number, and attach a copy, if appropriate.)
administrative or collective
bargaining procedures?

_____

Has a civil action (lawsuit)            _____No
been filed in connection
with this complaint?                    _____Yes  (Attach a copy of the civil action filed)

**NOTICE:**  Please attach a copy of the final decision or order from which you are appealing.  If a
Hearing was requested, please attach a copy of the agency's final order and a copy of the EEOC
Administrative Judge's decision.  Any comments or brief in support of this appeal MUST be filed
with the EEOC and with the agency within 30 days of the date of this appeal is filed.  The date the
appeal is filed is the date on which it is postmarked, hand delivered, or faxed to the EEOC at the
address above.

Signature of complainant or
Complainant's representative:

_____

Date:

EEOC Form 573 REV 7/01

# PRIVACY ACT STATEMENT

(This form is covered by the Privacy Act of 1974, Public Law 93-597. Authority for requesting the personal data and the use thereof are given below.)

1.  **FORM NUMBER/TITLE/DATE:** EEOC Form 573, Notice of Appeal/Petition, January 2001.

2.  **AUTHORITY:** 42 U.S.C. & Sect; 2000e-16.

3.  **PRINCIPAL PURPOSE:** The purpose of this questionnaire is to solicit information to enable
    the Commission to properly and effectively adjudicate appeals filed by Federal employees, former Federal employees, and applicants for Federal employment.

4.  **ROUTINE USES:** Information provided on this form will be used by Commission employees to determine: (a) the appropriate agency from which to request relevant files; (b) whether the appeal is timely; (c) whether the Commission has jurisdiction over the issue(s) raised in the appeal, and (d) generally, to assist the Commission in properly processing and deciding appeals. Decisions of the Commission are final administrative decisions, and, as such, are available to the public under the provisions of the Freedom of Information Act. Some information may also be used in depersonalized form as a data Base for statistical purposes.

5.  **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION:** Since your appeal is a voluntary action, you are not required to provide any personal information in connection with it. However, failure to supply the Commission with the requested information could hinder timely processing of your case, or even result in the rejection or dismissal of your appeal.

---

Send your appeal to:

### The Equal Employment Opportunity Commission
### Office of Federal Operations
### P. O. Box 19848
### Washington, D.C.  20036

---

EEOC Form 573 REV 1/01

**DEPARTMENT OF THE ARMY**
**QUAL EMPLOYMENT OPPORTUNITY COMPLIANCE**
**AND COMPLAINTS REVIEW**

Bunnatine H. Greenhouse )
)
                  Complainant )
)
             v. )  DA Docket No:  ARHQOSA03AUG0109
)
Francis J. Harvey, Secretary of the Army )
)
             Agency )

## CERTIFICATE OF SERVICE

    I hereby certify that on the date shown below, I transmitted the Army's final decision, with Attachment A, EEOC Form 573, and this Certificate of Service (Enclosure 1), to the following parties:

**Certified Mail - Return Receipt Requested**

Ms. Bunnatine H. Greenhouse
11300 Stones Throw Drive
Reston, Virginia 20194

Michael D. Kohn, Esquire
Kohn, Kohn, & Colapinto, P.C., LLP
3233 P. Street, N.W.
Washington, DC 20007

**Electronic Mail**

Department of the Army
Office of the Administrative Secretary
ATTN:  JDRP-EE (Mrs. Debra A. Muse)
Zachary Taylor Building
2531 Jefferson Davis Highway, Room 9E22
Arlington, Virginia  22202-3905
Email Address: debra.muse@hqda.army.mil

Chief of Engineers,
Headquarters, U.S. Army Corps of Engineers
ATTN: Office of Counsel (Richard Frenette, Esq.) (Agency Representative)
441 G Street, NW
Washington, DC 20314-1000
Email Address: richardJ.frenette@us.army.mil

Chief of Engineers
Headquarters, U.S. Army Corps of Engineers
ATTN: CEEO (Mr. Williams)
441 G Street, NW
Washington, DC 21314-1000
Gonzellas.E.Williams@hq2.usace.army.mil

Date: ___12/26/06___    _____
                        EEO Assistant

hp officejet 4200 series 4215                    Personal Printer/Fax/Copier/Scanner

Log for
1/3/2007 1:20PM

Last Transaction

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| 01/03 | 12:58p | Received | 7036023491 | 21:43 | 49 | OK |